1

**POMERANTZ LLP**
Jennifer Pafiti (SBN 282790)

2

1100 Glendon Avenue, 15th Floor

3

Los Angeles, California 90024
Telephone: (310) 405-7190

4

jpafiti@pomlaw.com

5

*Attorney for Plaintiff*

6

*[Additional Counsel on Signature Page]*

7

8

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

9

10

| | |
|---|---|
| ALDEN CHUNG, Individually and on Behalf of All Others Similarly Situated, | Case No. |
| Plaintiff, | **CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |
| v. | |
| EARGO, INC., CHRISTIAN GORMSEN, and ADAM LAPONIS, | **DEMAND FOR JURY TRIAL** |
| Defendants. | |

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CLASS ACTION COMPLAINT

Plaintiff Alden Chung ("Plaintiff"), individually and on behalf of all others similarly situated, by and through Plaintiff's attorneys, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge.  Plaintiff's information and belief is based upon, among other things, the investigation by Plaintiff's counsel, which includes without limitation: (a) review and analysis of regulatory filings made by Eargo, Inc. ("Eargo" or the "Company") with the United States ("U.S.") Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by Eargo; and (c) review of other publicly available information concerning Eargo.

## NATURE OF THE ACTION

1.      This is a class action on behalf of persons and entities that purchased or otherwise acquired Eargo securities between February 25, 2021 and September 22, 2021, inclusive (the "Class Period"). Plaintiff pursues claims against the Defendants under the Securities Exchange Act of 1934 (the "Exchange Act").

2.      Eargo is a medical device company.  The Company claims that its hearing aids "are the first and only virtually invisible, rechargeable, completely-in-canal, FDA-regulated, exempt Class I and Class II devices for the treatment of hearing loss."

3.      On August 12, 2021, after the market closed, Eargo revealed that claims submitted to the Company's largest third-party payor, which accounted for 80% of Eargo's accounts receivable, had not been paid since March 1, 2021.

4.      On this news, the Company's share price fell $8.00, or over 24%, to close at $24.70 per share on August 13, 2021, on unusually heavy trading volume.

5.      On September 22, 2021, after the market closed, Eargo revealed that "it is the target of a criminal investigation by the U.S. Department of Justice (the 'DOJ') related to insurance reimbursement

claims the Company has submitted on behalf of customers covered by federal employee health plans."

Moreover, the DOJ is the "principal contact related to the subject matter of the [ongoing] audit" of Eargo

by an insurance company that is the Company's largest third-party payor.  As a result of the foregoing,

Eargo withdrew its full year financial guidance.

6.      On this news, the Company's share price fell $14.81, or over 68%, to close at $6.86 per

share on September 23, 2021, on unusually heavy trading volume.

7.      Throughout the Class Period, Defendants made materially false and/or misleading

statements, as well as failed to disclose material adverse facts about the Company's business, operations,

and prospects.  Specifically, Defendants failed to disclose to investors: (i) that Eargo had improperly

sought reimbursements from certain third-party payors; (ii) that the foregoing was reasonably likely to

lead to regulatory scrutiny; (iii) that, as a result and because the reimbursements at issue involved the

Company's largest third-party payor, Eargo's financial results would be adversely impacted; and (iv)

that, as a result of the foregoing, Defendants' positive statements about the Company's business,

operations, and prospects were materially misleading and/or lacked a reasonable basis.

8.      As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the

market value of the Company's securities, Plaintiff and other Class members have suffered significant

losses and damages.

**JURISDICTION AND VENUE**

9.      The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15

U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-

5).

10.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §

1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

11.     Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)).  Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District.  Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District.  In addition, the Company's principal executive offices are located in this Judicial District.

12.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the U.S. mail, interstate telephone communications, and the facilities of a national securities exchange.

**PARTIES**

13.     Plaintiff, as set forth in the accompanying certification, incorporated by reference herein, purchased Eargo securities during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

14.     Defendant Eargo is incorporated under the laws of Delaware with its principal executive offices located in San Jose, California.  Eargo's common stock trades on the NASDAQ exchange ("NASDAQ") under the symbol "EAR."

15.     Defendant Christian Gormsen ("Gormsen") was the Company's Chief Executive Officer at all relevant times.

16.     Defendant Adam Laponis ("Laponis") was the Company's Chief Financial Officer at all relevant times.

17.     Defendants Gormsen and Laponis (collectively, the "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases and presentations to securities analysts, money and

portfolio managers and institutional investors, *i.e.*, the market.  The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.  The Individual Defendants are liable for the false statements pleaded herein.

## SUBSTANTIVE ALLEGATIONS

### Background

18.     Eargo is a medical device company.  The Company claims that its hearing aids "are the first and only virtually invisible, rechargeable, completely-in-canal, FDA-regulated, exempt Class I and Class II devices for the treatment of hearing loss."

### Materially False and Misleading Statements Issued During the Class Period

19.     The Class Period begins on February 25, 2021.  On that day, Eargo announced its fourth quarter and full year 2020 financial results in a press release that stated, in relevant part:

**Recent Highlights:**

- Net revenues of $22.4 million in the fourth quarter and $69.2 million for the full year of 2020, representing 110.8% and 110.9% increases, respectively, over the corresponding periods of 2019

- Gross systems shipped of 12,096 in the fourth quarter and 38,243 for the full year of 2020, representing 67.7% and 67.8% increases, respectively, over the corresponding periods of 2019

- Return accrual rate of 24.4% in the fourth quarter and 25.9% for the full year of 2020, representing a 9.6 and 9.0 percentage point improvement, respectively, over the corresponding periods of 2019

- Gross margin of 70.6% in the fourth quarter and 68.4% for the full year of 2020, representing a 15.4 and 16.6 percentage point improvement, respectively, over the corresponding periods of 2019; non-GAAP gross margin of 70.8% in the fourth quarter and 68.5% for the full year of 2020 representing a 15.5 and 16.6 percentage point improvement, respectively, over the corresponding periods of 2019

\* \* \*

**Full Year 2021 Financial Guidance**

- Net revenue of between $87 million and $93 million

- GAAP gross margin of between 68% and 71%

- Non-GAAP gross margin of between 70% and 72%

20.     On March 16, 2021, Eargo filed its annual report on Form 10-K for the period ended December 31, 2020 (the "2020 10-K"), affirming the previously reported financial results.   Regarding reimbursements from third-party payors, the 2020 10-K stated:

> ***Changes in third-party coverage and reimbursement may impact our ability to grow and sell our products.***
>
> Our products are primarily purchased on a cash-pay basis and currently only have limited coverage by third-party payors. Third-party coverage and reimbursement may increase for certain hearing aids but not our products, or could decrease for our products, which could reduce our market share. The process for determining whether a third-party payor will provide coverage for a product may be separate from the process for establishing the reimbursement rate that such a payor will pay for the product. A payor's decision to provide coverage for a product does not imply that an adequate reimbursement rate will be approved. Further, one payor's determination to provide coverage for a product does not assure that other payors will also provide such coverage. Third-party coverage and reimbursement may never become available to us at sufficient levels.

21.     On May 12, 2021, Eargo announced its first quarter 2021 financial results in a press release that stated, in relevant part:

**Recent Highlights:**

- Net revenues of $22.0 million, up 74.0% year-over-year

- Gross systems shipped of 11,704, up 66.5% year-over-year

- Return accrual rate of 23.2%, a 4.4 percentage point improvement year-over-year

- GAAP gross margin of 71.4%, up 8.2 percentage points year-over-year; non-GAAP gross margin of 72.2%, up 9.0 percentage points year-over-year

\* \* \*

**Full Year 2021 Financial Guidance**

- Increasing net revenue guidance from between $87 million and $93 million to between $89 million and $93 million

- Reiterating GAAP gross margin guidance of between 68% and 71%

- Reiterating non-GAAP gross margin of between 70% and 72%

22.    On May 13, 2021, Eargo filed its quarterly report on Form 10-Q for the period ended March 31, 2021 (the "1Q21 10-Q"), affirming the previously reported financial results. Regarding third-party payors, the 1Q21 10-Q stated, in relevant part:

> *A significant portion of our revenue is dependent upon reimbursement from third-party payors. Any material changes to third-party coverage or reimbursement could significantly impact our business and our ability to grow and sell our products.*
>
> A significant portion of our revenue depends on payments from third-party payors that we submit claims to on behalf of our customers. If there are decreases in hearing aid benefits offered under these plans, our ability to seek third-party reimbursement could be reduced. Decreases in hearing benefits could lead to changes in the amount these plans will pay for hearing aids, the types of providers these plans allow their members to see for hearing aids, or how often the plans will pay for hearing aids. If we fail to maintain access to existing levels of coverage and reimbursement for our products, our business and operating results could be adversely affected.
>
> We currently submit claims on behalf of customers to a concentrated number of third-party payors under certain benefit plans. Additionally, third-party payors periodically conduct pre- and post-payment reviews, including audits of previously submitted claims, and we are currently experiencing and may experience such reviews and audits of claims in the future. *For example, we are currently subject to a routine audit with our largest third-party payor, who accounted for approximately 57% of the Company's gross accounts receivable as of March 31, 2021.* Such reviews and audits of our claims have resulted and could in the future result in significant delays in payment, and could result in material recoupments of previous claims paid or denials of pending or future claims, which could impact our ability to recognize revenue, reduce our net sales and profitability, or result in the loss of our ability to submit claims to certain third-party payors for payment.

(Second emphasis added.)

23.     The above statements identified in ¶¶ 19-22 were materially false and/or misleading, and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants failed to disclose to investors: (i) that Eargo had improperly sought reimbursements from certain third-party payors; (ii) that the foregoing was reasonably likely to lead to regulatory scrutiny; (iii) that, as a result and because the reimbursements at issue involved the Company's largest third-party payor, Eargo's financial results would be adversely impacted; and (iv) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

24.     The truth began to emerge on August 12, 2021, after the market closed, when Eargo revealed that claims submitted to the Company's largest third-party payor had not been paid since March 1, 2021.  In a press release announcing its second quarter 2021 financial results, Eargo stated, in relevant part:

> Accounts receivable, net was $15.4 million as of June 30, 2021. The increase in accounts receivable from March 31, 2021 was primarily due to a claims audit by an insurance company that is our largest third-party payor, who accounted for approximately 80% of our gross accounts receivable as of June 30, 2021. ***During the audit, claims since March 1, 2021 have not been paid***. The Company is in active discussions with the payor and continues to work toward conclusion of the audit.
>
> **Full Year 2021 Financial Guidance**
>
> - Increasing net revenue guidance from between $89 million and $93 million to between $93 million and $96 million
>
> - Reiterating GAAP gross margin guidance of between 68% and 71%
>
> - Reiterating non-GAAP gross margin of between 70% and 72%

25.     Moreover, the same day, Eargo filed its quarterly report on Form 10-Q for the period ended June 30, 2021 (the "2Q21 10-Q"), affirming the previously reported financial results.  Regarding third-party payors, the 2Q21 10-Q stated:

> **A significant portion of our revenue is dependent upon reimbursement from third-party payors. Any material changes to third-party coverage or reimbursement or adverse outcomes of third-party payor audits could significantly impact our business and our ability to grow and sell our products.**
>
> A significant portion of our revenue depends on payments from third-party payors that we submit claims to on behalf of our customers. If there are decreases in hearing aid benefits offered under these plans, our ability to seek third-party reimbursement could be reduced. Decreases in hearing benefits could lead to changes in the amount these plans will pay for hearing aids, the types of providers these plans allow their members to see for hearing aids, or how often the plans will pay for hearing aids. If we fail to maintain access to existing levels of coverage and reimbursement for our products, our business and operating results could be adversely affected.
>
> We currently submit claims on behalf of customers to a concentrated number of third-party payors under certain benefit plans. Additionally, third-party payors periodically conduct pre- and post-payment reviews, including audits of previously submitted claims, and we are currently experiencing and may experience such reviews and audits of claims in the future. ***For example, we are currently subject to a claims audit with our largest third-party payor, who accounted for approximately 80% of our gross accounts receivable as of June 30, 2021, during which claims submitted since March 1, 2021 have not been paid. Reimbursement claims submitted to another insurance company are also currently undergoing an audit***, and to date claims from this insurance company have been processed and approved consistent with normal business practices during the audit. In addition to the risk that the insurance companies may deny the claims subject to the current audits, and we have received some denials to date, it is possible that they may seek recoupments of previous claims paid and deny any future claims. ***While we believe the claims submitted are valid and reimbursable with these insurance companies, and there exist processes for appeal and, if necessary, corrective action, an unfavorable outcome of the ongoing audits could have a material adverse effect on our future financial results, including our revenue recognition, sales return rate and bad debt reserve***. We are unable to provide assurances regarding the outcome of these audits. Such reviews and audits of our claims have resulted and could in the future result in significant delays in payment, and could result in material recoupments of previous claims paid or denials of pending or future claims, which could impact our ability to recognize revenue, reduce our net sales and profitability, or result in the loss of our ability to submit claims to certain third-party payors for payment.

(Second and third emphases added.)

26.     On this news, the Company's share price fell $8.00, or over 24%, to close at $24.70 per share on August 13, 2021, on unusually heavy trading volume.

27.     The 2Q21 10-Q also stated that the Company may be subject to penalties for violations of certain healthcare laws and regulations.  Specifically, the 2Q21 10-Q stated:

> **If we fail to comply with U.S. or foreign federal and state healthcare regulatory laws, we could be subject to penalties, including, but not limited to, administrative, civil and criminal penalties, damages, fines, disgorgement, exclusion from participation in governmental healthcare programs and the curtailment of our operations, any of which could adversely impact our reputation and business operations**.

> To the extent our products are or become covered by any federal or state government healthcare program, our operations and business practices may expose us to broadly applicable fraud and abuse and other healthcare laws and regulations. These laws may constrain the business or financial arrangements and relationships through which we conduct our operations, including our sales and marketing practices, consumer incentive and other promotional programs and other business practices. Such laws include, without limitation:

> * * *

> - the U.S. federal false claims laws, including the False Claims Act, which can be enforced through whistleblower actions, and civil monetary penalties laws, which, among other things, impose criminal and civil penalties against individuals or entities for knowingly presenting, or causing to be presented, to the U.S. federal government, claims for payment or approval that are false or fraudulent, knowingly making, using or causing to be made or used, a false record or statement material to a false or fraudulent claim, or from knowingly making a false statement to avoid, decrease or conceal an obligation to pay money to the U.S. federal government. In addition, the government may assert that a claim including items and services resulting from a violation of the U.S. federal Anti-Kickback Statute constitutes a false or fraudulent claim for purposes of the False Claims Act;

28.     The above statements identified in ¶¶ 24-25 and 27 were materially false and/or misleading, and failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, Defendants failed to disclose to investors: (i) that Eargo had improperly sought reimbursements from certain third-party payors; (ii) that the foregoing was reasonably likely to lead to regulatory scrutiny; (iii) that, as a result and because the reimbursements at issue involved the Company's

largest third-party payor, Eargo's financial results would be adversely impacted; and (iv) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

### Disclosures at the End of the Class Period

29.     On September 22, 2021, after the market closed, Eargo revealed that "it is the target of a criminal investigation by the U.S. Department of Justice (the 'DOJ') related to insurance reimbursement claims the Company has submitted on behalf of customers covered by federal employee health plans." Moreover, the DOJ is the "principal contact related to the subject matter of the [ongoing] audit" of Eargo by an insurance company that is the Company's largest third-party payor.  As a result of the foregoing, Eargo withdrew its full year financial guidance.  Specifically, the Company filed a Form 8-K with the SEC that stated, in relevant part:

> On September 21, 2021, Eargo, Inc. (the "Company") was informed that it is the target of a criminal investigation by the U.S. Department of Justice (the "DOJ") related to insurance reimbursement claims the Company has submitted on behalf of its customers covered by federal employee health plans. The Company is cooperating with the investigation. In addition, the Company intends to work with the government with the objective of validating the process to support any future claims that the Company may submit for reimbursement.

> As previously disclosed, the Company has been the subject of an ongoing claims audit by an insurance company that is the Company's largest third-party payor. The Company has been informed by the insurance company that the DOJ is now the principal contact related to the subject matter of the audit.

> In light of this information, the Company is withdrawing its financial guidance for the fiscal year ending December 31, 2021.

30.     On this news, the Company's share price fell $14.81, or over 68%, to close at $6.86 per share on September 23, 2021, on unusually heavy trading volume.

### PLAINTIFF'S CLASS ACTION ALLEGATIONS

31.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that purchased or otherwise

acquired Eargo securities during the Class Period, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

32.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Eargo's shares actively traded on the NASDAQ.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least hundreds or thousands of members in the proposed Class.  Millions of Eargo shares were traded publicly during the Class Period on the NASDAQ.  Record owners and other members of the Class may be identified from records maintained by Eargo or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

33.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

34.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

35.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of Eargo; and

(c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

36.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.   Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them.   There will be no difficulty in the management of this action as a class action.

## UNDISCLOSED ADVERSE FACTS

37.     The market for Eargo's securities was open, well-developed, and efficient at all relevant times.   As a result of these materially false and/or misleading statements, and/or failures to disclose, Eargo's securities traded at artificially inflated prices during the Class Period.   Plaintiff and other members of the Class purchased or otherwise acquired Eargo's securities relying upon the integrity of the market price of the Company's securities and market information relating to Eargo, and have been damaged thereby.

38.     During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Eargo's securities, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading.   The statements and omissions were materially false and/or misleading because they failed to disclose material adverse information and/or misrepresented the truth about Eargo's business, operations, and prospects as alleged herein.

39.     At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Eargo's financial well-being and prospects.  These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its financial well-being and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times.  Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein when the truth was revealed.

## LOSS CAUSATION

40.     Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

41.     During the Class Period, Plaintiff and the Class purchased Eargo's securities at artificially inflated prices and were damaged thereby.  The price of the Company's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## SCIENTER ALLEGATIONS

42.     As alleged herein, Defendants acted with scienter since Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, the Individual Defendants, by virtue of their receipt of information

reflecting the true facts regarding Eargo, their control over, and/or receipt and/or modification of Eargo's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Eargo, participated in the fraudulent scheme alleged herein.

**APPLICABILITY OF PRESUMPTION OF RELIANCE**

**<u>(FRAUD-ON-THE-MARKET DOCTRINE)</u>**

43.     The market for Eargo's securities was open, well-developed, and efficient at all relevant times.  As a result of the materially false and/or misleading statements and/or failures to disclose, Eargo's securities traded at artificially inflated prices during the Class Period.  On February 25, 2021, the Company's share price closed at a Class Period high of $61.16 per share.  Plaintiff and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of Eargo's securities and market information relating to Eargo, and have been damaged thereby.

44.     During the Class Period, the artificial inflation of Eargo's shares was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Eargo's business, prospects, and operations.  These material misstatements and/or omissions created an unrealistically positive assessment of Eargo and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company's shares.  Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

45.     At all relevant times, the market for Eargo's securities was an efficient market for the following reasons, among others:

(a)     Eargo shares met the requirements for listing, and were listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)     As a regulated issuer, Eargo filed periodic public reports with the SEC and/or the NASDAQ;

(c)     Eargo regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

(d)     Eargo was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

46.     As a result of the foregoing, the market for Eargo's securities promptly digested current information regarding Eargo from all publicly available sources and reflected such information in Eargo's share price.  Under these circumstances, all purchasers of Eargo's securities during the Class Period suffered similar injury through their purchase of Eargo's securities at artificially inflated prices and a presumption of reliance applies.

47.     A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions. Because this action involves Defendants' failure to disclose material adverse information regarding the

Company's business operations and financial prospects—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## NO SAFE HARBOR

48.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Eargo who knew that the statement was false when made.

## COUNT I

### (Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)

49.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

50.     During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase Eargo's securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each defendant, took the actions set forth herein.

51.     Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Eargo's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5.  All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

52.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Eargo's financial wellbeing and prospects, as specified herein.

53.     Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Eargo's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Eargo and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course

of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

54.     Each of the Individual Defendants' primary liability and controlling person liability arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

55.     Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Eargo's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities.  As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

56.     As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Eargo's securities was artificially inflated during the Class Period.  In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trade, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired Eargo's securities during the Class Period at artificially high prices and were damaged thereby.

57.     At the time of said misrepresentations and/or omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that Eargo was experiencing, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Eargo securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

58.     By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

59.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

### <u>COUNT II</u>

**(Violations of Section 20(a) of the Exchange Act Against the Individual Defendants)**

60.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

61.     The Individual Defendants acted as controlling persons of Eargo within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions and their ownership and contractual rights, participation in, and/or awareness of the Company's operations and intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.  The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

62.     In particular, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

63.     As set forth above, Defendants each violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by their acts and omissions as alleged in this Complaint.  By virtue of their position as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

A.     Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

B.     Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.     Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated:  November 4, 2021

Respectfully submitted,

**POMERANTZ LLP**

*/s/ Jennifer Pafiti*
Jennifer Pafiti (SBN 282790)
1100 Glendon Avenue, 15th Floor
Los Angeles, California 90024
Telephone: (310) 405-7190
jpafiti@pomlaw.com

**POMERANTZ LLP**
Jeremy A. Lieberman
(*pro hac vice* application forthcoming)
J. Alexander Hood II
(*pro hac vice* application forthcoming)
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
jalieberman@pomlaw.com
ahood@pomlaw.com

***Attorneys for Plaintiff***