1

**BERNSTEIN LITOWITZ BERGER
  & GROSSMANN LLP**
JONATHAN D. USLANER (Bar No. 256898)
jonathanu@blbglaw.com
2121 Avenue of the Stars, Suite 2575
Los Angeles, CA 90067
Tel: (310) 819-3470

2

3

4

5

**BLOCK & LEVITON LLP**
JACOB A. WALKER (Bar No. 271217)
jake@blockleviton.com
260 Franklin Street, Suite 1860
Boston, MA 02110
Tel: (617) 398-5600

6

7

8

*Counsel for Lead Plaintiffs IBEW Local 353 Pension
Plan and Xiaobin Cai and Lead Counsel for the Class*

9

10

[Additional Counsel Appear on Signature Page]

11

12

**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA**

13

14

| IN RE EARGO, INC. SECURITIES LITIGATION | Master File No. 3:21-cv-08597-CRB |
|---|---|

15

**CONSOLIDATED CLASS ACTION
COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS**

16

17

Judge: Hon. Charles R. Breyer

18

JURY TRIAL DEMANDED

19

20

21

22

23

24

25

26

27

28

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.  VIOLATIONS OF THE EXCHANGE ACT ...................................................... 2

    A.  INTRODUCTION ................................................................................ 2

    B.  JURISDICTION & VENUE ................................................................ 8

    C.  THE EXCHANGE ACT PARTIES ..................................................... 9

        1.  Lead Plaintiffs ......................................................................... 9

        2.  Exchange Act Defendants ........................................................ 9

    D.  SUMMARY OF THE FRAUD ........................................................... 11

        1.  Eargo's Non-Traditional, Direct-To-Consumer Hearing Aid Sales Model ................................................................................... 11

        2.  Eargo's Growth Strategy Relies On Increasing FEHBP Customers ........ 13

        3.  Eargo Launches A Successful IPO In October 2020 ............................... 15

        4.  As The Class Period Began, Eargo's Momentum Continued, And Defendants' False Or Misleading Statements Buoyed Eargo's Stock Price ................................................................................... 16

        5.  After Announcing Year-End 2020 Results, Eargo Stock Rises To Record Highs ................................................................................... 17

        6.  Eargo's Insurance-Focused Growth Strategy Was Predicated On Fraud ................................................................................... 18

        7.  Eargo Misleads Investors In Announcing 2020 Financial Results And 2021 Revenue Guidance ................................................................. 24

        8.  Unknown To Investors, Eargo's Largest Insurance Payor Initiates An Audit And Stops Paying Claims ........................................................ 26

        9.  Defendants Continue To Make False Or Misleading Statements About Eargo's Insurance Coverage And Revenue In Second Quarter 2021 ................................................................................... 28

        10.  Eargo Belatedly Issues More Information About The Audit But Continues To Mislead Investors To Stem A Sharper Stock Price Decline ................................................................................... 31

11. Defendants' Misconduct Triggers A Government Investigation, Causing Eargo's Stock Price To Plummet ................................. 33

12. Eargo Dramatically Cuts Its Workforce, Exits The Insurance Market, And Announces A Settlement With The Government For $34.4 Million .................................................................................... 36

E. DEFENDANTS' VIOLATIONS OF GENERALLY ACCEPTED ACCOUNTING PRINCIPLES AND MISSTATEMENTS OF FINANCIAL METRICS ............................................................................. 38

1. GAAP Governs Eargo's Reporting Of Financial Statements ................. 38

2. Defendants Violated GAAP Provision ASC 606 By Improperly Recognizing Revenue That Was Not Reimbursable ................................. 39

3. Eargo Purported To Recognize Revenue In Accordance With ASC 606 ............................................................................................................ 40

4. Defendants Violated ASC 606 By Knowingly or Recklessly Recognizing Revenue That Was Not Reimbursable ................................. 41

F. ADDITIONAL SCIENTER ALLEGATIONS ...................................................... 44

G. THE EXCHANGE ACT DEFENDANTS' ADDITIONAL FALSE AND MATERIALLY MISLEADING STATEMENTS AND OMISSIONS .............. 50

1. Materially False And Misleading Statements In Eargo's Third Quarter 2020 Earnings Call And Form 10-Q ........................................... 50

2. Materially False And Misleading Statements In Eargo's Fourth Quarter And Full Year 2020 Press And Earnings Releases, Investor Presentations, And 2020 Form 10-K ........................................... 53

3. Materially False And Misleading Statements In Eargo's First Quarter 2021 Press And Earnings Release, Form 10-Q, And Investor Presentation .............................................................................. 63

4. Materially False And Misleading Statements In Eargo's Second Quarter 2021 Press And Earnings Release, Form 10-Q, and Investor Presentations .............................................................................. 69

H. LOSS CAUSATION ........................................................................................... 75

I. PRESUMPTION OF RELIANCE ....................................................................... 80

J. THE INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND BESPEAKS-CAUTION DOCTRINE ......................................................... 81

K.   CLASS ACTION ALLEGATIONS APPLICABLE TO THE
     EXCHANGE ACT CLAIMS .................................................. 82

L.   CAUSES OF ACTION UNDER THE EXCHANGE ACT ................................. 83

COUNT I ........................................................................................ 83

For Violations Of Section 10(b) Of The Exchange Act And SEC Rule 10b-5 Promulgated
     Thereunder (Against All Exchange Act Defendants) ....................................... 83

COUNT II ....................................................................................... 85

For Violations Of Section 20(a) Of The Exchange Act (Against The Executive
     Defendants) .............................................................................. 85

II.   VIOLATIONS OF THE SECURITIES ACT .................................................. 87

A.   Securities Act Plaintiff ................................................................ 88

B.   Securities Act Defendants ............................................................. 88

C.   Summary Of The Securities Act Violations ............................................. 91

     1.   The Offering Documents Describe Eargo's "Consumer-First"
          Business Model ..................................................................... 91

     2.   In The Offering Documents, Eargo Reports Rapidly Rising
          Revenue Driven By Its Purportedly Successful Penetration Of The
          Insurance Market .................................................................. 94

     3.   Eargo Launches A Successful IPO On The Strength Of Its
          Revenue Growth And Seemingly Successful Insurance Initiatives ......... 96

     4.   Unknown To Investors In The IPO, Eargo Was Submitting
          Unsupported And Invalid Claims For Reimbursement And
          Improperly Recognizing Revenue .......................................... 99

     5.   Eargo's Stock Price Declines Due To The Conduct Described
          Herein ........................................................................ 104

     6.   Eargo Violated GAAP And Overstated Revenue In The Offering
          Documents By Improperly Recognizing Revenue Of Sales To
          FEHBP Customers ............................................................ 109

D.   The Securities Act Defendants' Untrue Statements And Omissions .................. 113

     1.   Untrue Statements And Omissions ........................................... 113

     2.   Failure To Disclose Information Required By Regulation S-K ............. 116

E.     The Securities Act Defendants' Failure To Exercise Reasonable Care Or
       To Conduct A Reasonable Investigation In Connection With The Offering...... 117

F.     CLASS ACTION ALLEGATIONS APPLICABLE TO THE
       SECURITIES ACT CLAIMS ........................................................................... 123

COUNT III ..................................................................................................................... 124

Against Eargo, The Securities Act Individual Defendants, And The Underwriter
       Defendants For Violations of Section 11 Of The Securities Act .................................... 124

COUNT IV ..................................................................................................................... 126

Against Eargo And The Underwriter Defendants For Violations Of Section 12(a)(2) Of
       The Securities Act ........................................................................................................... 126

COUNT V ....................................................................................................................... 127

Against The Securities Act Individual Defendants For Violations Of Section 15 Of The
       Securities Act ................................................................................................................... 127

III.   PRAYER FOR RELIEF ...................................................................................... 128

IV.    JURY TRIAL DEMANDED ................................................................................ 128

1    Lead Plaintiffs IBEW Local 353 Pension Plan ("IBEW Local 353") and Xiaobin Cai

2  ("Cai," with IBEW Local 353, "Lead Plaintiffs" or "Plaintiffs"), by and through their undersigned

3  counsel, bring two sets of claims in this action. First, Plaintiffs bring claims under the Securities

4  Exchange Act of 1934 (the "Exchange Act") individually and on behalf of all persons and entities

5  who purchased or otherwise acquired the publicly traded common stock of Eargo, Inc. ("Eargo"

6  or the "Company") between November 20, 2020 and March 2, 2022, inclusive (the "Class

7  Period"), and were damaged thereby (subject to certain exclusions enumerated in § I.K) As to these

8  Exchange Act claims, Plaintiffs allege that throughout the Class Period, the Exchange Act

9  Defendants (defined in § I.C.2) made a series of materially false or misleading statements and

10  omissions that they knew or recklessly disregarded were materially false or misleading at the time

11  the statements were made.

12    Second, as set forth separately in § II, Plaintiffs assert claims under the Securities Act of

13  1933 (the "Securities Act") individually and on behalf of all persons and entities who purchased

14  Eargo common stock in or traceable to Eargo's initial public offering (the "IPO"), conducted on

15  or about October 16, 2020, and were damaged thereby. As to these Securities Act claims, Plaintiffs

16  allege that the Securities Act Defendants (defined in § II.B) issued a materially inaccurate and

17  incomplete registration statement and offering documents in connection with the Company's IPO.

18  As to these Securities Act claims, Plaintiffs disclaim any allegation of fraud. These Securities Act

19  claims are based solely on strict liability and negligence.

20    Except as to allegations pertaining specifically to Lead Plaintiffs, all allegations in this

21  Complaint are based upon the investigation undertaken by Lead Counsel, which included, but was

22  not limited to, the review and analysis of: (i) public filings made by Eargo with the U.S. Securities

23  and Exchange Commission (the "SEC"); (ii) press releases and other public statements issued by

24  Defendants; (iii) research reports issued by securities and financial analysts; (iv) media and news

25  reports and other publicly available information concerning Eargo and Defendants; (v) transcripts

26  of Eargo's earnings and other conference calls with investors and analysts; (vi) publicly available

27  presentations, press releases, and interviews by Eargo and its employees; (vii) economic analyses

28

of the movement and pricing of Eargo's publicly traded common stock; (viii) information provided by relevant consultants and experts; (ix) interviews with former employees ("FEs") of Eargo; (x) an April 29, 2022 Press Release issued by the United States Department of Justice ("DOJ") entitled "Hearing Aid Company Eargo Inc. Agrees to Pay $34.37 Million to Settle Common Law and False Claims Act Allegations for Unsupported Diagnosis Codes"; and (xi) an April 29, 2022 "Settlement Agreement" between Eargo, Inc. and the United States Department of Justice (on behalf of the Office of Personnel Management, which administers the Federal Employees Health Benefits Program ("FEHBP")). Lead Counsel's investigation into the factual allegations continues, and many of the relevant facts are known only to Defendants or are exclusively within their custody or control. Plaintiffs believe that substantial additional evidentiary support will exist for the Complaint's allegations after a reasonable opportunity for discovery, including access to the materials that Defendants and third parties have produced to, among others, the U.S. Department of Justice, the U.S. Attorney's Office for the Northern District of Texas, other federal agencies, and third-party insurance payors, but not to Lead Plaintiffs.

# I.   VIOLATIONS OF THE EXCHANGE ACT

## A.   INTRODUCTION

1.     This case concerns Defendants' misstatements and omissions stemming from a practice of systemically falsifying insurance reimbursement requests to the FEHBP. The fraud allowed Eargo to report materially overstated revenue and growth rates in its financial statements, and to falsely portray its success in penetrating the market of consumers with insurance that covered hearing aids. In response to these representations, Eargo's stock price initially soared. Ultimately, however, one key insurer detected Eargo's scheme and began an audit, which was followed by a DOJ investigation. A series of disclosures—culminating in Eargo's agreement to pay $34.4 million to resolve False Claims Act and fraud allegations—shocked the market, decimated the price of Eargo stock, and caused unsuspecting investors to suffer large losses.

2.     Eargo sells hearing devices to people with mild to moderate hearing loss. In the

world of hearing device companies, Eargo pursued an atypical business model. Typically, hearing aid companies sell their products through doctors who prescribe them after examining the patient and conducting an in-person hearing examination. In contrast, Eargo employs a "direct to consumer" model, in which customers purchase a hearing device directly from Eargo without an audiogram and for a lower price than that offered by most hearing aid companies. Eargo characterized itself as an industry disruptor and repeatedly touted its consumer-centered, "Eargo Difference" as a way the Company set itself apart from its competitors.

3. Prior to October 2020, Eargo operated as a private company. In October 2020, Eargo conducted an IPO, going public at $18 per share and raising $162 million in capital. From the time of its IPO and moving forward throughout the Class Period, Eargo's ability to access a specific, untapped market of insurance customers was the critical growth driver for its sales and net revenue and, in turn, its stock price.

4. In particular, Eargo targeted customers who were insured by the FEHBP, the largest employer-sponsored group health insurance program in the world. The FEHBP provides a range of insurance plans to current and retired federal agency employees and United States Postal workers and their families. Most medical insurance plans, including Medicare and Medicaid, do not provide a direct hearing aid insurance benefit. The FEHBP, however, is an exception. Multiple FEHBP insurance plans offer some type of hearing aid benefit, including the Blue Cross Blue Shield Federal Employee Plan ("BCBS FEP"), the largest plan within the FEHBP. Eargo priced its hearing aid models commensurate with these benefits, with the Company's top-end model priced at or around the $2,500 benefit offered by BCBS FEP. In its effort to aggressively mine this customer pool, Eargo took control of the claims process and centralized it in-house, both by submitting claims directly to FEHBP insurers and by preparing claim forms for consumers to submit directly to FEHBP plans.

5. Throughout the Class Period, Eargo emphasized several benefits it received from tapping into the FEHBP market. First, the size of the market of consumers with access to a hearing aid benefit allowed Eargo to expand its potential consumer pool beyond cash-pay customers, who

had to pay the full cost of hearing aids out-of-pocket. Second, the Company explained that consumers with a hearing aid insurance benefit were less likely than cash-pay customers to return their products given that the insurer paid most or all of the cost. Third, Eargo told investors that it validated "customer eligibility and reimbursement amounts" of insurance customers "prior to shipping the product," which allowed the Company to record revenue from hearing aids sold to insurance customers upon shipment, rather than waiting for reimbursement.

6.      Eargo reported rapidly increasing revenues driven by this seemingly successful initiative. After embarking on its insurance strategy in 2019, Eargo's net revenue more than doubled over the next year: from $32.7 million at year-end 2019 to $69.2 million in 2020. In fact, by year-end 2020, insurance customers comprised approximately 45% of Eargo's total customer base. The Company attributed its increasing success to "rapid growth in the insurance channel," which provided a "natural tailwind" and "a multiyear runway for continued efficient growth." The company also based its 2021 public guidance, which forecast increasing net revenue up to $93 million, on what the Company "had already done" in this field, and its focus on continuing "to penetrate the Federal insurance opportunity[] that's driving a big part of our growth."

7.      Investors relied on Defendants' statements and concluded that Eargo was, in fact, successfully penetrating this critical new insurance market and legitimately creating outsized revenue acceleration. For example, on January 12, 2021, a William Blair analyst reported that "[i]nsurance continues to outperform," that "we continue to see significant opportunity in the FEHB channel today and … over time," and that "further expansion into insurance" positioned Eargo for continued growth.

8.      Fueled by Defendants' misrepresentations to investors, Eargo's stock price climbed. Eargo's stock price rose from its IPO price of $18 per share to a class period high of $75.37 per share on February 10, 2021 – an increase of 319% in just under four months.

9.      Unbeknownst to investors, however, Eargo's reported revenues were a mirage because the Company systematically falsified insurance reimbursement claims that it prepared for Eargo's FEHBP customers.

10.     As a condition of reimbursement, the FEHBP requires hearing aid providers to certify that a health care provider has determined that a patient suffers from hearing loss and that a hearing aid is "medically necessary." Eargo prepared insurance claims forms for its customers listing diagnosis codes that signified to FEHBP insurers that Eargo customers had received a hearing loss diagnosis based on a hearing test performed by a health care provider, and that a bona fide determination of medical necessity had been made. But Eargo did not require its insurance customers to submit to a hearing exam by a medical professional, and there had been no actual determination of medical necessity. Thus, as the DOJ ultimately determined, the reimbursement claims the Company submitted or caused customers to submit to FEHBP insurers were false and invalid. As detailed herein, former Eargo employees interviewed by Lead Counsel corroborated the DOJ's findings.

11.     According to the DOJ's findings, in January 2021, Eargo completed an internal review and concluded that the Company's insurance claims practices were improper—yet Eargo continued the practice unabated. As the volume of Eargo's fraudulent insurance submissions intensified during the Class Period, BCBS FEP also launched an audit and refused to pay *any* reimbursement claims as of March 1, 2021—an unusual step that signified the seriousness of the audit and the underlying misconduct. Despite the obvious importance to investors of Eargo's insurance revenues (which Eargo recorded upon product shipment), Defendants kept the audit and payment freeze under wraps, continued to mischaracterize the Company's insurance results and growth potential to investors, and continued to record revenue from FEHBP customers.

12.     Even when Defendants belatedly revealed the existence of an audit being conducted by an unnamed insurance company on May 13, 2021, Defendants continued to conceal the key fact that the insurer had frozen payment for months. Instead, Defendants misled investors that the audit was "routine," "happen[s] all the time," and was "pretty common." In fact, citing the Company's continued 'momentum,' Eargo doubled down and ***raised*** the bottom end of its 2021 revenue guidance by $2 million. Analysts applauded Eargo's strong first quarter performance, described its "continued momentum within the insurance channel," and characterized the

Company's "guidance as achievable and beatable."

13.     What soon followed, however, was a cascade of disclosures concerning the fraud that caused Eargo's stock price to collapse. On August 12, 2021, Eargo first disclosed that, during the audit, claims since March 1, 2021, had not been paid, and that "another insurance company" was also auditing reimbursement claims submitted by Eargo. In response, Eargo's stock price declined by 24% on high volume, falling from $32.70 on August 12, 2021 to close at $24.70 the following day. Yet, Eargo continued to mislead investors about the audit, calling it "an educational process that gives us the opportunity to further broaden our insurance coverage;" continued to book revenue upon the shipment of Eargo hearing aids to customers; and further raised the Company's revenue guidance from a range of $89 million to $93 million, to a range of $93 million to $96 million, citing "the continued momentum in our business and confidence in Eargo 5 driving consumer demand." Analysts were reassured by Eargo's depiction of the audit, with Wells Fargo citing management's confidence that "this is a routine diligence effort where the payor simply needs to change how they process claims, and expect it to be resolved without issue."

14.     Given these false reassurances about the nature of the audit and the Company's access to customer insurance benefits, investors were blindsided on September 22, 2021, when Eargo announced that it was the target of a DOJ investigation related to insurance reimbursement claims the Company submitted on behalf of its customers covered by FEHBP insurers. As a consequence, Eargo also announced that it was withdrawing its guidance for 2021, which it had raised previously in consecutive quarters despite the ongoing audit and the Company's internal review of improper insurance billing practices. Eargo's stock price immediately cratered, falling 68% on high volume, declining from a closing price of $21.67 on September 22, 2021 to a closing price of $6.86 on September 23, 2021.

15.     Less than two months later, on November 16, 2021, Eargo announced that it was unable to file its quarterly report with the SEC due to the ongoing investigation "related to insurance reimbursement claims the Company submitted on behalf of its customers covered by various federal employee health plans under the [FEHBP]" and "the Company[']s role in customer

reimbursement claim submissions to federal employee health plans." Eargo further disclosed that the investigation had expanded to include two additional third-party payor audits related to claims Eargo submitted for customers with FEHBP plans. In response to this news, Eargo stock price declined another 5%, from a closing price of $7.18 on November 16, 2021 to close at $6.79 the following day.

16.     On March 2, 2022, Eargo disclosed that it was unable to file its 2021 financial statements due to the ongoing investigation. It further stated that it had "reached an understanding in principle with the DOJ with respect to certain material terms of a potential settlement and resolution of the investigation and can now reasonably estimate a probable loss of approximately $34.4 million in connection with the investigation." Eargo's audits continued to mushroom, with Eargo disclosing that "the Company is currently subject to a number of other ongoing audits of insurance reimbursement claims submitted to additional third-party payors. One of these claims audits does not relate to claims submitted under the FEHB program." In response to this news, Eargo stock price declined 15%, falling to $4.02 per share.

17.     Finally, on April 29, 2022, Eargo and the DOJ announced they had reached a final settlement to resolve the DOJ's healthcare fraud investigation for approximately $34.4 million. In the Settlement Agreement, the DOJ concluded that "during the period from January 1, 2017 through January 31, 2021, Eargo submitted or caused the submission of claims for payment to the FEHBP using unsupported hearing loss-related diagnosis codes . . . on claims for hearing aid devices that Eargo submitted to the FEHBP and on superbills Eargo provided to FEHBP participants to obtain reimbursement from the FEHBP." The DOJ further concluded that "between February 1, 2021, and September 22, 2021, Eargo continued to include these unsupported hearing loss-related diagnosis codes on claims and superbills—even after completing an internal review of its billing and coding practices in January 2021—resulting in Eargo knowingly submitting or causing the submission of false claims for payment to the FEHBP." The $34.4 million settlement was more than Eargo's reported revenue in 2021 ($32.1 million) and over eight times the Company's gross profit ($4.1 million).

18.     The fraud described herein has crippled the Company and severely harmed its investors. As a direct result of these events, Eargo stated that it has "made the decision to stop accepting insurance benefits . . . and it is uncertain when, if ever, the Company will resume[.]" In other words, as a result of the fraud, Eargo decided to exit the market that it once touted as the key driver of its growth. The fraud also forced Eargo to lay off over one-quarter of its workforce. Due to the severe economic impact on the Company, Eargo told investors on May 2, 2022, "We anticipate that we will need to raise capital over the course of 2022." And on May 11, 2022, Eargo told investors that due to "the ongoing assessment of the accounting impact of the DOJ investigation and settlement with the U.S. government," the Company would be unable to file its first quarter 2022 Form 10-Q on a timely basis, opening it up to the possibility that Nasdaq may delist the stock.

19.     Eargo's stock price has never recovered from the fraud, and as of the close of the market on May 20, 2022, Eargo stock was trading at $1.25 per share.

## B.     JURISDICTION & VENUE

20.     The claims asserted herein arise under and pursuant to: (i) Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5); and (ii) Sections 11, 12(a)(2), and 15 of the Securities Act, 15 U.S.C. §§ 77k, 77l(a)(2), and 77o.

21.     This Court has jurisdiction over the claims asserted in this Complaint pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa), Section 22 of the Securities Act (15 U.S.C. § 77v), and 28 U.S.C. § 1331.

22.     Venue is proper in this judicial district pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b). Eargo maintains its corporate headquarters and principal place of business in this District and did so at all relevant times, and many of the acts and conduct that constitute the violation of law complained of herein, including dissemination to the public of materially false or misleading information, occurred in and/or were issued from this District.

23.     In connection with the acts and conduct alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce including, but not limited to, the mails, interstate telephone communications, and the facilities of the Nasdaq Stock Market, a national securities exchange.

## C.     THE EXCHANGE ACT PARTIES

### 1.     Lead Plaintiffs

24.     Lead Plaintiff IBEW Local 353 Pension Plan is a multi-employer defined benefit pension plan located in Canada. IBEW Local 353 manages nearly CAD$2 billion in assets on behalf of its active members, retirees, and beneficiaries, who are members of the International Brotherhood of Electrical Workers working in a variety of electrical disciplines across central Ontario. As set forth in the certification previously filed with the Court (ECF No. 24-2), IBEW Local 353 purchased shares of Eargo common stock at artificially inflated prices during the Class Period, including shares purchased in and/or traceable to the IPO, and suffered damages as a result of the violations of the federal securities laws alleged herein.

25.     Lead Plaintiff Xiaobin Cai is an individual investor. As set forth in the certification previously filed with the Court (ECF No. 21-3), Cai purchased shares of Eargo common stock at artificially inflated prices during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged herein.

### 2.     Exchange Act Defendants

#### (a)     Corporate Defendant

26.     Defendant Eargo is a medical device company, focused on the development and sale of hearing aids. Incorporated in Delaware in November 2010 as Aria, Inc., the Company changed its name to Eargo in November 2014. Eargo maintains its corporate headquarters at 1600 Technology Drive, San Jose, California. The Company is the issuer of the shares sold in the IPO. Eargo's common stock trades on Nasdaq under the ticker symbol "EAR." As of September 14, 2021, Eargo had over 39 million shares of common stock outstanding, owned by hundreds or thousands of investors.

#### (b)   <u>Executive Defendants</u>

27.   Defendant Christian Gormsen ("Gormsen") is, and was at all relevant times, Eargo's President and Chief Executive Officer ("CEO") and a Director of the Company. Gormsen first joined the Company's board of directors in November 2014, and he later became Eargo's President and Chief Executive Officer in June 2016. Prior to joining Eargo, Defendant Gormsen spent a decade at GN Group, the owner of several brands producing medical grade hearing technology. In statements to investors, Gormsen touted his "significant background in the hearing aid industry."

28.   Defendant Adam Laponis ("Laponis") is, and was at all relevant times, Eargo's Chief Financial Officer ("CFO"). Earlier in his career, Defendant Laponis gained extensive accounting experience working for two healthcare companies, Cardinal Health and Johnson & Johnson. Defendant Laponis served 18 months as the Chief Financial Officer of Cardiovascular Care of Cardinal Health and over a decade in various financial roles at Johnson & Johnson.

29.   Defendants Gormsen and Laponis are collectively referred to as the "Executive Defendants."

30.   The Executive Defendants, because of their positions with Eargo, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors. Each of the Executive Defendants made public statements, and signed and/or was provided with copies of the Company's reports, presentations, and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of the Executive Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.

D.    **SUMMARY OF THE FRAUD**

1.    **Eargo's Non-Traditional, Direct-To-Consumer Hearing Aid Sales Model**

31.    Eargo began selling its air conduction hearing aids in 2015. The Company claimed that its hearing aids offered several advantages over existing products, including that they are "virtually invisible."

32.    Eargo characterized itself as a disruptor of a "relatively mature industry" based on its non-traditional business model. The traditional hearing aid sales model requires customers to make one or more in-person visits to hearing aid professionals, in order to be examined, have an audiogram performed, have hearing aids prescribed, and then have hearing aids tested and fitted. In contrast, Eargo emphasized its direct-to-consumer business model. Eargo stated that it was able to reduce to cost of hearing devices by avoiding a "business-to-business model in which hearing aid manufacturers rely on a fragmented network of independent hearing clinics to sell their devices to consumers." According to Eargo, "the separation of the manufacturer from the consumer is not necessary, adds an incremental layer of cost and has contributed to the lack of consumer." Thus, Eargo marketed and sold hearing aids direct to consumers through "a team of inside sales consultants and a dedicated customer support team of licensed hearing professionals" who interacted with the customer online and/or over the phone.

33.    Eargo made intense marketing efforts to penetrate the hearing aid market. Consistent with its "consumer-first business model" and "consumer-first marketing efforts," Eargo sought to accelerate customer adoption by "driving consumers to our website by optimizing our mix of digital and traditional media[.]" Eargo focused its direct marketing efforts on the "approximately 14 million people in the United States with mild to moderate hearing loss who have annual household income above the national median[.]" Eargo claimed that its model allowed these customers "to complete their purchase over the phone with their sales consultant or directly on our website, without the need to navigate multiple visits to the hearing clinic for tests and fittings." These services, according to Eargo, "allows us to deliver clinical support in an efficient

1    and streamlined manner without the burden of in-clinic visits."

2    34.    Defendant Gormsen addressed Eargo's sales and marketing strategy in a February

3    2019 *New York Times* article about the "increasingly tantalizing field" of medical technology. That

4    article, which suggested that health care appeared to be the "next big thing" to be supported by

5    Silicon Valley venture capitalists, described Eargo as "a new company that walks the line between

6    medical firm and tech start-up." The article stated that Eargo's "support team consists of hearing

7    aid dispensers licensed in one or more states to advise customers on their hearing aid needs.

8    Because Eargo sells its products online, rather than in physical stores, a dispenser that's licensed

9    in one state can sell to customers in all of them." The article quoted Defendant Gormsen, who

10   stated that the existing sales model of employing dispensers who are licensed by state-level boards

11   and can only operate within their state was "archaic." Gormsen further stated: "I believe in a

12   professional that's certified. I don't care whether that person is certified in California or Colorado

13   … It's like saying you can't drive your car outside the state where you got your driver's license. It

14   doesn't make any sense." Based on its interview with Gormsen, the *New York Times* declared that

15   Eargo "envisions that shopping for a hearing aid would look more like buying a phone than the

16   more rigorous (but also time consuming) search for a medical device." As Gormsen stated, "We've

17   been talking to the likes of Best Buy or so on where maybe you go and talk to a blue shirt and then

18   a blue shirt could show you how the product works. And we could train them."

19   35.    Eargo constructed its website to highlight its unique sales process. The Company

20   stated that it sought to draw customers "to our website with landing pages where they can learn

21   more about us, submit their contact information for phone-based follow-up or purchase

22   immediately." A page on Eargo's website entitled "The Eargo Difference" touted its team of

23   hearing professionals who would contact prospective customers and provide "unlimited support"

24   to established customers.

25   36.    Eargo's website stated that the Company "offer[s] an online, do-it-yourself hearing

26   test for prospective customers who are interested in an assessment." According to Eargo, "potential

27   customers are not required to have a hearing test to order the Eargo hearing solution, . . . simplifies

28

the purchasing experience and improves the accessibility of hearing aids relative to the traditional hearing clinic channel." In fact, a page of "frequently asked questions" on the Company's website included the question, "Do I need to see an audiologist before calling or buying Eargo?" The answer stated: "Nope, no need to call an audiologist before calling or buying Eargo. Our team of pros here will work closely with you to understand your hearing situation and determine if Eargo is right for you." Another question asked, "Do I need an audiogram to buy Eargo?" The answer stated: "Nope, you don't need an audiogram to buy Eargo. Our team of pros here will work closely with you to understand your hearing situation and determine if Eargo is right for you. If you're more of a do-it-yourself kind of person, you can take our hearing check to get a better understanding of your hearing."

37.    A chart included in Eargo's January 2021 presentation at the J.P. Morgan Healthcare Conference further depicted the difference between Eargo's "consumer-centric experience" and the "traditional path":



2.    **Eargo's Growth Strategy Relies On Increasing FEHBP Customers**

38.    In its infancy, Eargo marketed its product primarily to cash-pay customers. Beginning in the fourth quarter of 2019, however, Eargo began to switch its focus and increasingly target insurance customers in order to open up a large new pool of customers and supercharge its

growth. In very short order, the most critical factor driving the growth of Eargo's business was increasing the Company's customers with a hearing aid insurance benefit—particularly federal employees and retirees covered by the FEHBP.

39.     Eargo thus "began targeting a more diverse mix of consumers, including those with hearing aid health insurance benefits and repeat customers." The Company explained that "consumers with hearing aid insurance benefits typically convert at higher rates and return their devices at lower rates, due in part to having reduced or, in some cases, no out of pocket cost for an Eargo hearing aid." Eargo claimed that its strategy of focusing on insurance and repeat customers led to a "more optimized mix of customers," which "has the potential to further improve the efficiency of our sales and marketing spend." Further, to ease the purchasing process and control the claims submission process, Eargo stated that it "provides insurance claims processing for consumers, eliminating in most cases the need for consumers to interface with their insurance providers."

40.     Eargo constructed specific website pages for prospective customers with a hearing aid insurance benefit, particularly customers with an FEHBP insurance benefit. Eargo also priced most of their hearing aids to cover the $2,500 benefit provided by the BCBS FEP, the FEHBP's largest insurer. For example, Eargo's website stated that "with your [Federal Employee Health Benefit] plan, Eargos May Not Cost You a Dime," which was "the deal of a lifetime."



41.     Eargo also informed investors that it verified insurance customer eligibility prior to

booking a sale to an insurance customer as revenue. As set forth in greater detail in § I.E, Eargo booked revenue upon shipment of the product, rather than upon receipt of reimbursement from an insurance company. Given this, and to assure investors that revenue was properly recorded, Eargo confirmed in public filings that "[f]or payments involving insurance payors, the Company validates customer eligibility and reimbursement amounts prior to shipping the product."

42.     Eargo's growth strategy of targeting customers with hearing aid insurance benefits was successful. In October 2020, Eargo reported that its insurance customers represented a "significant driver" of its growth, and the Company stated its "inten[t] to pursue additional coverage in the future." By year-end 2020, insurance customers represented 45% of Eargo's customer mix. That percentage grew to approximately 48% by September 2021.

### 3.     Eargo Launches A Successful IPO In October 2020

43.     The promise of Eargo's medical technology and the Company's rapid growth was, in fact, enticing to private investors. Between 2016 to July 2020, Eargo raised approximately $187 million in private financing.

44.     By the fall of 2020, Eargo undertook plans to initiate an IPO of Eargo common stock. On September 25, 2020, Eargo filed a Form S-1 Registration Statement and Prospectus with the SEC, which was amended on three occasions (the "Offering Documents"). On October 15, 2020, the SEC issued a notice of effectiveness, which allowed the IPO to commence.

45.     The IPO was a success. On October 16, 2020, Eargo conducted an initial public offering of 9,029,629 shares of its common stock at the price of $18.00 per share, raising over $162.5 million in gross proceeds and $148.1 million in net proceeds for the Company's benefit. Eargo's stock opened on October 16, 2020, at $36.00 per share, doubling the IPO price of $18, and closed at $33.68—a premium of 87%. Eargo's market value rose to about $1.2 billion, which was approximately five times its valuation by private investors several months earlier. Defendant Gormsen stated that Eargo would use the IPO proceeds "to invest in our technology department and build out our tele-care model," which was "resonating as we have seen strong growth during the pandemic."

46.     Analysts reacted positively to Eargo's IPO and its focus on insurance customers. For example, on November 10, 2020, J.P. Morgan initiated coverage of Eargo with an "Overweight" rating, predicting a December 2021 price target of $41 on the strength of Eargo's "differentiated direct-to-consumer business model, which has been validated by its strong market presence and brand recognition." Referencing "the generous coverage policy" of the "FEHB program relative to Eargo's average selling price," J.P. Morgan found that Eargo "has seen tremendous success so far in penetrating this target market with greater sales of the company's premium products and lower return rates." Its model forecasted "rapid growth in the insurance channel." The share price continued in a range of $33-$36 through November 19, 2020.

**4.      As The Class Period Began, Eargo's Momentum Continued, And Defendants' False Or Misleading Statements Buoyed Eargo's Stock Price**

47.     The Class Period begins shortly after the IPO, as Eargo continued to report apparent success in penetrating the insurance market. Specifically, following market close on November 19, 2020, Eargo issued a press release announcing its third quarter 2020 financial results. The Company reported $18.2 million in net revenue, an increase of 135.5% year-over-year. In an earnings call later that day, Defendant Gormsen described the applicable insurance market as comprising "approximately 12 million consumers in the U.S. over 50, who have both hearing loss and access to hearing aid benefits under certain health insurance plans." Gormsen stated that "Eargo has identified and started to rapidly penetrate pockets of consumers with hearing insurance benefits that cover most or all of the cost of an Eargo." As one example, Gormsen explained that the company gained access to "a database through a partnership that allowed us to mail directly retired federal employees," which "was a great opportunity" and "worked well for us." Further, Gormsen stated that Eargo's "positive mix shift toward more insurance and repeat customers [would] be a key driver of growth and scalability going forward."

48.     The next day, November 20, 2020, Eargo filed its Form 10-Q for third quarter 2020. Eargo reported net revenue of $18.2 million for the third quarter 2020 and $46.8 million for the first nine months of the year, which was year-over-year growth of 135.3% and 110.9%,

respectively. The Company attributed its revenue success in part "to growth in customers with health insurance coverage for hearing aids and repeat customers[.]"

49.     Analysts reacted positively to Eargo's third quarter 2020 results. In a report dated November 19, 2020, Wells Fargo touted Eargo's "record first quarter out of the gates" and rated the stock as "Overweight." On November 20, 2020, J.P. Morgan issued a report stating that Eargo's "Direct-to-Consumer Model Continues to be Validated," and that "[w]e remain bullish on the outlook and reiterate our Overweight rating here." That same day, William Blair issued a report applauding Eargo's "Strong Third Quarter," positing that "Eargo is on track to see strong growth in 2021 as advertising spend increases awareness, insurance drives growth, and its next-gen product launches."

50.     Eargo stock continued to rise through year-end, from $34.14 at market open on November 20, 2020; reaching a peak of $59.80 on December 14, 2020; and closing at $44.82 on December 31, 2020.

### 5.     After Announcing Year-End 2020 Results, Eargo Stock Rises To Record Highs

51.     On January 11, 2021, Eargo announced that its preliminary unaudited fourth quarter net revenue was expected to be $22.2 million, reflecting year-over-year growth of 109%; and that its preliminary unaudited full year 2020 net revenue was expected to be $69.0 million, representing year-over-year growth of 110%.

52.     The next day, January 12, 2021, Eargo presented at the annual J.P. Morgan Healthcare Conference. Defendant Gormsen stated that Eargo was "targeting right now federal employees" who have access to a hearing benefit. He added that, "We deal with all the claims processing on the back end, directly with the administrators of the FEHB program." Defendant Gormsen claimed that Eargo saw "a huge opportunity long term to expand this" to FEHBP customers, who represent 1.3 million of the 12 million in potential customers over the age of 50 with a hearing aid benefit.

53.     Defendant Gormsen also told investors that the Company "went in specifically to

this Q4 holiday buying season" focusing on "the opportunity for federal employees" and "the fact that we can help you as a federal employee access your benefits," and that "what we saw is a lot of people are not aware that they have access to benefits." He stated that the Company's marketing efforts "helped drive and accelerate all of our customer types, cash pay as well as insurance as well as repeat." Defendant Laponis confirmed these points, noting the "natural tailwind" Eargo experienced from its ability to convert benefits for insurance customers.

54.     Analysts seized on Eargo's positive news. A January 11, 2021 J.P. Morgan report, touting Eargo's "impressive" fourth quarter 2020 results, rated Eargo as "outperform." Noting the Company's "stronger-than-expected benefit on Insurance sales," J.P. Morgan stated that Eargo's "results bode well for Eargo's 2021 outlook[.]" A Wells Fargo report dated January 12, 2021, increased the Company's 2021 revenue projections. Referencing Eargo's "robust insurance volumes," Wells Fargo stated that it "expect[ed] insurance to continue meaningfully to EAR's overall growth[.]" Likewise, a William Blair report dated January 12, 2021, rated Eargo as "outperform," finding that "[i]nsurance continues to outperform and likely again was the biggest driver of the beat this quarter." The report stated that "[w]ith approximately 9 million FEHB patients and roughly 5,000 insurance units being shipped per quarter, we continue to see significant opportunity in the FEHBP channel today and Medicare Advantage or other payor partnerships over time." William Blair predicted that "further expansion into insurance" positioned the Company for continued growth.

55.      Between January 11, 2021 and January 13, 2021, Eargo's stock price rose approximately $10, from an opening price of $49.80 to a closing price of $59.78. The stock price continued to soar throughout the next month, rising to a record high of $75.37 at market close on February 10, 2021.

6.      **Eargo's Insurance-Focused Growth Strategy Was Predicated On Fraud**

56.     The Company's record stock price, however, was built on a fraud: Eargo did not submit valid and reimbursable claims to insurers. Instead, beginning in January 2017, Eargo

systematically submitted false payment claims to FEHBP insurers based upon unsupported diagnosis codes.

57.     The Company continued to submit false claims and improperly book revenue throughout 2021—even after completing "an internal review of its billing and coding practices" that further confirmed its improper diagnosis claims practices and after learning of a separate, insurer-driven audit that resulted in BCBS FEP refusing to pay any Eargo claims as of March 1, 2021.

58.     FEHBP carriers that offer a hearing aid benefit require that reimbursement claims for hearing aid devices include a hearing loss-related diagnosis code, which is set by the International Statistical Classification of Diseases, 10th Edition, Clinical Modification/Procedure Coding System (ICD-10-CM/PCS). ICD-10 is a diagnosis coding system of diseases and signs, symptoms, abnormal findings, complaints, social circumstances and external causes of injury or diseases. ICD-10 codes, which are used in virtually all health care settings, provide a standardized approach to categorize disease and patient conditions.

59.      Two relevant ICD-10 codes used by audiologists to diagnose patients following an evaluation of hearing loss are ICD-10 diagnosis codes H90.5 and H91.93, which relate to the following:

- H90.5 refers to "Sensorineural hearing loss, unspecified," which is a diagnosis of hearing loss following damage to the inner ear. Sensorineural hearing loss is the most common type of permanent hearing loss. A patient suffering from such condition may be unable to hear soft sounds and may experience louder sounds as unclear or muffled.

- H91.93 refers to "Unspecified hearing loss, bilateral," which is a diagnosis of hearing loss in both ears that cannot be attributed to a particular type of hearing loss (e.g., Sensorineural, conductive (outer or middle ear), or mixed (outer and/or middle ear and inner ear).

60.     Insurers that participate in the FEHBP also include language in their Policy Manuals that condition the reimbursement of claims on a determination of "medical necessity." For example, the BCBS FEP has had a longstanding requirement that all benefits are subject to a

determination of "medical necessity." Both the 2020 and 2021 Standard and Basic Option BCBS FEP Manuals provide:

> All benefits are subject to the definitions, limitations, and exclusions in this brochure and are payable only when we determine that the criteria for medical necessity are met. Medical necessity shall mean healthcare services that a physician, hospital, or other covered professional or facility provider, exercising prudent clinical judgment, would provide to a patient for the purpose of preventing, evaluating, diagnosing, or treating an illness, injury, disease, or its symptoms, and that are:
>
> > 1.  In accordance with generally accepted standards of medical practice in the United States; and
> >
> > 2.  Clinically appropriate . . .
> >
> > 3.  Not primarily for the convenience of the patient . . .
>
> **The fact that one of our covered physicians, hospitals, or other professional or facility providers has prescribed, recommended, or approved a service or supply does not, in itself, make it medically necessary or covered under this Plan**.

(emphasis in original).

61.   Similar to the medical necessity requirement, BCBS FEP's 2021 Plan required a prescription for reimbursement of hearing aids. The BCBS FEP Utilization Management Guideline and the BCBS FEP Policy Manual—both issued in October 2020—stated that "over-the-counter" hearing aids were "Not covered" by the Plan.

62.   Notwithstanding the requirement that a medical professional make a bona fide determination of medical necessity, Eargo did not do what was required to support the ICD-10 code for reimbursement. Rather, Eargo routinely created and submitted reimbursement requests with unsupported diagnosis codes that incorrectly asserted that a bona fide determination of medical necessity had been made by a medical professional when it had not. Investors, who were not privy to Eargo's claims submissions practices, and in particular, the manner in which Eargo purported to support its diagnosis codes, and who were assuaged by Defendants' statements that Eargo verified insurance eligibility and reimbursement amounts, were left in the dark as to Eargo's

1   systematic submission of false claims.

2   63.     These undisclosed practices led to Eargo's entry into a Settlement Agreement with

3   the Department of Justice on April 29, 2022 "to pay $34.37 Million to settle common law and

4   False Claims Act Allegations for unsupported diagnosis codes." As the DOJ concluded, "Eargo

5   included unsupported hearing loss-related diagnosis codes on claims for hearing aid devices that

6   Eargo submitted to the FEHBP and on invoices—called superbills—that Eargo provided to

7   FEHBP beneficiaries to obtain reimbursement for such devices from the FEHBP." The DOJ

8   further concluded that "Eargo continued to include these unsupported hearing loss-related

9   diagnosis codes on claims and superbills—even after completing an internal review of its billing

10  and coding practices in January 2021—resulting in Eargo knowingly submitting or causing the

11  submission of false claims for payment to the FEHBP."

12  64.     Former Employees ("FE") of Eargo corroborate the DOJ's conclusions.[1] FE1, a

13  former Director in Eargo's Audiology Group who worked at Eargo prior to the Class Period,

14  explained that Eargo stopped requiring prescriptions or even audiograms by 2017. FE1 explained

15  that the processes Eargo put in place, like getting a valid hearing test, became too cumbersome to

16  follow and eventually got dropped from the sales process. Specifically, FE1 described that when

17  he began working for the Company, the process for prescribing Eargo's hearing aids was specific

18  to each state and what they each consider to be a valid hearing evaluation or test, whether this was

19  an audiogram or otherwise, and what made it legal in each state. But, he explained, this process

20  turned into a "big bottleneck," and the Company ran the risk of telling customers to go get tested,

21  without the guarantee that they would come back to Eargo. The Company realized that this was

22  not efficient and dropped the requirement. FE1 understood why the Company did this—it was

23  because the amount of time it took to get a valid audiogram was too long. What he did not

24

25  _____

26  [1] The terms "Former Employees" and "FE" refer to the former employees of Eargo whose reports are discussed in this Complaint. In order to preserve the Former Employees' anonymity, while maintaining readability, the Complaint uses the pronouns "he," "his," and "him" to refer to all of the Former Employees, regardless of their gender.

27

28

1    understand was how the Company was able to do this.

2        65.    FE1 explained that he voiced concerns regarding Eargo's dropping the whole

3    audiogram requirement process, which, he noted, was not the right process. FE1 explained further

4    that Eargo's product was being sold by non-licensed, non-expert "hearing professionals," and his

5    issue with this was a matter of how these people know they are selling the appropriate device to a

6    person without the experience to make such a decision. The requirement for selling a class one

7    hearing aid is that a licensed professional needs to prescribe this medical device. FE1 reiterated

8    that the Company stopped requiring an audiogram "early on"—specifically, there was an internal

9    retooling of the product around 2016, followed by a relaunch, and at the time of the relaunch, the

10   Company decided to stop taking audiograms.

11       66.    The prescription was only the "beginning part" of FE1's concerns because then

12   there is the issue of how Eargo supports the product and the customer. The support would vary

13   because it was all done over the phone, and Eargo didn't consider if this was appropriate for the

14   individual or not—the lack of physical observation made Eargo's dealings with customers

15   "generic." FE1 noted that Eargo's attitude was "how do we keep people from returning the device'

16   not "how can we support people to get the best hearing result from it." Everything begins "on the

17   wrong foot" without knowing the anatomy of an individual's ear, which is so important in making

18   a good fitting. Further, FE1 explained that Eargo was not doing any type of self-assessment, just

19   asking customers, "Do you have hearing loss?" and giving customers a questionnaire over the

20   phone where they were asked to rate their hearing in different settings and situations on a scale of

21   1 to 5. If they scored too poorly, they had to speak to an audiologist before continuing. But this

22   process never actually materialized, and the salespeople who were being trained on how to conduct

23   this process ended up selling the hearing aids no matter what. Eargo's attitude was, "we only have

24   one size, and we hope like hell it fits you," which was how sales began, but, according to FE1, this

25   is not true for hearing aid users.

26       67.    Critically, FE1 explained that in its transactions with the federal employees, Eargo

27   would have had to have customers' insurance verified and have medical codes, which state how

28

they received devices or what type of hearing loss the product was provided for. For insurance to be satisfied, the insurance company needs to see the customer needed hearing aids. In normal practice, FE1 would need to provide an audiogram that shows the severity of hearing loss and justifies the need for a hearing aid with his state license on all documentation. Eargo couldn't have provided this for each customer, but likely still stated "bi-neural hearing loss" without providing an audiogram. FE1 clarified that this was not limited to "bi-neural" hearing loss, as the Company was using other codes too. He explained that hearing loss is one part of it, but understanding if hearing loss is sensory, neural, or conductive is a big part of medical coding. You can't just say someone has bi-neural hearing loss without specifying; they go hand in hand. If hearing loss is conductive, it can be medically corrected if it's within a certain range, and FE1 would be required to send the patient to an Ear, Nose and Throat doctor for clearance for a hearing aid. FE1 noted, "When I'm looking in someone's ear and see a disorder, it's the biggest thing they (Eargo) are not doing."

68.    Specifically, FE1 explained, Eargo used "super bills" which showed a statement of what was received from Eargo along with medical codes. A super bill is a document that is generated so that a customer can submit for reimbursement to its own insurance provider. But if a customer had on their super bill a medical code for having been fitted with bi-neural aids with hearing loss and sensory neurology, this was false, because such a medical code indicates that the customer was tested and/or received results to determine this. The problem, according to FE1, was that Eargo was using medical codes that insurers would pay off, and the codes would indicate that there was bi-neural hearing loss and that a physical exam of the ear was performed along with fitting and training the patient on how to use the product. The reality is that Eargo doesn't do this, doesn't require an audiogram or testing, or merely provided training for the customer over the phone and emailed the customer videos on device cleaning. FE1 explained that for some customers, this was inadequate: how would you know over the phone if someone knows how to properly clean or put in a hearing aid just because they are answering "yes" to questions on a phone?

69.     Finally, FE1 explained, Eargo was representing and delivering its service as a legitimate process, while providing no visual inspection and no physical meeting with a licensed person.

70.     FE2, who worked as an audiologist at Eargo from January 2017 to December 2019 similarly described that the salespeople who were encouraging customers to buy Eargo's hearing aids without an audiogram were not qualified to do so. FE2 explained further that some customers were told not to get a hearing test done for fear that the salesperson might lose out on the commission from possible sales.

### 7.     Eargo Misleads Investors In Announcing 2020 Financial Results And 2021 Revenue Guidance

71.     On February 25, 2021, Eargo announced its fourth quarter and full year 2020 financial results. The Company reported "net revenues of $22.4 million in the fourth quarter and $69.2 million for the full year of 2020, representing 110.8% and 110.9% increases, respectively, over the corresponding periods of 2019." Eargo stated that its full year 2021 guidance would be in a range of $87 million to $93 million. In a press release, Defendant Gormsen attributed Eargo's 2020 momentum, in part, to "better than expected sales to customers with insurance coverage[.]"

72.     That same day, Eargo held an earnings call to present its fourth quarter and full year 2020 performance. During the earnings call, held several weeks after Eargo had completed its internal review of improper insurance billing practices, Defendants spoke repeatedly about the growth of insurance customers and the importance of continuing that growth in the future. For example, in referencing sales to insurance customers, Defendant Gormsen stated that "we typically target insurance customers with call-outs on our national advertising, building awareness that consumers may be eligible for a hearing aid at low or no cost. However, the magnitude of insurance orders we received as a result of holiday advertising was ahead of our expectations, particularly in a quarter that is seasonally more cash-pay weighted." He described Eargo's "insurance opportunity," calling it "a multiyear runway for continued efficient growth." Defendant Gormsen explained that Eargo "opened a new channel for consumers to acquire hearing aids at low or no

cost through insurance, driving down our return rates and improving the efficiency of our business."

73.     An accompanying slide in the presentation cited "[f]urther penetration of insurance market" as a key "4Q20 Revenue Driver." Another slide listing "A Large, Untapped Insurance Market Opportunity," stated that there were approximately 12 million people in the United States over the age of 50 who have both hearing loss and access to hearing aid benefits under certain health insurance plans. Gormsen's presentation further depicted a "Future Opportunity" of approximately 10.7 million members represented and that approximately 1.3 million members were in a "Current Addressable Insurance Market." Those figures vastly overstated the number of Eargo customers who actually had access to hearing aid benefits.

74.     Likewise, Defendants Gormsen and Laponis based Eargo's 2021 revenue guidance on the Company's past insurance "sales." Defendant Gormsen stated that the Company's "accomplishments in 2020 give us high confidence in our ability to deliver our 2021 business plan and financial objectives." In response to an analyst question regarding Eargo's 2021 guidance, Gormsen responded, "I think we've been pretty clear in our communication that all our guidance is based on what we have already done." In particular, he said that the guidance is "driven off" of "[h]ow we can continue to penetrate the Federal insurance opportunity, that's driving a big part of our growth." Defendant Laponis stated that "in the back half of 2020 . . . roughly 45% of the volume came from insurance, a little bit more than that in Q3, a little bit less in Q4." Eargo was "modeling 2021 . . . to basically [be] a continuation of that similar behavior in terms of the insurance to a mixed percentage of the business. So we expect it to continue to grow in all three segments, as Christian said, and we expect the mix to be kind of weighted towards about 45% insurance throughout the year."

75.     Analysts applauded Eargo's results. On February 25, 2021, Wells Fargo issued a report raising its 2021 revenue estimate and its price per share by $8 to $68. Wells Fargo referenced the Company's "higher than expected demand from insurance customers" and the "under-tapped market segment" of insurance customers. On February 25, 2021, J.P. Morgan issued a report

entitled Eargo's "Strong 2021 Guidance and Eargo 5 Launch Give us Confidence in Continued Outperformance." The report repeated Eargo's statement that "insurance should be about 45% of total shipments in 2021, similar to what we saw in the back half of 2020." William Blair, which rated the stock as "Outperform," issued a report on February 26, 2021, stating that Eargo's fourth quarter momentum "sets up for a strong 2021." The report stated that there was a "large runway ahead for the company in terms of volume growth" within the insurance channel, and that "[m]anagement expects insurance to continue to represent approximately 45% of the product mix in 2021[.]"

76.     On February 26, 2021, Eargo participated in the SVB Leerink Global Healthcare Conference. During the conference, Defendant Gormsen stated that the Company's "initial focus" was on the "largest subset" of customers, federal employees, whose "program basically offers $2,500 of hearing coverage, allowing people to get hearing aids or Eargos at no money out of pocket. Not in the clinic, but with Eargo." Gormsen emphasized that the Company built "verification as well as [insurance] claims processing in-house," and that once customers provide a medical record number, "we'll verify your coverage and we'll ship your product. We'll focus you on hearing and we're dealing on the back end with all the integrations on the payer side." During the question-and-answer portion of the conference, the host asked Gormsen how far Eargo could penetrate the insurance market. Gormsen stated that 45% of Eargo's business was with insurance customers and that "we absolutely see growth opportunity in insurance as well." Gormsen explained that because Eargo is a "national provider" it "can build the verification infrastructure and the claims processing."

### 8.     Unknown To Investors, Eargo's Largest Insurance Payor Initiates An Audit And Stops Paying Claims

77.     The volume of Eargo's falsified insurance claims spiked to thousands of claims per quarter during the Class Period, and the largest insurance company administering the federal plan took notice. By no later than March 1, 2021, BCBS FEP had become highly suspicious of Eargo's claims, initiated an audit (including requesting patient medical records), and stopped reimbursing

Eargo for any hearing aid insurance claims as of that date. Typically, when an audit is conducted, payment continues. Thus, the payment freeze by BCBS FEP was unusual and a red flag of a significant issue.  Despite learning of an audit that posed an existential threat to the Company's business model, its net revenue, and its revenue guidance, Eargo did not disclose for months that its largest third-party payor had refused to pay *any* claims the Company submitted on behalf of BCBS FEP customers.

78.     In fact, Defendants continued to make false or misleading statements.

79.     As one example, on March 18, 2021, J.P. Morgan issued a report entitled "Bullish Investor Meetings Highlight Continued Momentum and Long Runway for Growth," which described a meeting the prior week with Defendants Gormsen and Laponis. The report stated that Gormsen and Laponis "took the opportunity to provide a broad overview of the company's strategy and outlook going forward," which included "highlighting" "the success the company has seen in the insurance market, with a significant runway for growth in the federal employee population and Medicare Advantage…." Citing Eargo's "push into the insurance market," which "only just began in earnest," J.P. Morgan came away from the meeting believing that here was "upside to Eargo's ~45% mix target" between insurance and cash pay customers. J.P. Morgan issued a price target of $68 by December 2021, which outpaced the March 17, 2021 share price of $55.14.

80.     In so doing, J.P. Morgan referenced Eargo's ability "to capture share in the largely untapped insurance market," repeating Eargo's own misleading estimate that it could access approximately 12 million customers over the age of 50 with hearing loss have some form of insurance benefit. J.P. Morgan specifically noted that Eargo was "currently focusing its efforts on driving adoption within the 1.3M federal employees with $2,500 in hearing aid benefits and zero out-of-pocket for the patient."

81.     The representations to J.P. Morgan analysts were materially false or misleading. While highlighting Eargo's purported success in the insurance market, Defendants knew, but failed to disclose, that Eargo was falsifying required codes on the reimbursement forms, and was involved in a pending audit, pursuant to which BCBS FEP had refused to pay any claims submitted

by Eargo since March 1, 2021.

9.    **Defendants Continue To Make False Or Misleading Statements About Eargo's Insurance Coverage And Revenue In Second Quarter 2021**

82.    As the BCBS FEP audit and payment freeze continued into the second quarter of 2021, Defendants continued to make false or misleading statements. On April 16, 2021, BofA Securities held a "2021 CEO Call Series Conference Call" with Defendants Gormsen and Laponis. During the call, the moderator asked Defendant Gormsen to discuss Eargo's targeting of federal employees and describe "how confident are you right now that you've got the right strategy for going after that federally insured patient population that your awareness is increasing because it's just such an obviously large pool of patients that are in a super unique situation in that the hearing aids are paid for." Gormsen responded that "the federal program offers and allows a hearing benefit of 2,500 dollars" and that "[w]e can offer a no money out of pocket solution to the federal employees."

83.    Referring to "all the success we had in 2020," Gormsen said "that we're doing a pretty good job of addressing" customers with federal insurance. "That's a great scenario and that gives us absolutely the confidence of the guidance we put out for 21-22." Gormsen emphasized that "the federal is the ***only*** part that's included in our guidance. So, we're not counting on additional insurance markets to come in and that's not included in our guidance."[2] Defendant Laponis further explained that "[j]ust to clarify the numbers, we did about 45% spot on in the back half of 2020 with our nexus federal. As we built the guidance, we assumed it would be in a similar type of range and that's what we talked about back second call, but clearly, it's an area where we see future opportunity." As on previous earnings and investor calls, Gormsen defined the "huge insured population" of "12 million total people out there who have some level of benefits of which federal is only a subset of 1.3 million," which falsely overestimated the actual pool of potential customers with access to an insurance benefit.

84.    On April 22, 2021, BofA Securities issued a report regarding the CEO Conference

---

[2] Unless otherwise indicated, all emphasis in quotations is added.

Call. The report stated that BofA Securities believed that "EAR is on track to beat estimates all year long, including in Q1" and that "EAR is one of the most interesting SMID caps we cover, given the $20bn potential market and EAR's first-mover advantage."

85.    Eargo reported its first quarter earnings on May 12, 2021. Its press release quoted Defendant Gormsen as stating that Eargo's marketing program continued to "drive demand across multiple customer types, including both cash pay and insurance customers producing 74% year-over-year growth." Eargo also announced that it had increased its net revenue guidance for 2021 to a range of $89 million to $93 million, up from the previous range of $87 million to $93 million.

86.    Also on May 12, 2021, Defendants Gormsen and Laponis participated in Eargo's First Quarter 2021 Earnings Call. During the earnings call, Defendant Gormsen delivered prepared remarks and referred to an accompanying slide presentation—specifically "Slide 5," reproduced below—stating that Eargo generated $22.0 million in net revenue, which constituted year-over-year growth of 74%. That same slide stated that one of the "1Q21 Revenue Drivers" was "Increased penetration into the insurance market." Gormsen further stated that "[b]oth revenue and volume growth in the first quarter was supported by several factors," the first of which was "the further penetration into the insurance market."



87.    In addition, during the earnings call Defendant Gormsen and Defendant Laponis

each expressed their "confidence" in Eargo's ability to meet its revenue guidance based upon Eargo's prior quarterly results and its existing "momentum." Gormsen, referring to the past quarter's results, stated: "I'm pleased to report that we again delivered outstanding performance in the first quarter of 2021, further increasing our confidence in our 2021 guidance and longer term financial objectives." Laponis also stated: "Due to our high degree of confidence and our ability to drive growth and capitalize on the momentum in our business, we are raising full year 2021 net revenue guidance to $89 million to $93 million, up from $87 million to $93 million."

88.    Eargo disclosed that an unnamed insurer was conducting what Eargo characterized as a "routine audit"—which Defendant Laponis called "pretty common" in August 2021 and Defendant Gormsen described in September 2021 as something that "happen[s] all the time." This audit was, in truth, anything but routine—it was prompted by Eargo's submission of thousands of false reimbursement requests. Defendants also failed to disclose that (i) the insurance company conducting the audit was the FEHBP plan's largest, BCBS FEP, which covered two-thirds of all federal employees and retirees with hearing aid benefits, and (ii) BCBS FEP had not paid Eargo any claims since March 1, 2021. Despite the ongoing audit and payment freeze, Eargo actually recorded a *lower* (and false) allowance for doubtful accounts than at year-end 2020 ($1.6 million allowance compared to $1.9 million at year-end 2020 and prior to the audit).

89.    Analysts reacted positively to Eargo's first quarter 2021 results. In a May 12, 2021 report, J.P. Morgan highlighted Eargo's "good 1Q21 results." Reiterating its "Overweight" rating, J.P. Morgan stated that Eargo experienced "another strong performance from the insurance segment" and that the Company's return rate "continued to trend downward due to a better-than-expected insurance mix." Likewise, William Blair issued a report on May 13, 2021, characterizing Eargo's first quarter 2021 performance as "another strong beat," which was "driven by growth in both the DTC cash-pay and insurance segments." William Blair viewed the Company's decision to raise the low-end of its full year guidance by only $2 million to be "related to conservatism" and stated that "[w]ith continued momentum within the insurance channel, success and investment in the targeting marketing, and the upcoming launch of Eargo 5 driving both the cash pay and

repeat segments in the second half of the year, we view guidance as achievable and beatable."

          **10.**      **Eargo Belatedly Issues More Information About The Audit But Continues To Mislead Investors To Stem A Sharper Stock Price Decline**

90.     In connection with announcing Eargo's second quarter 2021 earnings on August 12, 2021, Eargo told investors that the Company's accounts receivable rose "primarily due to a claims audit by an insurance company that is our largest third-party payor, who accounted for approximately 80% of our gross accounts receivable as of June 30, 2021." The Company further stated that claims submitted to this unidentified insurer had not been paid since March 1, 2021. In response to the information disclosed on this day, the price of Eargo's common stock declined over 24%, from a close of $32.70 on August 12, 2021 to a close of $24.70 the following day.

91.     To mitigate the impact of this information, Defendants made a number of false statements designed to ease the market's concerns. For instance, despite the claims audit, and the Company's undisclosed internal review demonstrating its submission of false claims to FEHBP insurers, the Company doubled down and raised its full-year 2021 net revenue guidance again "from between $89 million and $93 million to between $93 million and $96 million," citing "the continued momentum in our business and confidence in Eargo 5 driving consumer demand."

92.     Later that same day, Eargo held its second quarter 2021 earnings call. An analyst asked Defendants for additional information about the audit. The analyst asked, "I assume this is government. Can you disclose any more on why they're not paying or you're in this negotiation? And do you think you can resolve this in 2021?" Defendant Gormsen responded first by minimizing the audit, which he described as an opportunity to educate the insurer. He stated, "[T]his is more as I see it an education of our business model and how our business model works differently from the classic way of distributing hearing aids. Given that we're in an active discussion and it's a very constructive discussion, we're not disclosing the name, but it is a large payor that's basically administrating on behalf of the federal government."

93.     Gormsen explained that, given Eargo's method of distributing hearing devices, the audit was necessary for the Company to explain to the payor how Eargo's business operates, and

how it fits into the landscape of the hearing industry. He stated:

> We are providing all over America, right? So, we're one single provider with a high volume and hence a lot of dollars flowing through. So we see this more as—they're actually doing their diligence by auditing everything we do, because we do it in a different way. We don't do it through a clinic, right? We do it through telecare, online experiences, and phone experiences. So, it's really this process of seeing how that fits into sort of the traditional way of providing documentations and so on for benefits.

94.     Gormsen claimed that not only would the audit allow the Company to educate its third-party payors, but would ultimately help the Company to expand its business. He stated, "[W]e see this more as an educational process that gives us the opportunity to further broaden our insurance coverage."

95.     Analysts accepted Defendants' misleading reassurances regarding the Company's insurance practices and the nature of the claims audit. For example, Bank of America stated that it saw "no reason to believe the audit will end up impacting coverage. It makes sense that a totally new way of doing things would be reviewed in our view." Likewise, Wells Fargo cited management's confidence that "this is a routine diligence effort where the payor simply needs to change how they process claims, and expect it to be resolved without issue." And in an analyst report issued after a roadshow at the Company in mid-August, William Blair stated that:

> Management provided additional clarity around its recently announced insurance claims audit, suggesting the discussions were advanced (resolvable this year) and they (Eargo and the payer) are jointly creating a proposal for future claims processes. There does not appear to be an issue with the benefit amount, the device delivered, or a dispute/denial. Though there is some chance of that changing, management walked through why it has no indication that is the case today, commenting that the discussion with the C-suite of the payer is largely forward-looking with "light lifts" on potential new processes to be introduced. Given the size of the insurance business, this is a key area to watch for the company, though we believe that based on the data we have today, this is something that should be resolved with time.

96.     Based on meetings with Eargo executives, William Blair concluded: "The audit does not appear to be tied to coverage or the coverage amount but was triggered by the rapid growth from zero claims per quarter to 5,000 claims per quarter by Eargo in a matter of two years."

97.     Defendants continued to make misleading statements about the audit over the next few weeks. On September 9, 2021, Defendants Gormsen and Laponis attended the 2021 Virtual Wells Fargo Healthcare Conference, during which Defendant Gormsen stated that the unnamed insurer was "not questioning claims, so we are not denying claims, they are not questioning product. . . . They're not questioning our delivery of audiology there either. . . . It's more, how do we define a process that allows for them to approve our claims in a more streamlined manner, right." Gormsen claimed that the audit did not impact the Company's guidance, stating "We feel good about the guidance we've given. That doesn't keep us sleepless."

98.     The next day, September 10, 2021, Wells Fargo issued a report echoing Eargo's optimistic assessment of the audit, stating that a "key takeaway" from Defendants Gormsen and Laponis was that "[t]he insurer audit seems likely to resolve positively potentially in 2021." Referring to Defendants comments during the conference, Wells Fargo stated: "Management has stressed that this is a routine audit which is common in the hearing aid industry and that they are not questioning claims or product, but instead helping to define a process to approve claims in a more streamlined manner." Further, Wells Fargo emphasized that Defendants "feel confident the audit will resolve without issue, and it is more a question of when, not if, it gets resolved and the claims paid. They noted they are aiming to complete within the calendar year." As a result, Wells Fargo maintained its "Overweight" rating for the stock.

### 11.     Defendants' Misconduct Triggers A Government Investigation, Causing Eargo's Stock Price To Plummet

99.     On September 22, 2021—less than two weeks after Defendants had assured investors that the audit was routine, had nothing to do with whether the claims were valid, and was a growth "opportunity"—Eargo filed a Form 8-K with the SEC disclosing that the Department of Justice had begun conducting a criminal investigation into the matter.

100.    Specifically, Defendants announced:

On September 21, 2021, Eargo, Inc. (the "Company") was informed that it is the target of a criminal investigation by the U.S. Department of Justice (the "DOJ") related to insurance reimbursement claims the Company has submitted on behalf of its customers covered by federal employee health plans. The Company is

cooperating with the investigation. In addition, the Company intends to work with the government with the objective of validating the process to support any future claims that the Company may submit for reimbursement.

As previously disclosed, the Company has been the subject of an ongoing claims audit by an insurance company that is the Company's largest third-party payor. The Company has been informed by the insurance company that the DOJ is now the principal contact related to the subject matter of the audit.

101.    Defendants additionally disclosed that the Company was withdrawing its net revenue guidance for the fiscal year ending December 31, 2021.

102.    In response to this news, Eargo's stock plummeted from a closing price of $21.86 on September 22, 2021 to a closing price of $6.86 on September 23, 2021—a staggering 68% drop in a single trading day.

103.    Analysts responded to the Company's news with surprise. A Wells Fargo analyst noted in a September 23, 2021 report that the DOJ investigation directly impacted Eargo's business model and stated that it suspected that "establishing medical necessity may be one area that is being looked at, as both insurance and cash pay customers can order an Eargo device online without consulting an audiologist by instead signing a waiver acknowledging they haven't received a medical examination." Wells Fargo downgraded Eargo's stock to "equal weight," assuming that "EAR is unable to continue selling into the insurance business"—a remarkable assumption given Defendants' months of assurances that Eargo's penetration of the insurance market would be the cornerstone of the Company's business model.

104.    Following the close of trading on November 16, 2021, Defendants disclosed more disappointing news relating to the DOJ's ongoing investigation. Specifically, the Company filed with the SEC a Form 12b-25 Notification of Late Filing disclosing: "Eargo, Inc. (the "Company") has determined that it is unable to file its Quarterly Report on Form 10-Q for the quarterly period ended September 30, 2021 (the "Form 10-Q") within the prescribed time period without unreasonable effort and expense due to the circumstances described below."

105.    Defendants elaborated on the "circumstances" relating to the DOJ's ongoing

investigation and provided new information about the investigation to the market. The Form 12b-25 explained that the investigation "related to insurance reimbursement claims the Company submitted on behalf of its customers covered by various federal employee health plans under the Federal Employee Health Benefits ("FEHB") program." The Company added, "The investigation also pertains to the Company's role in customer reimbursement claim submissions to federal employee health plans." Finally, Defendants announced that the inquiry had expanded to include more of Eargo's payors than originally disclosed: "Two additional third-party payor audits related to claims submitted for customers with FEHB plans are also in process."

106.   Defendants provided certain additional financial metrics in the Form 12b-25, explaining, "Total payments the Company has received to date from the government in relation to claims submitted under the FEHB program, net of any product returns and associated refunds, are approximately $44 million," and "During the three months ended September 30, 2021, the Company shipped 13,117 gross hearing aid systems, approximately 48% of which were to customers with potential insurance coverage."

107.   As a result of Eargo's outsized reliance on FEHBP customers, Defendants concluded, "The Company has not yet completed its assessment of the accounting impact of the DOJ investigation and the ongoing claims audits on its financial statements for the three months ended September 30, 2021 and prior periods, and is therefore unable to file the Form 10-Q on a timely basis."

108.   Eargo's disappointments continued to mount over the next several days. On November 22, 2021, the Company filed a Form 8-K and accompanying press release announcing that "the Company received a letter from The Nasdaq Stock Market LLC ("Nasdaq") indicating that, since the Company has not yet filed its Quarterly Report on Form 10-Q for the period ended September 30, 2021 (the "Form 10-Q"), the Company no longer complies with Nasdaq Listing Rule 5250(c)(1) for continued listing."

109.   Defendants disclosed further, "Under the Nasdaq Listing Rules, the Company has 60 calendar days to submit a plan to regain compliance (the "Plan") and, if Nasdaq accepts the

Plan, Nasdaq may grant an exception of up to 180 calendar days from the Form 10-Q original filing due date, or until May 16, 2022, to regain compliance. The Company intends to submit the Plan within the 60-calendar day period."

110.    Following this news, Eargo's share price declined from a closing price of $6.27 on November 19, 2021 to a close of $5.88 on November 22, 2021. The stock continued to decline the following day, closing at $5.56 on November 23, 2021.

### 12.    **Eargo Dramatically Cuts Its Workforce, Exits The Insurance Market, And Announces A Settlement With The Government For $34.4 Million**

111.    On December 7, 2021, Eargo announced via a Form 8-K "a plan to reduce its employee workforce by 25 percent to 30 percent to streamline its organization in response to declines in customer orders since the Company announced the investigation of the Company by the U.S. Department of Justice."

112.    Then, on January 6, 2022, the Company disclosed, "On January 4, 2022, the DOJ confirmed to the Company that the investigation has been referred to the Civil Division of the DOJ and the U.S. Attorney's Office for the Northern District of Texas and the criminal investigation is no longer active." The Company noted that it is "continuing to cooperate with the investigation."

113.    On March 2, 2022, Eargo filed a Form 12b-25 Notification of Late Filing with the SEC. The purpose of the Form 12b-25 was to inform investors as to why Eargo was unable to file required SEC Reports (such as its Third Quarter 2021 Report on Form 10-Q and its Annual Report for 2021 on Form 10-K) within the prescribed period. Eargo stated that it was unable to file its Annual Report for 2021 on Form 10-K based on a DOJ investigation "related to insurance reimbursement claims the Company submitted on behalf of its customers covered by various federal employee health plans under the Federal Employee Health Benefits ("FEHBP") program," as well as "the Company's role in customer reimbursement claim submissions to federal employee health plans." Eargo further disclosed that "the Company is currently subject to a number of other ongoing audits of insurance reimbursement claims submitted to additional third-party payors. One of these claims audits does not relate to claims submitted under the FEHB program."

114.    For the first time, Eargo disclosed that as of September 21, 2021 (when it announced the government investigation), the Company had "offered affected customers (i.e., customers using insurance benefits as a method of direct payment for transactions prior to December 8, 2021) the option to return their hearing aids or purchase their hearing aids without the use of their insurance benefits in case their claim is denied or ultimately not submitted by the Company to their insurance plan for payment." The Company further stated that the ongoing investigation and the ongoing audits of insurance reimbursement claims had prevented Eargo from "complet[ing] its assessment of the accounting impact of these matters on its financial statements for the year ended December 31, 2021 and the three-month and nine-month periods ended September 30, 2021, complet[ing] and finaliz[ing] the preparation of its financial statements and related disclosures, or conclud[ing] the assessment of its internal controls over financial reporting pursuant to Section 404(b) of the Sarbanes-Oxley Act of 2002."

115.    On April 29, 2022, the Department of Justice issued a Press Release announcing a $34.37 million settlement with Eargo "to settle common law and False Claims Act allegations of unsupported diagnosis codes."

116.    The DOJ made clear that Eargo's conduct was both longstanding and knowing. The DOJ Press Release issued in connection with the Settlement Agreement explained that FEHBP carriers "that offer a hearing aid benefit require that claims for hearing aid devices include a hearing loss-related diagnosis code. These diagnosis codes must be supported by a hearing loss diagnosis, which is typically based on a hearing test." Despite this requirement, the DOJ stated that "during the period from January 1, 2017 through January 31, 2021, Eargo submitted or caused the submission of claims for payment to the FEHBP using unsupported hearing loss-related diagnosis codes (ICD-10 diagnosis codes H90.5 and H91.93) on claims for hearing aid devices that Eargo submitted to the FEHBP and on superbills Eargo provided to FEHBP participants to obtain reimbursement from the FEHBP."

117.    Further, the DOJ stated that "between Feb. 1, 2021, and Sept. 22, 2021, Eargo continued to include these unsupported hearing loss-related diagnosis codes on claims and

superbills—even after completing an internal review of its billing and coding practices in January 2021—resulting in Eargo knowingly submitting or causing the submission of false claims for payment to the FEHBP." The $34.4 million settlement was more than Eargo's reported revenue in 2021 ($32.1 million) and over eight times the Company's gross profit. Further, Eargo's 2021 revenue was over $57 million less than the low end of the Company's 2021 revenue guidance.

118.    The misconduct described herein has had devastating consequences for Eargo's shareholders. As a direct result of the fraud, Eargo has been unable to meet Nasdaq's requirements for listing, and currently faces the prospect that it will be de-listed from the exchange. Eargo has slashed its workforce, exited the once-critical insurance market, and stated that it needs to raise capital to stay afloat. As of close of trading on May 20, 2022, Eargo stock was trading at $1.25 per share—a tiny fraction of its Class Period high of more than $75.37 per share.

### E.    DEFENDANTS' VIOLATIONS OF GENERALLY ACCEPTED ACCOUNTING PRINCIPLES AND MISSTATEMENTS OF FINANCIAL METRICS

119.    Each quarter throughout the Class Period, Defendants reported and discussed Eargo's net revenue and other financial results in earnings releases, SEC filings, and during earnings calls and presentations to investors.

120.    Defendants claimed that Eargo's financial statements were prepared in accordance with Generally Accepted Accounting Principles ("GAAP"), and Defendants Gormsen and Laponis executed Sarbanes-Oxley Certifications that the information presented in SEC filings fairly presented, in all material respects, the financial condition and results of the Company.

121.    Yet, at each reporting period end, Eargo's reported revenue was false and in violation of GAAP. The Company's reported revenue was artificially inflated because Eargo's FEHBP customers (including BCBS FEP customers) were ineligible for a hearing aid benefit, and Eargo falsified claims submissions with unsupported diagnosis codes.

### 1.    GAAP Governs Eargo's Reporting Of Financial Statements

122.    Financial statements (including footnote disclosures) are a central feature of financial reporting and are a principal means of communicating financial information to investors.

For companies such as Eargo, the accounting profession (and the SEC) recognize GAAP as the uniform rules, conventions, and procedures necessary to define and reflect accepted accounting practices at a particular time. SEC Regulation S-X states that financial statements filed with the SEC that are not prepared and presented in accordance with GAAP "will be presumed to be misleading or inaccurate, despite footnotes or other disclosures." 17 C.F.R. § 210.4-01(a)(1). GAAP violations, therefore, bear on whether SEC regulations for publicly-traded companies, such as Eargo, have been properly followed and satisfied.

123.    GAAP are primarily promulgated by the Financial Accounting Standards Board ("FASB") and are codified into a system that has been accepted by the SEC as the framework by which public companies must report their financial position and the results of their operations (among other things)—i.e., SEC regulations require that public company financial statements be prepared in conformity with GAAP. Beginning with the year 2009, the FASB codified its accounting standards into a system whereby pertinent sections are organized by topic and referenced by the acronym ASC ("Accounting Standards Codification"). These ASCs represent the source of authoritative GAAP for nongovernmental entities, including Eargo. (ASC 105, Generally Accepted Accounting Principles, section 10-05-1).

124.    The framework for the accounting standards that make up the ASCs within GAAP is set out in, among other places, Statements of Financial Accounting Concepts ("FASCON"). To that end, FASCON 8, Conceptual Framework for Financial Reporting ("FASCON 8"), states:

> Financial reports represent economic phenomena in words and numbers. To be useful, financial information not only must represent relevant phenomena, but it also must faithfully represent the phenomena it purports to represent. To be a perfectly faithful representation, a depiction would have three characteristics. It would be complete, neutral, and free from error.

FASCON 8, ¶QC12.

### 2.    Defendants Violated GAAP Provision ASC 606 By Improperly Recognizing Revenue That Was Not Reimbursable

#### (a)    GAAP Provision ASC 606 Governs Recognition Of Revenue

125.    Eargo incorporated GAAP Provision ASC 606 into its SEC Reports during the

Class Period, defined the specific requirements of ASC 606, and described how Eargo complied with ASC 606. The Executive Defendants signed each SEC Report on Forms 10-Q and 10-K during the Class Period and certified that the information in each of the Company's SEC Reports fairly presented, in all material respects, the financial condition and result of operations of the Company.

126.    As Eargo itself has disclosed, GAAP provision ASC 606, "Revenue from Contracts with Customers," governs Eargo's recognition of revenue from its sales of hearing aids.

127.    Specifically, under ASC 606, revenue is recognized when promised goods or services are transferred to customers in an amount that reflects the consideration to which the entity expects to be entitled in exchange for those goods or services by following a five-step process:

128.    First, the business must identify the contract with its customer.

129.    Second, the business must identify the performance obligations in the contract.

130.    Third, the business must determine the transaction price and allocation to performance obligations.

131.    Fourth, the business must allocate the transaction price to the performance obligations in the contract.

132.    Fifth, the business must recognize the revenue when or as it satisfies its performance obligations.

3.    **Eargo Purported To Recognize Revenue In Accordance With ASC 606**

133.    In Eargo's Form 10-K for 2020, the Company described how it recognizes revenue in accordance with ASC 606:

> For product sales, control is transferred upon shipment to the customer. . . . Revenue is recognized when a customer obtains control of promised goods or services, in an amount that reflects the consideration which the entity expects to receive in exchange for those goods or services.

134.    Eargo also disclosed how it interpreted and applied each of the five required steps in ASC 606.

135.    First, to identify the contract with a customer, Eargo "generally considers completion of an Eargo sales order . . . as a customer contract provided that collection is considered probable . . . . *For payments involving insurance payors, the Company validates customer eligibility and reimbursement amounts prior to shipping the product*."

136.    Second, with respect to performance obligations in the contract, Eargo considers "product performance obligations" to "include hearing aid systems and related accessories," and it considers "service performance obligations" to "include extended warranty coverage."

137.    Third, to determine the transaction price and allocation to performance obligations, Eargo considers both "fixed consideration," which "includes amounts to be contractually billed to the customer," and "variable consideration," which 'includes the 45-day right of return that applies to all products." To estimate returns, "the Company analyzes historical return levels, current economic trends, and changes in customer demand. Based on this information, the Company reserves a percentage of product sale revenue and accounts for the estimated impact as a reduction in the transaction price."

138.    Fourth, to allocate the transaction price to the performance obligations in the contract, "the Company allocates the transaction price to the performance obligations on a relative standalone selling price basis," which is "based on multiple factors including, but not limited to historical discounting trends for products and services, gross margin objectives, internal costs, competitor pricing strategies, and industry technology lifecycles."

139.    Finally, the Company recognizes "revenue for products . . . at a point in time, which is generally upon shipment."

**4.    Defendants Violated ASC 606 By Knowingly or Recklessly Recognizing Revenue That Was Not Reimbursable**

140.    As described in §§ I.D.6-12 & § I.F, Defendants knew, or were deliberately reckless in not knowing, that Eargo submitted false claims to FEHBP insurers based upon unsupported diagnosis codes. Such diagnosis codes were required to be supported by a hearing loss diagnosis, which is typically based on a hearing test performed by a health care provider—which Eargo did

not require. While the Company touted that its customers would gain access to, for instance, "lifetime remote support from licensed hearing professionals and audiologists," the Company did not require a patient to consult with an audiologist or undergo an audiogram or other hearing test before purchasing an Eargo device.

141.    As a result, this source of payment for its products—reimbursement from FEBHP insurers, like the BCBS—never met the requirements of ACS 606. Specifically, ASC 606 states:

> An entity shall account for a contract with a customer that is within the scope of this Topic only when all of the following criteria are met:
>
> a.  The parties to the contract have approved the contract (in writing, orally, or in accordance with other customary business practices) and are committed to perform their respective obligations.
>
> b.  The entity can identify each party's rights regarding the goods or services to be transferred.
>
> c.   The entity can identify the payment terms for the goods or services to be transferred.
>
> d.  The contract has commercial substance (that is, the risk, timing, or amount of the entity's future cash flows is expected to change as a result of the contract).
>
> e.  ***It is probable that the entity will collect substantially all of the consideration to which it will be entitled in exchange for the goods or services that will be transferred to the customer***.
>
> In evaluating whether collectability of an amount of consideration is probable, an entity shall consider only the customer's ability and intention to pay that amount of consideration when it is due. The amount of consideration to which the entity will be entitled may be less than the price stated in the contract if the consideration is variable because the entity may offer the customer a price concession.

142.    The final requirement in the aforementioned list of criteria is obviously not met given that in this case, the claims submitted by Eargo were not reimbursable without the proper submission of medical necessity described above.

143.    The Company also failed to comply with its own disclosures regarding the timing and propriety of its revenue recognition—particularly with respect to "assess[ing] insurance eligibility" prior to recognizing revenue—and thus should not have recognized as revenue the

shipments to FEHBP customers even under its own disclosed policies.

144. During the Class Period, Eargo informed investors that the split between insurance and cash pay customers was approximately 45%—the percentage split upon which the Company determined its public guidance. In fact, in an April 22, 2021 BofA Healthcare Conference, Defendant Laponis confirmed that the percentage related to FEHBP customers: "[W]e did about 45% spot on in the back half of 2020 *with our nexus federal*. As we built the guidance, we assumed it would be in a similar type of range and that's what we talked about back second call, but clearly, it's an area where we see future opportunity"

145. Based on that revenue split of approximately 45%, Eargo caused its reported revenue to be materially inflated as reflected in the chart below:

| Period | Reported Revenue | Insurance Mix | Revenue Inflation |
|---|---|---|---|
| 3Q2020 Nov. 20, 2020 | $18.1 million | ≈45% | **≈$8.1 million** |
| 4Q2020 Feb. 25, 2021 | $22.4 million | ≈45% | **≈$10.08 million** |
| 1Q2021 May 12, 2021 | $22.0 million | ≈45% | **≈$9.9 million** |
| 2Q2021 Aug. 12, 2021 | $22.9 million | ≈45% | **≈$10.3 million** |
| **Total 3Q20-2Q21** | **$85.4 million** | **≈45%** | **≈$38.4 million** |

146. Even if Defendants had some theoretical basis to believe before January 2021 that Eargo's products were reimbursable by FEHBP insurers—and they did not—there is no question that Defendants violated ASC 606 by continuing to recognize revenue for sales of hearing aids after January 2021—the point at which Eargo completed its internal review of its improper insurance billing practices. At least immediately upon completing the internal review, Defendants should have discontinued recognizing revenue from sales to customers covered by FEHBP

insurance plans. Indeed, as the DOJ determined, Defendants knowingly submitted or caused the submission of false claims for payment to the FEHBP.

147.    Defendants further violated ASC 606 by continuing to recognize revenue for sales of hearing aids after March 1, 2021, when BCBS stopped reimbursing Eargo for any claims submitted. Immediately upon learning that BCBS intended to stop reimbursing Eargo's claims, Defendants should have discontinued recognizing revenue from sales to customers covered by BCBS.

## F.    ADDITIONAL SCIENTER ALLEGATIONS

148.    As set forth above and further below, numerous facts demonstrate that the Executive Defendants and Eargo knew or were deliberately reckless in not knowing that Defendants' statements identified in § I.G were materially false or misleading when made. The scienter of Eargo as a corporate entity is derived from the scienter of its executives, including but not limited to the Executive Defendants.

149.    *First*, the nature of the misconduct supports a strong inference of scienter. Defendants submitted or caused the submission of insurance claims to FEHBP insurers with diagnosis codes indicating that a hearing professional had diagnosed Eargo customers with hearing loss based on a hearing examination—a practice the Company's own internal review confirmed resulted in the submission of false claims. The government investigation confirmed that Eargo systematically falsified diagnosis codes in insurance claims submitted to the FEHBP. *See, e.g.*, § I.D.11. The government's investigation further confirmed that the Company and the Executive Defendants knew that fact, as Eargo completed an internal review of its improper billing practices in January 2021—yet continued "knowingly submitting or causing the submission of false claims for payment to the FEHBP."

150.    And Defendants did it on a widespread scale, amounting to thousands of false claims per quarter that were created and submitted in a systemic manner that was centralized through Eargo. This is not the kind of conduct that occurs by mistake. Rather, it was intentional or at least deliberately reckless in nature.

151. **Second**, it was at minimum deliberately reckless for Defendants to embark on this critical insurance growth initiative and speak about it in glowing terms to the market without actually pre-clearing customers' eligibility with BCBS and other insurers. Eargo's model was typically based on avoiding an audiogram and a doctor's visit if possible. BCBS FEP's Policy Manual issued in October 2020 and UM Guidelines also indicated that sales of Eargo devices to BCBS FEP customers, Eargo's largest third-party payor, may be ineligible for reimbursement given the manner in which Eargo sold its hearing aids.

152. If Defendants had doubts about reimbursement in light of Eargo's sales practices, Defendants should have simply asked BCBS FEP, which would have answered any questions about the scope of its coverage as applied to Eargo's sales practices. Rather than simply confirming with BCBS FEP and other FEHBP insurers whether Eargo's devices were truly covered—which is what a prudent, good faith actor would have done—Eargo simply submitted thousands of false claims. While doing this, Defendants repeatedly assured the market that they verified eligibility and reimbursement amounts before submitting claims and booking revenue—when they clearly had not done so. In light of Eargo's business model and practices, it was at minimum deliberately reckless for Defendants to submit tens of thousands of claims, book substantial amounts of revenue, and assure investors that Eargo was successfully penetrating the insurance market, without actually confirming with FEHBP insurers like BCBS FEP that Eargo's customers were, in fact, eligible for reimbursement.

153. **Third**, the scale and severity of Eargo's misconduct establishes that this was not a "close call" or a gray area. The conduct began in 2017 and lasted for nearly five years. At one point, Eargo was under criminal investigation for the practices set forth above, and the DOJ civil investigation ended with a $34.4 million settlement in which the government asserted that Defendants violated the False Claims Act. Eargo has since withdrawn from the insurance market entirely, potentially permanently. The scope and severity of the misconduct supports a strong inference of scienter.

154. **Fourth**, Defendants continued to book revenue upon shipment of devices to

FEHBP insureds *even after Eargo's internal review confirmed improper billing practices and after BCBS had refused to pay any claims*. For instance, in its financial results for the second and third quarters of 2021, after which BCBS FEP refused to pay claims, Eargo booked over $20 million in revenue related to insurance customers (≈45% of reported revenue for those quarters). Over $15 million of that revenue related to BCBS FEP customers, which represented approximately 53% of Eargo's net revenue in the second quarter or 2021. It was at minimum deliberately reckless for Defendants to continue to book revenue from shipments to FEHBP insurance customers after Defendants completed Eargo's internal review and BCBS had stopped paying claims in connection with its audit.

155.   *Fifth*, Defendants repeatedly omitted key information about its internal review and the ongoing audit conducted by BCBS FEP, Eargo's largest third-party payor, and then later, repeatedly mischaracterized the nature and severity of the audit. *See*, *e.g.*, §§ I.D.6-10; I.G.3-4. As described in more detail *supra*, between March 1, 2021 and August 12, 2021, Eargo filed numerous reports with the SEC, and the Executive Defendants otherwise spoke publicly about the Company's net revenues and accounts receivable attributed to insurance sales. Eargo further raised its revenue projections in the first and second quarters of 2021 on the purported strength of insurance sales and revenue. Yet, the Exchange Act Defendants failed to disclose the very existence of this significant audit until May 2021, and then, until August 2021, continued to conceal the critical fact that the Company's largest third-party payor had requested patient medical records and not paid *any* of Eargo's claims since March 1, 2021.

156.   Instead of promptly and fully disclosing the relevant facts, the Exchange Act Defendants continued to make false and misleading statements regarding the nature and severity of the audit. Specifically, in response to questions by investors and securities analysts, Defendants emphatically denied that the third-party payor's audit was serious, instead mischaracterizing it as a "routine diligence effort" and an opportunity to "educate" the third-party payor to "defin[e] a process forward."

157.   For instance, on Eargo's August 12, 2021 earnings call, during which the Company

reported an increase in accounts receivables due to the audit, an analyst asked, "[D]o you feel comfortable on the amount of cash you have coming in?" Defendant Laponis responded: "These kind of audits are—on claims are pretty common, particularly given the growth in our business. We believe all the claims we submitted are valid, reimbursable and we have had a very productive call even this week with the payor and we're confident we're able to provide them all the requested documentation." In response to another analyst's question about the audit, Gormsen responded, "[T]his is more as I see it an education of our business model and how our business model works differently from the classic way of distributing hearing aids."

158.  Critically, the Executive Defendants conveyed to analysts during an August 16, 2021 meeting that there was not "an issue with the benefit amount, the device delivered, or a dispute denial." Similarly, during their appearance at the September 9, 2021 Virtual Wells Fargo Healthcare Conference, Defendants Gormsen and Laponis reiterated these assurances in response to analysts' questions. For example, the conference host asked Defendant Gormsen, "[A]re there any updates since the earnings call in August and when do you think it will be resolved?" Gormsen responded, "[A]udits in the hearing aid industry happen all the time, right. You're audited by large customers. . . . [W]e are not denying claims, they are not questioning product. . . . They're not questioning our delivery of audiology there either. So it's really about—it's more, how do we define a process that allows for them to approve our claims in a more streamlined manner, right." The host later asked bluntly, "What are they auditing?", to which Gormsen replied, "So it's not that we have auditors running around the company looking at things, it's more is a how do we make sure we validate all your claims." At that same conference, Laponis responded to a question about the impact of the audit on revenue recognition by stating, "[W]e haven't had any dispute raised at this point by the payor."

159.  The Executive Defendants' statements about the audit support scienter not only because they were false, but also because these Defendants were, in fact, personally involved in the "dialogue" with the payor concerning the audit. In an August 16, 2021 William Blair's analyst note, the analyst stated, "Management provided more details around the insurance claims audit

disclosed on the second-quarter earnings call regarding its largest third-party payor. Eargo described the discussions as advanced, with frequent C-suite dialogue on process details/evidence documentation and creating guidelines for future claims (rather than discussions about a dispute or denial)."

160.   Yet just 12 days after Defendants' misrepresentations at the September 9, 2021 Wells Fargo conference, the Company announced that it had been named a target of a federal criminal investigation, a designation under Department of Justice Guidelines meaning that the DOJ believed it had substantial evidence linking the Company to the commission of a crime and was, in the judgment of the prosecutors, a putative defendant. *See* Department of Justice Manual, Section 9-11.151, Advice of "Rights" of Grand Jury Witnesses, available at https://www.justice.gov/jm/jm-9-11000-grand-jury#9-11.151. This made clear that the Exchange Act Defendants' repeated statements downplaying the severity of the audit were knowingly or deliberately recklessly false.

161.   ***Sixth***, as noted above, the DOJ's findings support a strong inference of scienter. The DOJ concluded that, between January 1, 2017 and January 31, 2021, "Eargo included unsupported hearing loss-related diagnosis codes on claims for hearing aid devices that Eargo submitted to the FEHBP and on invoices—called superbills—that Eargo provided to FEHBP beneficiaries to obtain reimbursement for such devices from the FEHBP." The DOJ further concluded that, between February 1, 2021 and September 22, 2021, "Eargo continued to include these unsupported hearing loss-related diagnosis codes on claims and superbills—even after completing an internal review of its billing and coding practices in January 2021—resulting in Eargo ***knowingly*** submitting or causing the submission of false claims for payment to the FEHBP." Based on its criminal, and then civil, investigations of Eargo, the DOJ determined that Eargo's conduct was intentional, which supports a strong inference of scienter.

162.   ***Seventh***, the Executive Defendants held themselves out as knowledgeable about Eargo's ability to penetrate the federal employee insurance market and the status of the audit. As detailed above, Defendants Gormsen and Laponis, healthcare industry veterans, spoke regularly

to investors and securities analysts about the importance of the insurance market to Eargo's business and growth and the nature of the audit, professing to know what they were speaking about.

163.    Throughout the Class Period, Defendants Gormsen and Laponis demonstrated specific familiarity with the overall insurance market, the Company's insurance-based growth strategy, and the Company's claims filing and verification of insurance eligibility, which they discussed in multiple SEC filings, on multiple earning calls, and at multiple investor conferences. *See generally* §§ I.D & I.G. These statements demonstrate that the Executive Defendants had actual access to information about which they made false and misleading statements to the market.

164.    Further, after announcing the audit being conducted by an unnamed insurer, Defendants described their personal involvement in that process, mischaracterized the nature of that process, and communicated the likely resolution.

165.    The fact that the Executive Defendants held themselves out as knowledgeable about these subjects and discussed these subjects in detail with investors and securities analysts, supports a strong inference of their scienter.

166.    *Eighth*, sales to insurance customers and penetration of the insurance market was a "core operation" of Eargo's, which supports the inference of scienter. Selling hearing aids to insured customers comprised at least 45% of Eargo's total net revenues and was what the Executive Defendants identified as the largest category of Eargo's sales growth.

167.    As set forth in detail above, §§ I.D.2 & I.G, the Exchange Act Defendants directly attributed the Company's growth to increased sales to customers with an insurance benefit. Further, as discussed in detail above, §§ I.D.6 & I.G, the Executive Defendants repeatedly referred to customers with a federal insurance benefit as a "huge opportunity" and "key drivers" for growth. In fact, potential customers with a federal insurance benefit were so important that the Company priced its hearing aids based on the amount of the federal benefit, and the Company's net revenue guidance was "driven off" of "[h]ow [it] can continue to penetrate the Federal insurance opportunity, that's driving a big part of [the Company's] growth."

168.    For example, in the fourth quarter 2020 and full-year 2020 earnings call, Laponis

described that 45% of the Company's sales volume "came from insurance" and that, as a result, the Company was "modeling 2021 . . . to basically [be] a continuation of that similar behavior in terms of the insurance to a mixed percentage of business." At the SVB Leerink Global Healthcare Conference a few days later, Gormsen explained that 45% of Eargo's sales were to insurance customers and that "we absolutely see growth opportunity in insurance as well." Further, revenue from sales to BCBS FEP customers, Eargo's largest third-party payor, was critical to the Company's revenue and growth strategy. After BCBS FEP refused to pay any claims after March 1, 2021, 57% and 80% of the Company's accounts receivable as of the first and second quarters 2021, respectively, related to BCBS FEP unpaid claims.

169.     The fact that insurance sales and further growth through sales to federal employees and retirees with insurance benefits was a core operation of Eargo's—and the Executive Defendants touted its importance and the Company's focus on it—supports a strong inference of the Executive Defendants' scienter with respect to their misleading statements on the subject. At the very least, given the Executive Defendants' intimate knowledge of Eargo's insurance sales and the nature of the audit, it was deliberately reckless not to investigate the accuracy of their statements regarding net revenues from insurance sales and the nature and seriousness of the ongoing audit.

G.     **THE EXCHANGE ACT DEFENDANTS' ADDITIONAL FALSE AND MATERIALLY MISLEADING STATEMENTS AND OMISSIONS**

1.     **Materially False And Misleading Statements In Eargo's Third Quarter 2020 Earnings Call And Form 10-Q**

170.     In addition to misstating the financial metrics noted above, Defendants made a number of other false or misleading statement or omissions. As detailed further below, these misstatements generally concerned: (i) Eargo's progress and success in penetrating the insurance market; (ii) the fact that Eargo's successful penetration of the insurance market was a driver of revenue growth; (iii) Eargo's assurance that it verified customer eligibility and reimbursement amounts prior to shipping the product and recoding revenue; (iv) the size of the insurance market that Eargo could access; (v) the audit by BCBS FEP; and (vi) Eargo's guidance, which was

expressly based on its purported historical sales to FEHBP customers.

**(a)** **Eargo's Third Quarter 2020 Earnings Call**

171.    On November 20, 2020, Eargo filed a Form 8-K with the SEC and published a press release entitled "Eargo Reports Third Quarter 2020 Financial Results." The 8-K was signed by Defendant Laponis. The press release reported that Eargo earned net revenues of $18.2 million for the quarter, which was up 135.3% year-over-year. The reported revenue was materially misstated for the reasons set forth above in § I.E.

172.    On November 19, 2020, Defendants Gormsen and Laponis held an earnings call to discuss Eargo's third quarter 2020 financial results, during which they repeated the materially misstated financial results noted above. During the call, Defendant Gormsen also stated that Eargo estimated there are "approximately 12 million consumers in the U.S. over 50, who have both hearing loss and access to hearing aid benefits under certain health insurance plans." Gormsen continued: "Eargo has identified and started to rapidly penetrate pockets of consumers with hearing insurance benefits that cover most or all of the cost of an Eargo."

173.    The statements regarding Eargo's addressable insurance market were false and misleading when made. The total insured consumers accessible to Eargo was not approximately 12 million consumers given that Eargo's FEHBP customers were ineligible for insurance reimbursement, including 5.5 million BCBS FEP customers.

**(b)** **Eargo's Third Quarter 2020 Form 10-Q**

174.    On November 20, 2020, Eargo filed its Form 10-Q, which was signed by Defendants Gormsen and Laponis. The Form 10-Q contained the same materially misstated financial results noted above for the third quarter of 2020.

175.    The third quarter 2020 Form 10-Q stated, "Changes in third-party coverage and reimbursement may impact our ability to grow and sell our products" and that "A payor's decision to provide coverage for a product does not imply that an adequate reimbursement rate will be approved . . . . Third-party coverage and reimbursement may never become available to us at sufficient levels."

176.    It was misleading for Defendants to describe generic, abstract risks regarding potential "changes in third-party coverage" while concealing that the risks that had already occurred, i.e., that FEHBP customers (including BCBS FEP customers) were not eligible for reimbursement for the purchase of Eargo hearing aids, and that Eargo had submitted numerous unsupported claims to BCBS and other insurers that were not eligible for payment at all.

177.    The Form 10-Q further stated that the "Company generally considers completion of an Eargo sales order . . . as a customer contract provided that collection is considered probable," and that "[f]or payments that are not made upfront by credit card, the Company assesses insurance eligibility . . . as appropriate."

178.    This statement was materially false and misleading. Contrary to this statement, Eargo did not "assess[] insurance eligibility," but instead submitted false claims to FEHBP insurers (including BCBS FEP) to obtain reimbursement without preclearing patient eligibility.

179.    Eargo further stated that Defendants attributed the Company's increased revenue in the third quarter of 2020, in part, to "growth in sales to customers with health insurance coverage, as such customers generally have lower return rates." Defendants further stated that the Company's increased sales volume was "largely driven," in part, by a "growth in customers with health insurance coverage for hearing aids . . . ."

180.    It was materially misleading to state that Eargo's "increase in [sales] volume was largely driven by . . . growth in sales to customers with health insurance coverage" without disclosing that: (i) FEHBP customers (including BCBS FEP customers) were not eligible for reimbursement for the purchase of Eargo hearing aids; and (ii) Eargo had been submitting false claims to FEHBP insurers (including BCBS FEP) to obtain reimbursement.

181.    Further, the Form 10-Q included a section on Eargo's compliance with "U.S. or foreign federal and state healthcare regulatory laws," stating that "if" Eargo failed to comply with such laws "we could be subject to penalties, including, but not limited to, administrative, civil and criminal penalties, damages, fines, disgorgement, exclusion from participation in governmental healthcare programs and the curtailment of our operations, any of which could adversely impact

our reputation." That section listed as an example of such laws "the U.S. federal false claims laws, including the False Claims Act, which can be enforced through whistleblower actions, and civil monetary penalties laws, which, among other things, impose criminal and civil penalties against individuals or entities for knowingly presenting, or causing to be presented, to the U.S. federal government, claims for payment or approval that are false or fraudulent, knowingly making, using or causing to be made or used, a false record or statement material to a false or fraudulent claim, or from knowingly making a false statement to avoid, decrease or conceal an obligation to pay money to the U.S. federal government."

182.    It was misleading to describe generic and abstract risks that "could" render Eargo subject to penalties and fines, without disclosing that, in fact, those risks had already occurred because Eargo's FEHBP customers (including BCBS FEP customers) were not eligible for reimbursement for the purchase of Eargo hearing aids, and Eargo had submitted numerous false unsupported claims to BCBS and other insurers that were not eligible for payment at all.

> **2.    Materially False And Misleading Statements In Eargo's Fourth Quarter And Full Year 2020 Press And Earnings Releases, Investor Presentations, And 2020 Form 10-K**
>
> > **(a)    J.P. Morgan Healthcare Conference And Investor Presentation On January 12, 2021**

183.    On January 12, 2021, after disclosing preliminary unaudited financial results for the fourth quarter and full year 2020, Defendants, Gormsen and Laponis participated in the J.P. Morgan Healthcare Conference. During the conference, when asked about the company's profitability potential, Defendant Laponis represented that "a natural tailwind" existed in the company's ability to drive awareness for insurance customer segment for insurance customers to "convert better" and as a result, Eargo could grow its customer base at a "lower cost of acquisition." Regarding insurance benefits, Defendant Gormsen stated that the Company was "targeting right now federal employees" who have access to a hearing benefit. He stated that "our focus and the reason we're focused on federal employees initially is you give us your medical record number, we have APIs built that will verify your coverage. Upon acceptance of that, which

is typically instantaneous, we will actually ship you your products. You don't have to worry about the credit card, anything. We deal with all the claims processing on the back end, directly with the administrators of the FEHB program." Gormsen further claimed that Eargo saw "a huge opportunity long term to expand this" to FEHBP customers, who represent 1.3 million of the 12 million in potential customers over the age of 50 with a hearing aid benefit.

184.   These statements were false or misleading when made. It was misleading for Defendants to describe Eargo's current "targeting" of and "focus" on federal employees without disclosing that the Company was systemically submitting false insurance claims for reimbursement.

185.   The statements regarding Eargo's insurance opportunity were also false or misleading when made. The total insurance "opportunity" accessible to Eargo was not approximately 12 million customers, or 1.3 million customers in the "current addressable insurance market," given that FEHBP customers were not eligible for reimbursement for the purchase of Eargo hearing aids, which included 5.5 million BCBS FEP customers.

(b)   **Eargo's Fourth Quarter 2020 And Full Year 2020 Press Release**

186.   On February 25, 2021, Eargo filed a Form 8-K with the SEC and published a press release entitled "Eargo Reports Fourth Quarter and Full Year 2020 Financial Results." The 8-K was signed by Defendant Laponis. The press release reported that Eargo earned net revenues of $22.4 million for the quarter, which was up 110.8% year-over-year. The press release also reported that Eargo earned net revenues of $69.2 million for the year, which was up 110.9% year-over-year. The reported revenue was materially misstated for the reasons set forth above in § I.E.

187.   Regarding the Company's growth in 2021, Defendant Gormsen stated, "Our performance in 2020 and the continued consumer acceptance of using telecare to solve for hearing loss gives us a high degree of confidence we can continue to help more people hear better in 2021. This is reflected in our full year 2021 revenue guidance of between $87 million and $93 million."

188.   Defendants' statements concerning Eargo's performance and revenue guidance for

2021 were materially false or misleading when made. The guidance was misleading because: (i) it was based on a false premise, namely, that Eargo's historical penetration of the insurance market was legitimate and would continue; and (ii) it omitted to disclose material facts, namely, that FEHBP customers (including BCBS FEP customers) were ineligible for reimbursement benefits on Eargo's product, and Eargo was systemically falsifying claims to obtain reimbursement. Given that insurance customers comprised approximately 45% of Eargo's customer base (which the Company expected would continue in 2021), Defendants knew the Company's guidance was baseless and impossible for Eargo to achieve.

(c)     **February 25, 2021 Fourth Quarter 2020 And Full Year 2020 Earnings Call And Investor Presentation**

189.    Also on February 25, 2021, Defendants Gormsen and Laponis participated in the Company's earnings call for the fourth quarter 2020 and full year 2020. A presentation slide, reproduced below and entitled "A Large, Untapped Insurance Market," highlighted Eargo's penetration of the insurance market, stating that there were approximately 12 million people in the United States over the age of 50 who have both hearing loss and access to hearing aid benefits under certain health insurance plans. Eargo stated that approximately 10.7 million members represented a "Future Opportunity" and that approximately 1.3 million members were in a "Current Addressable Insurance Market."

CONSOLIDATED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS
Case No. 3:21-cv-08597-CRB

55

1
2
3
4
5
6
7
8
9
10
11
12
13
14



15    190.    These statements regarding Eargo's insurance opportunity were false and

16  misleading when made. The total insurance "opportunity" accessible to Eargo was not

17  approximately 12 million customers, or 1.3 million customers in the "current addressable

18  insurance market," given that FEHBP customers were not eligible for reimbursement for the

19  purchase of Eargo hearing aids, including 5.5 million BCBS FEP customers.

20    191.    Defendants made additional false or misleading statements regarding Eargo's

21  "insurance opportunity," calling it "a multiyear runway for continued efficient growth." Defendant

22  Gormsen explained that Eargo "opened a new channel for consumers to acquire hearing aids at

23  low or no cost through insurance, driving down our return rates and improving the efficiency of

24  our business." As part of his prepared remarks, Defendant Laponis stated that at the end of 2020

25  "roughly 45% of the volume came from insurance," and that the company was modeling 2021 as

26  "a continuation of that similar behavior" with an expected mix "kind of weighted towards about

27

28

1  45% insurance throughout the year."

2  192.    These statements were false and misleading. It was misleading to describe Eargo's

3  purported performance in the insurance market as a growth driver, and to highlight that 45% of

4  Eargo's sales came from the insurance market, without disclosing that: (i) FEHBP customers

5  (including BCBS FEP customers) were not eligible for reimbursement for the purchase of Eargo

6  hearing aids; and (ii) Eargo had been submitting false claims to FEHBP insurers (including BCBS

7  FEP) to obtain reimbursement.

8  193.    A subsequent slide entitled "Strong Platform for 2021 Execution," listed

9  "Continued efficient growth driven by improved customer mix" as part of the Company's "2021

10  Plan." Defendant Gormsen stated that the Company's "accomplishments in 2020 give us high

11  confidence in our ability to deliver our 2021 business plan and financial objectives." In response

12  to an analyst question regarding Eargo's 2021 guidance, Gormsen responded, "I think we've been

13  pretty clear in our communication that all our guidance is based on what we have already done."

14  In particular, he said that the guidance is "driven off" of "[h]ow we can continue to penetrate the

15  Federal insurance opportunity, that's driving a big part of our growth."

16  194.    Defendants' statements concerning Eargo's performance, revenue guidance, and

17  expected performance for 2021 were materially false or misleading when made. These statements

18  were misleading because: (i) they were based on a false premise, namely, that Eargo's historical

19  penetration of the insurance market was legitimate and would continue; and (ii) they omitted to

20  disclose material facts, namely, that FEHBP customers (including BCBS FEP customers) were

21  ineligible for reimbursement benefits on Eargo's product, and Eargo was systemically falsifying

22  claims to obtain reimbursement. Given that insurance customers comprised approximately 45% of

23  Eargo's customer base (which the Company expected would continue in 2021), Defendants knew

24  the Company's guidance was baseless and impossible for Eargo to achieve.

25  **(d)    Materially False And Misleading Statements At February 26, 2021 SVB Leerink Global Healthcare Conference And Presentation**

27  195.    On February 26, 2021, Defendants Gormsen and Laponis participated in the SVB

Leerink Global Healthcare Conference. During the conference, Defendant Gormsen delivered prepared remarks and referred to an accompanying slide presentation. Referencing the insurance market as a growth driver for the Company, Gormsen stated that Eargo was "starting to enter into insurance as well as repeat purchasers." Gormsen continued that the company has seen "a lot of successes with our insurance offering." Gormsen further indicated that the Company's "initial focus" was on the "largest subset" of customers, federal employees, whose "program basically offers $2,500 of hearing coverage, allowing people to get hearing aids or Eargos at no money out of pocket. Not in the clinic, but with Eargo."

196.    These statements were false and misleading. It was misleading to describe Eargo's purported "success" with and "focus" on these insurance customers without disclosing that: (i) FEHBP customers (including BCBS FEP customers) were not eligible for reimbursement for the purchase of Eargo hearing aids; and (ii) Eargo had been submitting false claims to FEHBP insurers (including BCBS FEP) to obtain reimbursement.

197.    Gormsen also emphasized that the Company built "verification as well as [insurance] claims processing in-house," and that once customers provide a medical record number, "we'll verify your coverage and we'll ship your product. We'll focus you on hearing and we're dealing on the back end with all the integrations on the payor side."

198.    These statements were false and misleading. Contrary to these statements, Eargo did not verify insurance coverage. In fact, because FEHBP customers (including BCBS FEP customers) were not eligible for reimbursement for the purchase of Eargo hearing aids, Eargo had been submitting false claims to FEHBP insurers (including BCBS FEP) to obtain reimbursement.

199.    During the same conference, Gormsen stated, "I would say what we're guiding is basically a continuation of what we've done." Gormsen also characterized the Company's guidance as a "conservative stance" and stated that the Company was "only guiding within the federal [insurance] segment." These statements about Eargo's revenue guidance were misleading because: (i) the guidance was based on a false premise, namely, that Eargo's historical penetration of the insurance market was legitimate and would continue; and (ii) they omitted to disclose

material facts, namely, that FEHBP customers (including BCBS FEP customers) were ineligible for reimbursement benefits on Eargo's product, and Eargo was systemically falsifying claims to obtain reimbursement. Given that insurance customers comprised approximately 45% of Eargo's customer base (which the Company expected would continue in 2021), Defendants knew the Company's guidance was the opposite of "conservative"—it was baseless and impossible for Eargo to achieve.

**(e)**   **March 16, 2021 Form 10-K For The Fiscal Year Ended December 31, 2020**

200.   On March 16, 2021, Eargo issued its Annual Report for the fiscal year ended 2020 on Form 10-K. The Form 10-K was signed by Defendants Gormsen and Laponis. The Form 10-K reported revenue of $69.2 million for the year. The revenue was materially misstated for the reasons set forth above at § I.E.

201.   The Form, 10-K was issued over two weeks after Eargo learned that its largest thirty-party insurance payor had instituted an audit and refused to reimburse any claims for BCBS FEP customers. The Form 10-K contained several additional statements that were materially false and misleading when made.

202.   First, the Form 10-K included a section entitled "Accounting and Revenue Recognition," which stated: "For payments involving insurance payors, the Company validates customer eligibility and reimbursement amounts prior to shipping the product."

203.   This statement was false or misleading. Contrary to this statement, Eargo did not "validate[] customer eligibility and reimbursement amounts prior to shipping the product." Instead, because FEHBP customers (including BCBS FEP customers) were not eligible for reimbursement for the purchase of Eargo hearing aids, Eargo had been submitting false claims to FEHBP insurers (including BCBS FEP) to obtain reimbursement. This was demonstrated by, among many other things, the fact that BCBS FEP had instituted an audit and had not reimbursed Eargo for any customer insurance claims as of March 1, 2021.

204.   Second, as part of the Form 10-K, Eargo stated, "Changes in third-party coverage

and reimbursement may impact our ability to grow and sell our products" and that "A payor's decision to provide coverage for a product does not imply that an adequate reimbursement rate will be approved… Third-party coverage and reimbursement may never become available to us at sufficient levels." It was misleading for Defendants to describe generic, abstract risks regarding potential "changes in third-party coverage" while concealing that the risks that had already occurred, i.e., that FEHBP customers (including BCBS FEP customers) were not eligible for reimbursement for the purchase of Eargo hearing aids, and BCBS FEP had instituted an audit and had not reimbursed Eargo for any customer insurance claims as of March 1, 2021.

205.    Third, the Form 10-K included a section on Eargo's compliance with "U.S. or foreign federal and state healthcare regulatory laws," stating that "if" Eargo failed to comply with such laws "we could be subject to penalties, including, but not limited to, administrative, civil and criminal penalties, damages, fines, disgorgement, exclusion from participation in governmental healthcare programs and the curtailment of our operations, any of which could adversely impact our reputation." That section listed as an example of such laws "the U.S. federal false claims laws, including the False Claims Act, which can be enforced through whistleblower actions, and civil monetary penalties laws, which, among other things, impose criminal and civil penalties against individuals or entities for knowingly presenting, or causing to be presented, to the U.S. federal government, claims for payment or approval that are false or fraudulent, knowingly making, using or causing to be made or used, a false record or statement material to a false or fraudulent claim, or from knowingly making a false statement to avoid, decrease or conceal an obligation to pay money to the U.S. federal government."

206.    It was misleading to describe generic and abstract risks that "could" render Eargo subject to penalties and fines, without disclosing that, in fact, those risks had already occurred because Eargo's FEHBP customers (including BCBS FEP customers) were not eligible for reimbursement for the purchase of Eargo hearing aids, and Eargo had submitted numerous false unsupported claims to BCBS and other insurers that were not eligible for payment at all.

207.    Further, the Form 10-K described Eargo's increase in revenue during the fourth

quarter and over the full year of 2020. Defendants attributed the Company's increased revenue, in part, to "growth in sales to customers with health insurance coverage, as such customers generally have lower return rates." Defendants further stated that the Company's increased sales volume was "largely driven," in part, by a "growth in customers with health insurance coverage for hearing aids . . . ."

208.   It was materially misleading to state that Eargo's "increase in [sales] volume was largely driven by . . . growth in sales to customers with health insurance coverage" without disclosing that: (i) FEHBP customers (including BCBS FEP customers) were not eligible for reimbursement for the purchase of Eargo hearing aids; and (ii) Eargo had been submitting false claims to FEHBP insurers (including BCBS FEP) to obtain reimbursement.

(f)   **Materially False And Misleading Statements At The BofA Securities "2021 CEO Call Series Conference Call" On April 16, 2021**

209.   On April 16, 2021, Defendant Gormsen participated in the Bank of America 2021 CEO Call Series conference. During the call, Gormsen spoke at length about the Company's targeting of federal insurance customers, stating, "just to be clear, hearing aids are not paid for through the federal program, but the federal program offers and allow a hearing benefit of 2,500 dollars." He continued that Eargo could offer a "no money out of pocket solution to federal employees."

210.   This statement was false and misleading when made. It was false and misleading for Gormsen to state that the "federal program offers and allows a hearing benefit of 2,500 dollars" and that Eargo offered a "no money out of pocket solution to federal employees" without disclosing that: (i) FEHBP customers (including BCBS FEP customers) were not eligible for reimbursement for the purchase of Eargo hearing aids; and (ii) Eargo had been submitting false claims to FEHBP insurers (including BCBS FEP) to obtain reimbursement.

211.   Regarding further penetration of the insurance market, Gormsen further touted the "enormous head room and long-term growth." Referring to "all the success we had in 2020," Gormsen said "that we're doing a pretty good job of addressing" customers with federal insurance.

"That's a great scenario and that gives us absolutely the confidence of the guidance we put out for 21-22." Gormsen emphasized that "the federal is the only part that's included in our guidance. So, we're not counting on additional insurance markets to come in and that's not included in our guidance." Defendant Laponis further explained that "[j]ust to clarify the numbers, we did about 45% spot on in the back half of 2020 with our nexus federal. As we built the guidance, we assumed it would be in a similar type of range and that's what we talked about back second call, but clearly, it's an area where we see future opportunity."

212.   Defendants' statements concerning Eargo's performance, revenue guidance, and expected performance for 2021 were materially false or misleading when made. These statements were misleading because: (i) they were based on a false premise, namely, that Eargo's historical penetration of the insurance market was legitimate and would continue; and (ii) they omitted to disclose material facts, namely, that FEHBP customers (including BCBS FEP customers) were ineligible for reimbursement benefits on Eargo's product; Eargo was systemically falsifying claims to obtain reimbursement; and BCBS FEP had instituted an audit and had not reimbursed Eargo for any insurance claims as of March 1, 2021—including claims underlying the revenues on which the guidance was based. Given that insurance customers comprised approximately 45% of Eargo's customer base (which the Company expected would continue in 2021), Defendants knew the Company's guidance was baseless and impossible for Eargo to achieve.

213.   As on previous earnings and investor calls, Gormsen also defined the "huge insured population" of "12 million total people out there who have some level of benefits of which federal is only a subset of 1.3 million," which falsely over included the actual pool of potential Eargo customers with access to an insurance benefit. These statements were false and material when made given that FEHBP customers were not eligible for reimbursement for the purchase of Eargo hearing aids, including 5.5 million BCBS FEP customers.

3.    **Materially False And Misleading Statements In Eargo's First Quarter 2021 Press And Earnings Release, Form 10-Q, And Investor Presentation**

(a)    **Eargo's First Quarter 2021 Press Release**

214.    On May 12, 2021, Eargo filed a Form 8-K with the SEC and published a press release entitled "Eargo Reports First Quarter 2021 Financial Results" The Form 8-K was signed by Defendant Laponis. The press release reported that Eargo earned net revenues of $22.0 million for the quarter, which was up 74.0% year-over-year. The revenue was materially misstated for the reasons set forth above in § I.E.

215.    The release quoted Defendant Gormsen as stating that Eargo's marketing program continued to "drive demand across multiple customer types, including both cash pay and insurance customers producing 74% year-over-year growth."

216.    It was materially misleading to state that Eargo's success with insurance customers was a driver of its growth without disclosing that: (i) FEHBP customers (including BCBS FEP customers) were not eligible for reimbursement for the purchase of Eargo hearing aids; (ii) Eargo had been submitting false claims to FEHBP insurers (including BCBS FEP) to obtain reimbursement; and (iii) BCBS FEP had instituted an audit and had not reimbursed Eargo for any insurance claims as of March 1, 2021—including claims underlying the revenues on which the results were based.

217.    The release further quoted Defendant Gormsen: "Our strong start to the year gives us increased confidence to deliver our full year revenue and gross margin guidance…" As part of the press release, Eargo announced that it had increased its net revenue guidance for 2021 to a range of $89 million to $93 million, up from the previous range of $87 million to $93 million.

218.    Defendants' statements concerning Eargo's performance, revenue guidance, and expected performance for 2021 were materially false or misleading when made. These statements were misleading because: (i) they were based on a false premise, namely, that Eargo's historical penetration of the insurance market was legitimate and would continue; and (ii) they omitted to disclose material facts, namely, that FEHBP customers (including BCBS FEP customers) were

ineligible for reimbursement benefits on Eargo's product; Eargo was systemically falsifying claims to obtain reimbursement; and BCBS FEP had instituted an audit and had not reimbursed Eargo for any insurance claims as of March 1, 2021—including claims underlying the revenues on which the guidance was based. Given that insurance customers comprised approximately 45% of Eargo's customer base (which the Company expected would continue in 2021), Defendants knew the Company's increased guidance was baseless and impossible for Eargo to achieve.

(b)     **May 12, 2021 Earnings Call And Investor Presentation**

219.    Also on May 12, 2021, Defendants Gormsen and Laponis participated in Eargo's First Quarter 2021 Earnings Call. During the earnings call, Defendant Gormsen delivered prepared remarks and referred to an accompanying slide presentation—specifically "Slide 5," reproduced below—stating that Eargo generated $22.0 million in net revenue, which constituted year-over-year growth of 74%. That same slide stated that one of the "1Q21 Revenue Drivers" was "Increased penetration into the insurance market." In his remarks, Defendant Gormsen stated that Eargo "delivered strong first quarter net revenue growth of approximately 74%." He further stated that "[b]oth revenue and volume growth in the first quarter was supported by several factors," the first of which was "the further penetration into the insurance market."



220.   It was materially misleading to state that Eargo's success with insurance customers was a driver of its growth without disclosing that: (i) FEHBP customers (including BCBS FEP customers) were not eligible for reimbursement for the purchase of Eargo hearing aids; (ii) Eargo had been submitting false claims to FEHBP insurers (including BCBS FEP) to obtain reimbursement; and (iii) BCBS FEP had instituted an audit and had not reimbursed Eargo for any insurance claims as of March 1, 2021—including claims underlying the revenues on which the results were based.

221.   A subsequent slide titled "Comparison of 1Q21 and 1Q20 Results," listed Eargo's First Quarter 2021 "Net Revenue" of $22.0 million and its year-over-year growth of 74%. The slide stated that Eargo experienced "increased insurance market penetration" and had a "[s]trong mix of insurance customers" in First Quarter 2021. In his prepared remarks, Defendant Laponis stated that Eargo's return rate "was driven primarily by a higher mix of insurance customers."

222.   Again, it was materially misleading to state that Eargo's success with insurance customers was a driver of its growth without disclosing that: (i) FEHBP customers (including BCBS FEP customers) were not eligible for reimbursement for the purchase of Eargo hearing aids; (ii) Eargo had been submitting false claims to FEHBP insurers (including BCBS FEP) to obtain reimbursement; and (iii) BCBS FEP had instituted an audit and had not reimbursed Eargo for any insurance claims as of March 1, 2021—including claims underlying the revenues on which the results were based. For the same reasons, it was misleading for Defendants to discuss Eargo's purported insurance "penetration" into the insurance market, its "strong mix" of insurance customers, and its "higher mix of insurance customers."

223.   In addition, Defendant Gormsen and Defendant Laponis each expressed their "confidence" in Eargo's ability to meet its revenue guidance based upon Eargo's prior quarterly results and its existing "momentum." Defendant Gormsen, referring to the past quarter's results, stated: "I'm pleased to report that we again delivered outstanding performance in the first quarter of 2021, further increasing our confidence in our 2021 guidance and longer-term financial objectives." Defendant Laponis also stated: "Due to our high degree of confidence and our ability

to drive growth and capitalize on the momentum in our business, we are raising full year 2021 net revenue guidance to $89 million to $93 million, up from $87 million to $93 million."

224.    Defendants' statements concerning Eargo's performance, revenue guidance, and expected performance for 2021 were materially false or misleading when made. These statements were misleading because: (i) they were based on a false premise, namely, that Eargo's historical penetration of the insurance market was legitimate and would continue; and (ii) they omitted to disclose material facts, namely, that FEHBP customers (including BCBS FEP customers) were ineligible for reimbursement benefits on Eargo's product; Eargo was systemically falsifying claims to obtain reimbursement; and BCBS FEP had instituted an audit and had not reimbursed Eargo for any insurance claims as of March 1, 2021—including claims underlying the revenues on which the guidance was based. Given that insurance customers comprised approximately 45% of Eargo's customer base (which the Company expected would continue in 2021), Defendants knew the Company's increased guidance was baseless and impossible for Eargo to achieve.

(c)    **May 13, 2021 Form 10-Q**

225.    On May 13, 2021, Eargo issued its First Quarter 2021 Form 10-Q, signed by Defendants Gormsen and Laponis. The First Quarter 2021 Form 10-Q stated that Eargo generated $22.0 million in net revenue, which constituted year-over-year growth of 74%. The revenue was materially misstated for the reasons set forth in § I.E.

226.    The Form 10-Q further touted that Eargo's increased revenue of "$9.4 million, or 74.0%, from $12.7 million during the three months ended March 31, 2021 to $22.0 million during the three months ended March 31, 2021." Defendants attributed the Company's increased revenue, in part, to "growth in sales to customers with health insurance coverage, as such customers generally have lower return rates." Defendants further stated that the Company's increased sales volume was "largely driven," in part, by a "growth in customers with health insurance coverage for hearing aids . . . ."

227.    It was materially misleading to state that Eargo's "increase in [sales] volume was largely driven by . . . growth in sales to customers with health insurance coverage" without

disclosing that: (i) FEHBP customers (including BCBS FEP customers) were not eligible for reimbursement for the purchase of Eargo hearing aids; and (ii) Eargo had been submitting false claims to FEHBP insurers (including BCBS FEP) to obtain reimbursement.

228.    The Form 10-Q also included a section entitled "Revenue Recognition," which stated: "For payments involving insurance payors, the Company validates customer eligibility and reimbursement amounts prior to shipping the product."

229.    This statement was false or misleading. Contrary to this statement, Eargo did not "validate[] customer eligibility and reimbursement amounts prior to shipping the product." Instead, because FEHBP customers (including BCBS FEP customers) were not eligible for reimbursement for the purchase of Eargo hearing aids, Eargo had been submitting false claims to FEHBP insurers (including BCBS FEP) to obtain reimbursement. This was demonstrated by, among many other things, the fact that BCBS FEP had instituted an audit and had not reimbursed Eargo for any customer insurance claims as of March 1, 2021.

230.    Additionally, Eargo also included a "Risk Factor" in the Form 10-Q which stated that, "A significant portion of our revenue is dependent upon reimbursement from third-party payors. Any material changes to third-party coverage or reimbursement could significantly impact our business and our ability to grow and sell our products." The Risk Factor further stated that Eargo was subject to a "routine" audit with its "largest third-party payor, who accounted for approximately 57% of the Company's gross accounts receivable as of March 31, 2021," and that such reviews and audit "could in the future result significant delays in payments and could result in material recoupments of previous claims paid or denials of pending or future claims…" The Risk Factor also stated that Eargo "cannot predict whether, under what circumstances, or at what payment levels third-party payors will cover and reimburse our products."

231.    These statements regarding third-party coverage and the insurance audit were false and misleading when made because, among other things, they did not identify that Eargo's hearing aids were not reimbursable under the BCBS FEP's 2021 Plan and that there had been a "material change" in third-party coverage—namely, that BCBS FEP had refused to reimburse Eargo for any

insurance claims during the first quarter 2021. It was further false and misleading to characterize the audit as "routine" and to state that it "could in the future" result in payment delays, because, as of the date of the Form 10-Q (May 13, 2021), BCBS FEP had refused to pay any reimbursement claims for over two and one-half months.

232.    The Form 10-Q also included a section on Eargo's compliance with "U.S. or foreign federal and state healthcare regulatory laws," stating that "if" Eargo failed to comply with such laws "we could be subject to penalties, including, but not limited to, administrative, civil and criminal penalties, damages, fines, disgorgement, exclusion from participation in governmental healthcare programs and the curtailment of our operations, any of which could adversely impact our reputation." That section listed as an example of such laws "the U.S. federal false claims laws, including the False Claims Act, which can be enforced through whistleblower actions, and civil monetary penalties laws, which, among other things, impose criminal and civil penalties against individuals or entities for knowingly presenting, or causing to be presented, to the U.S. federal government, claims for payment or approval that are false or fraudulent, knowingly making, using or causing to be made or used, a false record or statement material to a false or fraudulent claim, or from knowingly making a false statement to avoid, decrease or conceal an obligation to pay money to the U.S. federal government."

233.    It was misleading to describe generic and abstract risks that "could" render Eargo subject to penalties and fines, without disclosing that, in fact, those risks had already occurred because Eargo's FEHBP customers (including BCBS FEP customers) were not eligible for reimbursement for the purchase of Eargo hearing aids, and Eargo had submitted numerous false unsupported claims to BCBS and other insurers that were not eligible for payment at all.

(d)    **June 2, 2021 Fireside Chat At William Blair's 41st Annual Growth Stock Conference With The CEO, CFO, And VP Of Investor Relations**

234.    On June 2, 2021, Defendants Gormsen and Laponis participated in the William Blair 41st Annual Growth Stock Conference. Regarding the insurance market, Defendant Gormsen stated, "over the last year had a lot of success penetrating into insurance, but predominately

through what we call federal employee. So federal employees have a $2,500 hearing benefit. But it was not just about tapping into a benefit, it was really about making the benefit available to the end user."

235.    It was materially misleading to tout Eargo's "success penetrating into insurance for "federal employees" without disclosing that: (i) FEHBP customers (including BCBS FEP customers) were not eligible for reimbursement for the purchase of Eargo hearing aids; (ii) Eargo had been submitting false claims to FEHBP insurers (including BCBS FEP) to obtain reimbursement; and (iii) BCBS FEP had instituted an audit and had not reimbursed Eargo for any insurance claims as of March 1, 2021—including claims underlying the revenues on which the results were based.

236.    In describing the Eargo device purchase process for customers with insurance coverage, Gormsen continued: "So the way it works with Eargo is, if you give us your medical record number, we will verify your coverage as a federal employee and at this moment and we have APIs built and the data integrations. The moment we verify, which is real time, we can then shift you to the box, focus you want hearing everything that happens in the back end and so it's a (inaudible) processing and medical billing, all of that we're dealing with that, so you as a user can focus on hearing better."

237.    This statement was false and misleading. Contrary to this statement, Eargo did not "verify" coverage for its products. Instead, because FEHBP customers (including BCBS FEP customers) were not eligible for reimbursement for the purchase of Eargo hearing aids, Eargo had been submitting false claims to FEHBP insurers (including BCBS FEP) to obtain reimbursement. This was demonstrated by, among many other things, the fact that BCBS FEP had instituted an audit and had not reimbursed Eargo for any customer insurance claims as of March 1, 2021.

     **4.**    **Materially False And Misleading Statements In Eargo's Second Quarter 2021 Press And Earnings Release, Form 10-Q, and Investor Presentations**

     **(a)**    **August 12, 2021 Earnings Call And Investor Presentation**

238.    On August 12, 2021, Eargo filed a Form 8-K with the SEC and published a press

release entitled "Eargo Reports Second Quarter 2021 Financial Results." The 8-K was signed by Defendant Laponis. The press release reported that Eargo earned net revenues of $22.9 million for the quarter, which was up 43.7% year-over-year. The release further reported net accounts receivable of $15.4 million. These financial metrics were materially misstated for the reasons set forth above in § I.E.

239.   The release also stated:

The increase in accounts receivable from March 31, 2021 was primarily due to a claims audit by an insurance company that is our largest third-party payor, who accounted for approximately 80% of our gross accounts receivable as of June 30, 2021. During the audit, claims since March 1, 2021 have not been paid. The Company is in active discussions with the payor and continues to work toward conclusion of the audit.

240.   As part of the press release, Eargo announced that it had further increased its net revenue guidance for 2021 to a range of $93 million to $96 million, up from the previous range of $87 million to $93 million.

241.   Defendants' statements concerning Eargo's revenue guidance for 2021 were materially false or misleading when made. These statements were misleading because: (i) they were based on a false premise, namely, that Eargo's historical penetration of the insurance market was legitimate and would continue; and (ii) they omitted to disclose material facts, namely, that FEHBP customers (including BCBS FEP customers) were ineligible for reimbursement benefits on Eargo's product, and Eargo was systemically falsifying claims to obtain reimbursement. Given that insurance customers comprised approximately 45% of Eargo's customer base (which the Company expected would continue in 2021), and that BCBS FEP comprised approximately 45% of Eargo's total accounts receivable, Defendants knew the Company's increased guidance was baseless and impossible for Eargo to achieve.

242.   That same day, August 12, 2021, Defendants Gormsen and Laponis participated in an earnings call regarding Eargo's second quarter 2021 financial results. Defendant Gormsen reiterated that an insurance company that was Eargo's "largest third-party payor, who accounted for approximately 80% of the Company's gross accounts receivable as of June 30, 2021," was

conducting a claims audit and had not paid Eargo on any claims since March 1, 2021. Defendant Laponis described the claims audit as "pretty common" and assured investors that "all the claims we submitted are valid and reimbursable," and the insurer—identified only as "a large payor that's basically administrating on behalf of the federal government"—was only focused on "requested documentation," and not the propriety of the claims. Moreover, Defendant Gormsen stated that the claims audit merely represented "an educational process" for the insurer that gave the Company "the opportunity to further broaden" its "insurance coverage."

243.   Defendants' statements regarding the claims audit were materially false and misleading when made. It was misleading for Defendants to characterize the audit as "pretty common," to categorically assure investors that "all the claims we submitted are valid and reimbursable," and label the audit as an "educational process" to "further broaden" Eargo's insurance coverage when, in truth and in fact: (i) Eargo had been systemically falsifying insurance reimbursement clams, which were not valid or reimbursable; and (ii) the Company had completed its own internal review in January 2021 and had, as the DOJ determined, "knowingly submitted or caus[ed] the submission of false claims for payment to the FEHBP."

### (b)   August 12, 2021 Form 10-Q

244.   On August 12, 2021, Eargo filed its Second Quarter 2021 Form 10-Q, signed by Defendants Gormsen and Laponis. The Second Quarter 2021 Form 10-Q stated that Eargo generated $22.9 million in net revenue. The revenue was materially misstated for the reasons set forth in § I.E.

245.   The Form 10-Q further touted "Revenue increased by $7.0 million, or 43.7%, from $15.9 million during the three months ended June 30, 2020 to $22.9 million during the three months ended June 30, 2021." Defendants attributed the Company's increased revenue, in part, to "growth in sales to customers with health insurance coverage, as such customers generally have lower return rates." Defendants further stated that the Company's increased sales volume was "largely driven," in part, by a "growth in customers with health insurance coverage for hearing aids . . . ."

246.    It was materially misleading to state that Eargo's "increase in [sales] volume was largely driven by . . . growth in sales to customers with health insurance coverage" without disclosing that: (i) FEHBP customers (including BCBS FEP customers) were not eligible for reimbursement for the purchase of Eargo hearing aids; and (ii) Eargo had been submitting false claims to FEHBP insurers (including BCBS FEP) to obtain reimbursement.

247.    The Form 10-Q also included a section entitled "Revenue Recognition," which stated: "For payments involving insurance payors, the Company validates customer eligibility and reimbursement amounts prior to shipping the product." This statement was false or misleading because Eargo had not validated customer eligibility and reimbursement amounts from its largest third-party payor prior to shipping the product. In fact, such customers were not eligible for reimbursement of Eargo's product, and Eargo had been falsifying claims to obtain reimbursement.

248.    In the Form 10-Q, Eargo also included a "Risk Factor," which stated "A significant portion of our revenue is dependent upon reimbursement from third-party payors. Any material changes to third-party coverage or reimbursement could significantly impact our business and our ability to grow and sell our products." The Risk Factor further disclosed that an insurance company that was Eargo's "largest third-party payor, who accounted for approximately 80% of the Company's gross accounts receivable as of June 30, 2021," was conducting a claims audit and had not paid Eargo on any claims since March 1, 2021. This statement was materially false and misleading when made because it omitted and did not disclose that, in fact, Eargo's federal employee insurance customers were not eligible for reimbursement of Eargo's product and Eargo had been falsifying claims to obtain reimbursement.

249.    The Form 10-Q also included a section on Eargo's compliance with "U.S. or foreign federal and state healthcare regulatory laws," stating that "if" Eargo failed to comply with such laws "we could be subject to penalties, including, but not limited to, administrative, civil and criminal penalties, damages, fines, disgorgement, exclusion from participation in governmental healthcare programs and the curtailment of our operations, any of which could adversely impact our reputation." That section listed as an example of such laws "the U.S. federal false claims laws,

including the False Claims Act, which can be enforced through whistleblower actions, and civil monetary penalties laws, which, among other things, impose criminal and civil penalties against individuals or entities for knowingly presenting, or causing to be presented, to the U.S. federal government, claims for payment or approval that are false or fraudulent, knowingly making, using or causing to be made or used, a false record or statement material to a false or fraudulent claim, or from knowingly making a false statement to avoid, decrease or conceal an obligation to pay money to the U.S. federal government."

250.    It was misleading to describe generic and abstract risks that "could" render Eargo subject to penalties and fines, without disclosing that, in fact, those risks had already occurred because Eargo's FEHBP customers (including BCBS FEP customers) were not eligible for reimbursement for the purchase of Eargo hearing aids, and Eargo had submitted numerous false unsupported claims to BCBS and other insurers that were not eligible for payment at all.

### (c)    August 16, 2021 William Blair Nondeal Roadshow

251.    On August 16, 2021, Defendant Gormsen and Laponis participated in the William Blair Virtual Nondeal Roadshow. A subsequent William Blair analyst report summarized management's statements as follows:

> Management provided more details around the insurance claims audit disclosed  on the second-quarter earnings call regarding its largest third-party payor. Eargo described the discussions as advanced, with frequent C-suite dialogue on process details/evidence documentation and creating guidelines for future claims (rather than discussions about a dispute or denial). The audit does not appear to be tied to coverage or the coverage amount but was triggered by the rapid growth from zero claims per quarter to 5,000 claims per quarter by Eargo in a matter of two years. Management suggested that based on its dialog the payor wants to ensure that it develops the proper claims processing procedures for the future.

252.    These statements regarding the audit were false and misleading when made. It was false and misleading for Defendants to downplay the nature and risks of the audit and characterize it as "creating guidance for future claims" and not "tied to coverage or the coverage amount," when, in truth and in fact: (i) the audit was absolutely tied to coverage and eligibility; (ii) Eargo's federal insurance customers were not eligible for reimbursement; (iii) Eargo had been submitting

false claims to obtain reimbursement; and (iv) the Company had completed its own internal review in January 2021 and had, as the DOJ determined, "knowingly submitted or caus[ed] the submission of false claims for payment to the FEHBP."

### (d)      September 9, 2021 Conference Call—Wells Fargo's 2021 Virtual Healthcare Conference Fireside Chat

253.     On September 9, 2021, Defendants Gormsen and Laponis participated in the Wells Fargo 20201 Virtual Healthcare Conference Fireside chat. During the call, Defendant's provided additional details about the audit. Gormsen downplayed the audit by stating that audits in the hearing aid industry "happen all the time," the insurer was "not questioning claims…denying claims…" and that the audit was focused on allowing the insurer to approve Eargo's "claims in a more streamlined manner" and "defining a process moving forward." Gormsen further touted that there was "nothing sort of punitive in the discussion" and that the auditors had even given Eargo "applauses for product and delivery and price points."

254.     It was false and misleading for Defendants to downplay the nature and risks of the audit and characterize it as "creating guidance for future claims," as not "tied to coverage or the coverage amount," and as "not punitive in nature," when, in truth and in fact: (i) the audit was absolutely questioning and denying claims; (ii) Eargo's federal insurance customers were not eligible for reimbursement; (iii) Eargo had been submitting false claims to obtain reimbursement; and (iv) the Company had completed its own internal review in January 2021 and had, as the DOJ determined, "knowingly submitted or caus[ed] the submission of false claims for payment to the FEHBP."

255.     Regarding future growth with insurance customers, Gormsen expressed confidence by stating that the Company saw "a lot of future growth within federal employees" and mentioned the possibility collaborating with the auditor "in terms of educating and targeting members to continue to drive growth, an outsized growth."

256.     It was false and misleading for Defendants to tout Eargo's continuing growth in the federal insurance segment because: (i) it was based on a false premise, namely, that Eargo's

historical penetration of the insurance market was legitimate and would continue; and (ii) it omitted to disclose material facts, namely, that FEHBP customers (including BCBS FEP customers) were ineligible for reimbursement benefits on Eargo's product, and Eargo was systemically falsifying claims to obtain reimbursement. Given that insurance customers comprised approximately 45% of Eargo's customer base, Defendants knew the Company's continuing growth was baseless and impossible for Eargo to achieve.

## H.    LOSS CAUSATION

257.    The fraud described herein was the proximate cause of declines in Eargo's stock price and resulting losses suffered by the Class. *See Mineworkers Pension Scheme v. First Solar Inc.*, 881 F.3d 750 (9th Cir. 2018). Defendants' materially false and misleading statements and omissions artificially inflated and/or maintained the price of Eargo's stock. The artificial inflation in Eargo's stock price was removed through a series of partial disclosures concerning the facts concealed and/or misrepresented by the misstatements and omissions, described below. These partial disclosures reduced the amount of inflation in the price of Eargo's publicly traded stock, causing economic injury to Plaintiffs and other members of the Class.

258.    Specifically, on August 12, 2021, Eargo issued a Form 8-K, signed by Defendant Laponis, as well as a press release, which disclosed an increase in the Company's accounts receivable "primarily due to a claims audit by an insurance company that is our largest third-party payor, who accounted for approximately 80% of our gross accounts receivable as of June 30, 2021." The Company also disclosed, "During the audit, claims since March 1, 2021 have not been paid. The Company is in active discussions with the payor and continues to work toward conclusion of the audit." The Company's Form 10-Q the same day disclosed the same information, as well as the fact that "another insurance company" was also auditing reimbursement claims submitted by Eargo. The Form 10-Q stated, "we have received some denials to date," and that it was "possible that they may seek recoupments of previous claims paid and deny any future claims."

259.    The market connected the decline in Eargo's stock price to the news of the audit

disclosed on August 12, 2021. For example, J.P. Morgan's analyst described the audit as a "disappointment." Wells Fargo described it as a "big risk," and William Blair's analyst noted that the audit "overshadow[ed]" Eargo's other positive results.

260.     In response to this news, the price of Eargo's common stock declined over 24%, from a close of $32.70 on August 12, 2021 to a close of $24.70 the following day. This decline caused Plaintiffs and Class members to suffer loss as the artificial inflation in Eargo's stock price was partially removed.

261.     Nevertheless, Defendants assured investors that the audit was no cause for concern, and the market accepted Defendants' comforting statements. For example, Defendant Laponis described "these kind of audits" as "pretty common," Gormsen described the audit as an "education on our business model" for the payor. He also described the audit as merely concerning "documentation." In addition, the Company soothed the market by raising its 2021 full year revenue guidance.

262.     On September 22, 2021, the Company filed a Form 8-K with the SEC, signed by Defendant Laponis, in which Defendants disclosed, "On September 21, 2021, Eargo, Inc. (the "Company") was informed that it is the target of a criminal investigation by the U.S. Department of Justice (the "DOJ") related to insurance reimbursement claims the Company has submitted on behalf of its customers covered by federal employee health plans." Defendants additionally disclosed that the Company was withdrawing its guidance for the fiscal year ending December 31, 2021.

263.     Analysts reacted negatively to Eargo's September 22, 2021 disclosures. For example, Wells Fargo's analyst noted in a September 23, 2021 report that "we see risk that the company can no longer sell into the insurance channel due to the DOJ investigation," and that the Company was "working through if there will be immediate changes in business operations or revenue recognition."

264.     In response to this news, Eargo's stock plummeted from a closing price of $21.67 on September 22, 2021 to a closing price of $6.86 on September 23, 2021—a 68% drop. This

decline caused Plaintiffs and Class members to suffer loss as the artificial inflation in Eargo's stock price was partially removed.

265.    Following the close of trading on November 16, 2021, the Company filed with the SEC a Form 12b-25 Notification of Late Filing, signed by Defendant Laponis, in which the Company disclosed, "Eargo, Inc. (the "Company") has determined that it is unable to file its Quarterly Report on Form 10-Q for the quarterly period ended September 30, 2021 (the "Form 10-Q") within the prescribed time period without unreasonable effort and expense due to the circumstances described below." Specifically, the Form 12b-25 explained that the investigation "related to insurance reimbursement claims the Company submitted on behalf of its customers covered by various federal employee health plans under the Federal Employee Health Benefits ("FEHBP") program." The Company added, "The investigation also pertains to the Company's role in customer reimbursement claim submissions to federal employee health plans."

266.    Finally, Defendants announced that the inquiry had expanded to include more of Eargo's payors than previously disclosed: "Two additional third-party payor audits related to claims submitted for customers with FEHB plans are also in process." Defendants also disclosed, "Total payments the Company has received to date from the government in relation to claims submitted under the FEHB program, net of any product returns and associated refunds, are approximately $44 million," and "During the three months ended September 30, 2021, the Company shipped 13,117 gross hearing aid systems, approximately 48% of which were to customers with potential insurance coverage." Finally, Defendants disclosed, "The Company has not yet completed its assessment of the accounting impact of the DOJ investigation and the ongoing claims audits on its financial statements for the three months ended September 30, 2021 and prior periods, and is therefore unable to file the Form 10-Q on a timely basis."

267.    Analysts reacted negatively to Eargo's November 16, 2021 disclosures. J.P. Morgan's analyst noted, "[W]e're increasingly concerned about . . . the company's ability to serve the insurance market moving forward."

268.    In response to this news, the price of Eargo shares dropped from a closing price of

$7.18 on November 16, 2021 to close at $6.79 the following day, a decline of over 5%. This decline caused Plaintiffs and Class members to suffer loss as the artificial inflation in Eargo's stock price was partially removed.

269.     On November 22, 2021, the Company filed a Form 8-K and accompanying press release with the SEC, signed by Defendant Laponis, which disclosed that "the Company received a letter from The Nasdaq Stock Market LLC ("Nasdaq") indicating that, since the Company has not yet filed its Quarterly Report on Form 10-Q for the period ended September 30, 2021 (the "Form 10-Q"), the Company no longer complies with Nasdaq Listing Rule 5250(c)(1) for continued listing." Defendants disclosed further, "Under the Nasdaq Listing Rules, the Company has 60 calendar days to submit a plan to regain compliance (the "Plan") and, if Nasdaq accepts the Plan, Nasdaq may grant an exception of up to 180 calendar days from the Form 10-Q original filing due date, or until May 16, 2022, to regain compliance. The Company intends to submit the Plan within the 60-calendar day period."

270.     In response to this news, Eargo's share price declined from a closing price of $5.88 on November 22, 2021 to a closing price of $5.56 the following day, a decline of over 5%. This decline caused Plaintiffs and Class members to suffer loss as the artificial inflation in Eargo's stock price was partially removed.

271.     On March 2, 2022, Eargo filed a Form 12b-25 Notification of Late Filing with the SEC, in which the Company disclosed that it was unable to file its Annual Report for 2021 on Form 10-K based on a DOJ investigation "related to insurance reimbursement claims the Company submitted on behalf of its customers covered by various federal employee health plans under the Federal Employee Health Benefits ("FEHBP") program," as well as "the Company's role in customer reimbursement claim submissions to federal employee health plans." The Company further disclosed that "the Company is currently subject to a number of other ongoing audits of insurance reimbursement claims submitted to additional third-party payors. One of these claims audits does not relate to claims submitted under the FEHBP program."

272.     Eargo further stated that it had "reached an understanding in principle with the DOJ

with respect to certain material terms of a potential settlement and resolution of the investigation and can now reasonably estimate a probable loss of approximately $34.4 million in connection with the investigation." The Company noted that "discussions are continuing," and that "there can be no assurance as to the terms or timing of a final resolution with respect to the investigation. Further, any such settlement of the investigation may not resolve the ongoing audits of insurance reimbursement claims by additional third-party payors, nor has the Company begun working with the government and third-party payors to potentially validate processes to support any future claims that it may submit for reimbursement, and there are no guarantees that the Company will be able to arrive at any such acceptable processes or submit any future claims."

273.    Eargo further disclosed, "Beginning on December 8, 2021, the Company made the decision to stop accepting insurance benefits as a method of direct payment and it is uncertain when, if ever, the Company will resume accepting insurance benefits as a method of direct payment." Eargo also stated that "[w]hile the Company intends to work with the government and third-party payors at the appropriate time with the objective of validating processes to support any future claims that it may submit for reimbursement, the Company may not be able to arrive at acceptable processes or submit any future claims."

274.    Finally, Eargo disclosed that it had "offered affected customers (i.e., customers using insurance benefits as a method of direct payment for transactions prior to December 8, 2021) the option to return their hearing aids or purchase their hearing aids without the use of their insurance benefits in case their claim is denied or ultimately not submitted by the Company to their insurance plan for payment."

275.    In response to this news, Eargo's share price declined from a close of $4.77 on March 2, 2022 that day to a close of $4.02 the following day—a decline of over 15%. This decline caused Plaintiffs and Class members to suffer loss as the artificial inflation in Eargo's stock price was partially removed.

276.    The declines in Eargo's stock price were a direct and proximate result of the fraud described herein. The timing and magnitude of Eargo's stock-price declines negate any inference

that the economic losses and damages suffered by Plaintiffs and the other members of the Class were caused by changed market conditions, macroeconomic factors, or Eargo-specific facts unrelated to Defendants' fraudulent conduct.

## I.    PRESUMPTION OF RELIANCE

277.    At all relevant times, the market for Eargo's common stock was efficient for the following reasons, among others:

(a)    Eargo's stock met the requirements for listing, and was listed and actively traded on the Nasdaq Stock Market, a highly efficient and automated market;

(b)    As a regulated issuer, Eargo filed periodic reports with the SEC and the Nasdaq Stock Market;

(c)    Eargo regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)    Eargo was followed by numerous securities analysts employed by major brokerage firms who wrote reports which were distributed to those brokerage firms' sales force and certain customers. Each of these reports was publicly available and entered the public marketplace.

278.    As a result of the foregoing, the market for Eargo's common stock reasonably promptly digested current information regarding Eargo from all publicly available sources and reflected such information in the price of Eargo's common stock. All purchasers of Eargo common stock during the Class Period suffered similar injury through their purchase of Eargo common stock at artificially inflated prices, and a presumption of reliance applies.

279.    A Class-wide presumption of reliance is also appropriate in this action under the United States Supreme Court holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against Defendants are predicated upon omissions

of material fact for which there is a duty to disclose.

**J.     THE INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND BESPEAKS-CAUTION DOCTRINE**

280.    The statutory safe harbor or bespeaks caution doctrine applicable to forward-looking statements under certain circumstances does not apply to any of the false or misleading statements pleaded in this Complaint. None of the statements complained of herein was a forward-looking statement. Rather, the statements were historical statements or statements of purportedly current facts and conditions at the time the statements were made, including statements about among other things, the eligibility of Eargo's FEHBP customers for a hearing aid insurance benefit, Eargo's success in penetrating the insurance market, the drivers of Eargo's revenue growth, Eargo's revenues and guidance, the size of the applicable insurance market, the nature of a claims audit, and risks regarding insurance reimbursement and the submission of false claims.

281.    To the extent that any of the false or misleading statements alleged herein can be construed as forward-looking, those statements were not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements. As set forth above in detail, then-existing facts contradicted Defendants' statements regarding, among other things, the eligibility of Eargo's FEHBP customers for a hearing aid insurance benefit, Eargo's success in penetrating the insurance market, the drivers of Eargo's revenue growth, Eargo's revenues and guidance, the size of the applicable insurance market, the nature of a claims audit, and risks regarding insurance reimbursement and the submission of false claims. Given the then-existing facts contradicting Defendants' statements, any generalized risk disclosures made by Eargo were not sufficient to insulate Defendants from liability for their false or misleading statements.

282.    To the extent that the statutory safe harbor does not apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those statements was made, the particular speaker knew that the particular forward-looking statement was false, and the false forward-looking statement was

1    authorized and approved by an executive officer of Eargo who knew that the statement was false

2    when made.

3    **K.    CLASS ACTION ALLEGATIONS APPLICABLE TO THE EXCHANGE**
     **ACT CLAIMS**

4

5          283.    Lead Plaintiffs bring this action as a class action pursuant to Fed. R. Civ. P. 23(a)

6    and 23(b)(3) on behalf of a Class consisting of all those who purchased or otherwise acquired the

7    common stock of Eargo between November 20, 2020 and March 2, 2022, inclusive, and who were

8    damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors

9    of Eargo at all relevant times, members of their immediate families and their legal representatives,

10   heirs, agents, affiliates, successors or assigns, Defendants' liability insurance carriers and any

11   affiliates or subsidiaries thereof, and any entity in which Defendants or their immediate families

12   have or had a controlling interest.

13         284.    The members of the Class are so numerous that joinder of all members is

14   impracticable. Throughout the Class Period, Eargo shares were actively traded on the Nasdaq

15   Stock Market. As of September 14, 2021, Eargo had over 39 million shares of common stock

16   outstanding, owned by hundreds or thousands of investors. While the exact number of Class

17   members is unknown to Lead Plaintiffs at this time and can only be ascertained through appropriate

18   discovery, Lead Plaintiffs believe that there are at least tens of thousands of members of the

19   proposed Class. Class members who purchased Eargo common stock may be identified from

20   records maintained by Eargo or its transfer agent(s), and may be notified of this class action using

21   a form of notice similar to that customarily used in securities class actions.

22         285.    Lead Plaintiffs' claims are typical of Class members' claims, as all members of the

23   Class were similarly affected by Defendants' wrongful conduct in violation of federal laws as

24   complained of herein.

25         286.    Lead Plaintiffs will fairly and adequately protect Class members' interests and have

26   retained competent counsel experienced in class actions and securities litigation.

27         287.    Common questions of law and fact exist as to all Class members and predominate

28

over any questions solely affecting individual Class members. Among the questions of fact and law common to the Class are:

      (a)    whether the federal securities laws were violated by Defendants' acts and omissions as alleged herein;

      (b)    whether the Defendants made statements to the investing public during the Class Period that were false, misleading, or omitted material facts;

      (c)    whether Defendants acted with scienter; and

      (d)    the proper way to measure damages.

288.    A class action is superior to all other available methods for the fair and efficient adjudication of this action because joinder of all Class members is impracticable. Additionally, the damage suffered by some individual Class members may be relatively small so that the burden and expense of individual litigation make it impossible for such members to individually redress the wrong done to them. There will be no difficulty in the management of this action as a class action.

## L.    CAUSES OF ACTION UNDER THE EXCHANGE ACT

### COUNT I

**For Violations Of Section 10(b) Of The Exchange Act
And SEC Rule 10b-5 Promulgated Thereunder
(Against All Exchange Act Defendants)**

289.    Lead Plaintiffs repeat and re-allege each and every allegation set forth above as if fully set forth herein.

290.    This Count is asserted on behalf of all members of the Class against Defendant Eargo and the Executive Defendants for violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

291.    During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew were, or they deliberately disregarded as, misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

292. Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Lead Plaintiffs and others similarly situated in connection with their purchases of Eargo common stock during the Class Period.

293. Defendants, individually and in concert, directly and indirectly, by the use of means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct that operated as a fraud and deceit upon Lead Plaintiffs and the Class; made various untrue and/or misleading statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; made the above statements intentionally or with deliberate recklessness; and employed devices and artifices to defraud in connection with the purchase and sale of Eargo common stock, which were intended to, and did:

(a)     deceive the investing public, including Lead Plaintiffs and the Class, regarding, among other things, the eligibility of Eargo's FEHBP customers for a hearing aid insurance benefit, Eargo's success in penetrating the insurance market, the drivers of Eargo's revenue growth, Eargo's revenues and guidance, the size of the applicable insurance market, the nature of a claims audit, and risks regarding insurance reimbursement and the submission of false claims;

(b)     artificially inflate and maintain the market price of Eargo common stock; and

(c)     cause Lead Plaintiffs and other members of the Class to purchase Eargo common stock at artificially inflated prices and suffer losses when the true facts became known.

294. Defendant Eargo and the Executive Defendants are liable for all materially false or

misleading statements made during the Class Period, as alleged above.

295.    As described above, Defendants acted with scienter throughout the Class Period, in that they acted either with intent to deceive, manipulate, or defraud, or with deliberate recklessness. The misrepresentations and omissions of material facts set forth herein, which presented a danger of misleading buyers or sellers of Eargo stock, were either known to the Defendants or were so obvious that the Defendants should have been aware of them.

296.    Lead Plaintiffs and the Class have suffered damages in that, in direct reliance on the integrity of the market, they paid artificially inflated prices for Eargo common stock, which inflation was removed from its price when the true facts became known. Lead Plaintiffs and the Class would not have purchased Eargo common stock at the prices they paid, or at all, if they had been aware that the market price had been artificially and falsely inflated by these Defendants' materially misleading statements.

297.    As a direct and proximate result of these Defendants' wrongful conduct, Lead Plaintiffs and the other members of the Class suffered damages attributable to the material misstatements and omissions alleged herein in connection with their purchases of Eargo common stock during the Class Period.

## COUNT II

### For Violations Of Section 20(a) Of The Exchange Act
### (Against The Executive Defendants)

298.    Lead Plaintiffs repeat and re-allege each and every allegation set forth above as if fully set forth herein.

299.    This count is asserted on behalf of all members of the Class against the Executive Defendants for violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

300.    The Executive Defendants acted as controlling persons of Eargo within the meaning of Section 20(a) of the Exchange Act, as alleged herein.

301.    By reasons of their high-level positions of control and authority as the Company's most senior officers, the Executive Defendants had the authority to influence and control, and did

influence and control, the decision-making and the activities of the Company and its employees, and to cause the Company to engage in the wrongful conduct complained of herein. The Executive Defendants were able to influence and control, and did influence and control, directly and indirectly, the content and dissemination of the public statements made by Eargo during the Class Period, thereby causing the dissemination of the materially false or misleading statements and omissions of material facts as alleged herein. The Executive Defendants were provided with, or had unlimited access to, copies of the Company's press releases, public filings, and other statements alleged by Lead Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or to cause the statements to be corrected.

302.    Each of the Executive Defendants spoke to investors on behalf of the Company during the Class Period. Therefore, each of the Executive Defendants was able to influence and control, and did influence and control, directly and indirectly, the content and dissemination of the public statements made by Eargo during the Class Period, thereby causing the dissemination of the materially false or misleading statements and omissions of material facts as alleged herein.

303.    As set forth above, Eargo violated Section 10(b) of the Exchange Act by its acts and omissions as alleged in this Complaint.

304.    By virtue of their positions as controlling persons of Eargo and as a result of their own aforementioned conduct, the Executive Defendants are liable pursuant to Section 20(a) of the Exchange Act, jointly and severally with, and to the same extent as, the Company is liable under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, to Lead Plaintiffs and the other members of the Class who purchased or otherwise acquired Eargo securities. As detailed above, during the respective times, these Executive Defendants served as officers and/or directors of Eargo.

305.    As a direct and proximate result of the Executive Defendants' conduct, Lead Plaintiffs and the other members of the Class suffered damages in connection with their purchase or acquisition of Eargo common stock.

1    **II.**      **VIOLATIONS OF THE SECURITIES ACT**

2            306.      In this part of the Complaint, Plaintiffs assert a series of strict liability and

3    negligence claims under Sections 11, 12(a)(2), and 15 of the Securities Act on behalf of all persons

4    or entities who purchased Eargo common stock in or traceable to Eargo's initial public offering

5    (the "IPO" or the "Offering"), conducted on or about October 16, 2020, and were damaged thereby.

6            307.      Plaintiff expressly disclaims any allegations of fraud or intentional misconduct in

7    connection with these non-fraud claims, which are pleaded separately in this Complaint from

8    Plaintiffs' Exchange Act claims.

9            308.      The Securities Act claims are based on statements made by Eargo in connection

10   with its IPO. Eargo conducted the Offering pursuant to the Company's Registration Statement and

11   Preliminary Prospectus filed with the SEC on September 25, 2020, as updated by amendments

12   dated October 1, 9, and 13, 2020, and a Form S-1MEF filed October 15, 2020 (the "Registration

13   Statement"); a Preliminary Prospectus dated October 13, 2020; and a Prospectus dated October

14   15, 2020 (the "Prospectus" and collectively with the "Registration Statement," and all documents

15   incorporated by reference, the "Offering Documents").

16           309.      As explained herein, the Offering Documents were negligently prepared and, as a

17   result, contained untrue statements of material fact, omitted material facts necessary to make the

18   statements contained in them not misleading, and failed to make adequate disclosures required

19   under the statute, rules, and regulations governing the preparation of public offering documents

20   for securities.

21           310.      To the extent that any challenged statement is construed as a statement of opinion,

22   belief or projection made in connection with the Offering, any such statement is alleged to have

23   been a materially misstated statement of opinion, belief or projection when made at and at the time

24   of the Offering.

25           311.      This action was brought within one year after the discovery of the untrue statements

26   and omissions (and within one year after such discovery should have been made in the exercise of

27

28

reasonable diligence) and within three years of the Offering.

**A.      Securities Act Plaintiff**

312.    Lead Plaintiff IBEW Local 353 Pension Plan is a multi-employer defined benefit pension plan located in Canada. IBEW Local 353 manages nearly CAD$2 billion in assets on behalf of its active members, retirees, and beneficiaries, who are members of the International Brotherhood of Electrical Workers working in a variety of electrical disciplines across central Ontario. As set forth in the certification previously filed with the Court (ECF No. 24-2), IBEW Local 353 purchased shares of Eargo common stock in and/or traceable to the IPO, and suffered damages as a result of the violations of the federal securities laws alleged herein. Specifically, on October 16, 2020, IBEW Local 353 purchased 6,777 shares of Eargo common stock at $18 per share.

**B.      Securities Act Defendants**

313.    Each of the following Defendants is statutorily liable under Sections 11, 12, and/or 15 of the Securities Act for the materially untrue statements or omissions contained in and incorporated (and thereby made anew) in the Offering Documents.

314.    Securities Act Defendant Eargo is a medical device company that manufacturers hearing aids, which it sells direct to consumers. Incorporated in Delaware, the Company maintains its corporate headquarters at 1600 Technology Drive, San Jose, California. The Company is the issuer of the shares sold in the IPO. Eargo's common stock trades on Nasdaq under ticker symbol "EAR." As of September 14, 2021, Eargo had over 39 million shares of common stock outstanding, owned by hundreds or thousands of investors.

315.    The Securities Act Defendants listed in the table below are the "Securities Act Individual Defendants." The Securities Act Individual Defendants served, at times relevant to the claims alleged in the Complaint, as officers or directors of the Company. The Securities Act Individual Defendants signed (or authorized their signatures to be affixed to) the Registration Statement as directors of officers of Eargo in the positions stated below:

| Name | Position |
|------|----------|
| Christian Gormsen | Chief Executive Officer (Principal Executive Officer) |
| Adam Laponis | Chief Financial Officer (Principal Financial and Accounting Officer) |
| Josh Makower, M.D. | Director (Chairman of the Board of Directors) |
| Juliet Bakker | Director |
| Peter Tuxen Bisgaard | Director |
| Doug Hughes | Director |
| Geoff Pardo | Director |
| Nina Richardson | Director |
| Brooke Seawell | Director |
| David Wu | Director |

316.     Each of the Securities Act Individual Defendants, either personally or by attorney-in-fact, signed the Registration Statement.

317.     Each of the Securities Act Individual Defendants, by virtue of his or her management or directorship positions, had the duty to exercise due care and diligence and the duty of full and candid disclosure of all material facts related to the Company. The Securities Act Individual Defendants were required to exercise reasonable care and prudent supervision over the dissemination of information concerning the business, operations, and financial reporting of Eargo. By virtue of these duties, these officers and directors were required to supervise the preparation of and dissemination of the Offering Documents, and ensure that they were accurate and complete.

318.     All of the Securities Act Individual Defendants were control persons of Eargo within the meaning of Section 15 of the Securities Act by reason of their own involvement in the daily business of Eargo and as senior executives or directors of Eargo. The Securities Act Individual Defendants, at the time they held positions with Eargo, were able to, and did, exercise substantial control over the operations of Eargo, including control of the materially false and misleading statements, omissions, and course of conduct complained of herein.

319.     As officers, directors, and/or controlling persons of a publicly held company and under the federal securities laws, the Securities Act Individual Defendants had a duty (a) to

disseminate promptly complete, accurate, and truthful information with respect to Eargo; (b) to correct any previously issued statements that had become materially misleading or untrue; and (c) to disclose any trends, events, and uncertainties that would materially affect Eargo's earnings and present and future operating results, so that the market price of Eargo publicly traded securities would be based upon truthful and accurate information.

320.     Securities Act Defendants J.P. Morgan Securities LLC ("J.P. Morgan"), Bank of America Securities, Inc. ("BofA"), Wells Fargo Securities, LLC ("Wells Fargo"), and William Blair & Company, LLC ("Wm. Blair") are collectively referred to as the "Underwriter Defendants." The Underwriter Defendants served as the underwriters for the Offering, as well as Eargo's financial advisors. The Underwriter Defendants assisted in the preparation and dissemination of the materially untrue and incomplete Offering Documents. The Underwriter Defendants were responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Documents.

| Underwriter | Shares Underwritten |
| --- | --- |
| J.P. Morgan | 2,944,446 |
| BofA | 2,551,852 |
| Wells Fargo | 1,177,777 |
| Wm. Blair | 1,177,777 |

321.     The Underwriter Defendants were eligible to purchase 1,177,777 additional shares of Eargo common stock in an overallotment option, which they exercised in full.

322.     In connection with the IPO, including the underwriters' option, the Company issued and sold an aggregate of 9,029,629 shares of common stock at $18.00 per share, raising approximately $148.1 million in proceeds, net of underwriting discounts and commissions of $11.4 million and estimated offering costs of $3.1 million.

323.     Eargo, the Securities Act Individual Defendants, and the Underwriter Defendants are collectively referred to herein as the "Securities Act Defendants."

C.      **Summary Of The Securities Act Violations**

1.      **The Offering Documents Describe Eargo's "Consumer-First"
Business Model**

324.    Eargo, founded in 2010, produces hearing aids for customers with mild to moderate hearing loss.

325.    As expressed in the Offering Documents, the Company claimed that its hearing aids offered several advantages over existing products, including that they are "virtually invisible."

326.    Eargo characterized itself as a disruptor of a "relatively mature industry" based on its non-traditional business model. The traditional hearing aid sales model requires customers to make one or more in-person visits to hearing aid professionals, in order to be examined, have an audiogram performed, have hearing aids prescribed, and then have hearing aids tested and fitted. In contrast, Eargo emphasized its direct-to-consumer business model. Eargo stated that it was able to reduce the cost of hearing devices by avoiding a "business-to-business model in which hearing aid manufacturers rely on a fragmented network of independent hearing clinics to sell their devices to consumers." According to Eargo, "the separation of the manufacturer from the consumer is not necessary, adds an incremental layer of cost and has contributed to the lack of consumer." Thus, Eargo marketed and sold hearing aids direct to consumers through "a team of inside sales consultants and a dedicated customer support team of licensed hearing professionals" who interacted with the customer online and/or over the phone.

327.    Eargo experienced growth from 2015 through the IPO in October 2020. The Company's revenue increased from $6.6 million at year-end 2017 to $32.8 million in year-end 2019.

328.    The promise of Eargo's medical technology was, in fact, enticing to private investors. Between 2016 to July 2020, Eargo raised approximately $187 million in private financing. By the fall of 2020, Eargo undertook plans to initiate an IPO of Eargo common stock.

329.    Eargo's rapid growth coincided with intense marketing efforts to penetrate the hearing aid market. Consistent with its "consumer-first business model" and "consumer-first

marketing efforts," Eargo sought to accelerate customer adoption by "driving customers to our website by optimizing our mix of digital and traditional media[.]" Eargo focused its direct marketing efforts on the "approximately 14 million people in the United States with mild to moderate hearing loss who have annual household income above the national median[.]" Eargo claimed that its model allowed these customers "to complete their purchase over the phone with their sales consultant or directly on our website, without the need to navigate multiple visits to the hearing clinic for tests and fittings." These services, according to Eargo, "allow[] us to deliver clinical support in an efficient and streamlined manner without the burden of in-clinic visits."

330.    Defendant Gormsen addressed Eargo's sales and marketing strategy in a February 2019 *New York Times* article about the "increasingly tantalizing filed" of medical technology. That article, which suggested that health care appeared to be the "next big thing" to be supported by Silicon Valley venture capitalists, described Eargo as "a new company that walks the line between medical firm and tech start-up." The article stated that Eargo's "support team consists of hearing aid dispensers licensed in one or more states to advise customers on their hearing aid needs. Because Eargo sells its products online, rather than in physical stores, a dispenser that's licensed in one state can sell to customers in all of them." The article quoted Defendant Gormsen, who stated that the existing sales model of employing dispensers who are licensed by state-level boards and can only operate within their state was "archaic." Gormsen further stated: "I believe in a professional that's certified. I don't care whether that person is certified in California or Colorado … It's like saying you can't drive your car outside the state where you got your driver's license. It doesn't make any sense." Based on an interview with Gormsen, the *New York Times* declared that Eargo "envisions that shopping for a hearing aid would look more like buying a phone than the more rigorous (but also time consuming) search for a medical device." As Gormsen stated, "We've been talking to the likes of Best Buy or so on where maybe you go and talk to a blue shirt and then a blue shirt could show you how the product works. And we could train them." Eargo's website stated that it sought to draw customers "to our website with landing pages where they can learn more about us, submit their contact information for phone-based follow-up or purchase

immediately." A page on Eargo's website entitled "The Eargo Difference" touted its team of hearing professionals who would contact prospective customers and provide "unlimited support" to established customers.

331.    The Offering Documents stated that Eargo's website "offer[s] an online, do-it-yourself hearing test for prospective customers who are interested in an assessment." According to Eargo, that "potential customers are not required to have a hearing test to order the Eargo hearing solution, … simplifies the purchasing experience and improves the accessibility of hearing aids relative to the traditional hearing clinic channel."

332.    A page of "frequently asked questions" on Eargo's website included the question, "Do I need to see an audiologist before calling or buying Eargo?" The answer stated: "Nope, no need to call an audiologist before calling or buying Eargo. Our team of pros here will work closely with you to understand your hearing situation and determine if Eargo is right for you." Another question asked, "Do I need an audiogram to buy Eargo?" The answer stated: "Nope, you don't need an audiogram to buy Eargo. Our team of pros here will work closely with you to understand your hearing situation and determine if Eargo is right for you. If you're more of a do-it-yourself kind of person, you can take our hearing check to get a better understanding of your hearing."

333.    A chart in Eargo's October 2020 Offering Documents depicted the difference between Eargo's "consumer-centric experience" and the "traditional path":



2. **In The Offering Documents, Eargo Reports Rapidly Rising Revenue Driven By Its Purportedly Successful Penetration Of The Insurance Market**

334. In its infancy, Eargo marketed its product primarily to cash-pay customers. Beginning in the fourth quarter of 2019, however, Eargo began to switch its focus and increasingly target insurance customers in order to open up a large new pool of customers and supercharge its growth. In very short order, the most critical factor driving the growth of Eargo's business was increasing the Company's customers with a hearing aid insurance benefit—particularly federal employees and retirees covered by the FEHBP.

335. Thus, prior to the IPO, Eargo "began targeting a more diverse mix of consumers, including those with hearing aid health insurance benefits and repeat customers." The Company explained in the Offering Documents that "consumers with hearing aid insurance benefits typically convert at higher rates and return their devices at lower rates, due in part to having reduced or, in some cases, no out of pocket cost for an Eargo hearing aid." Eargo claimed that its strategy of focusing on insurance and repeat customers led to a "more optimized mix of customers" that "has the potential to further improve the efficiency of our sales and marketing spend." Further, to ease the purchasing process and control the insurance reimbursement process, Eargo stated that it

"provides insurance claims processing for consumers, eliminating in most cases the need for consumers to interface with their insurance providers."

336.     Eargo also constructed specific website pages for prospective customers with a hearing aid insurance benefit. For example, Eargo's website stated that "Eargos May Not Cost You a Dime" with FEHBP benefits, which was "the deal of a lifetime."



337.     Eargo also informed investors that it verified insurance customer eligibility prior to booking a sale to an insurance customer as revenue. For example, in the Offering Documents, Eargo stated that it assessed "insurance eligibility" as appropriate prior to recording revenue. This was important to investors in the IPO because Eargo booked a sale as revenue upon shipment—before the reimbursement claim was actually granted and paid by the insurer.

338.     Eargo's strategy of targeting customers with hearing aid insurance benefits was successful. In the Offering Documents, the Company reported $28.6 million in revenue for the six months ended June 30, 2020—nearly doubling reported revenue of $14.4 million for the six months ended June 30, 2019. In addition, Eargo's full-time employees increased from 115 as of December 31, 2017, to approximately 196 full-time employees as of June 30, 2020.

339.     In the October 2020 Offering Materials, Eargo reported that its insurance customers represented a "significant driver" of its growth, and the Company stated its "inten[t] to pursue additional coverage in the future." Commensurate with its insurance growth strategy, Eargo priced most of its hearing aids to cover the $2,500 benefit provided by the BCBS FEP, the FEHBP's

largest insurer.

340.     In fact, by in or around the end of the third quarter 2020, when the IPO occurred, approximately 45% of Eargo customers were customers with a FEHBP hearing aid benefit, the vast majority of which were insured by BCBS FEP. Defendants tracked Eargo's insurance customer mix closely, as it was an essential metric prior and subsequent to the IPO to determine Eargo's sales forecast and revenue guidance. For example, Defendant Laponis told investors in February 2021 that "in the back half of 2020 have roughly 45% of the volume came from insurance, a little bit more than that in Q3, a little bit less in Q4." Defendant Gormsen confirmed, "I think we've been pretty clear in our communication that all our guidance is based on what we have already done." In particular, he said that the guidance is "driven off" of "[h]ow we can continue to penetrate the Federal insurance opportunity, that's driving a big part of our growth."

341.     Likewise, at an April 2021 Conference, Defendant Laponis explained: "[W]e did about 45% spot on in the back half of 2020 with our nexus federal. As we built the guidance, we assumed it would be in a similar type of range and that's what we talked about back second call, but clearly, it's an area where we see future opportunity." Defendant Gormsen emphasized the importance of tracking sales to FEHBP customers, stating "the federal is the only part that's included in our guidance. So, we're not counting on additional insurance markets to come in and that's not included in our guidance."

### 3.     Eargo Launches A Successful IPO On The Strength Of Its Revenue Growth And Seemingly Successful Insurance Initiatives

342.     On October 16, 2020, Eargo conducted its initial public offering of 9,029,629 shares of its common stock at the price of $18.00 per share, raising over $162.5 million in gross proceeds and $148.1 million in net proceeds for the benefit of Eargo.

343.     Eargo's stock opened at $36 per share, doubling the IPO price of $18, and closed at $33.68—a premium of 87%. Eargo's market value rose to about $1.2 billion, which was approximately five times its valuation by private investors several months earlier. Defendant Gormsen stated that Eargo would use the IPO proceeds "to invest in our technology department

and build out our tele-care model," which was "resonating as we have seen strong growth during the pandemic."

344.    Analysts—including most notably those of the Underwriter Defendants—reacted positively to Eargo's IPO and its growth focus on insurance customers, and recommended Eargo stock to investors. For example, on November 10, 2020, J.P. Morgan initiated coverage of Eargo with an "Overweight" rating, predicting a December 2021 price target of $41 on the strength of Eargo's "differentiated direct-to-consumer business model, which has been validated by its strong market presence and brand recognition." Referencing "the generous coverage policy" of the FEHB program relative to Eargo's average selling price, J.P. Morgan found that Eargo "has seen tremendous success so far in penetrating this target market with greater sales of the company's premium products and lower return rates." Its model forecast "rapid growth in the insurance channel." Eargo's shares continued to trade in a range of $33 to $36 through November 19, 2020.

345.    In the several ensuing months, Eargo continued to report rapidly rising revenue driven by its purportedly successful penetration of the federal insurance market. Analysts—again, including those of the Underwriter Defendants—continued to underscore this growth driver as critical to the value of Eargo stock. As one example, on November 19, 2020, Eargo announced its third quarter 2020 financial results, including $18.2 million in net revenue, an increase of 135.5% year-over-year. In an earnings call later that day, Defendant Gormsen described the applicable insurance market as comprising "approximately 12 million consumers in the U.S. over 50, who have both hearing loss and access to hearing aid benefits under certain health insurance plans." Gormsen stated that "Eargo has identified and started to rapidly penetrate pockets of consumers with hearing insurance benefits that cover most or all of the cost of an Eargo." Gormsen stated that Eargo's "positive mix shift toward more insurance and repeat customers [would] be a key driver of growth and scalability going forward." In response, on November 20, 2020, William Blair issued a report applauding Eargo's "Strong Third Quarter," positing that "Eargo is on track to see strong growth in 2021 as advertising spend increases awareness, insurance drives growth, and its next-gen product launches."

346.    Similarly, on January 11, 2021, Eargo announced its preliminary results for the fourth quarter and year-end 2020. Eargo announced that its preliminary unaudited fourth quarter net revenue was expected to be $22.2 million, reflecting year-over-year growth from the fourth quarter 2019 of 109%. Further, the Company announced that its preliminary unaudited full year 2020 net revenue was expected to be $69.0 million, which represented year-over-year growth of 110%.

347.    The next day, January 12, 2021, Eargo presented at the annual J.P. Morgan Healthcare Conference. Defendant Gormsen told conference participants that the Company was "targeting right now federal employees" who have access to a hearing benefit. He added that, "We deal with all the claims processing on the back end, directly with the administrators of the FEHB program." Defendant Gormsen also told investors that the Company "went in specifically to this Q4 holiday buying season" focusing on "the opportunity for federal employees" and "the fact that we can help you as a federal employee access your benefits," and that "what we saw is a lot of people are not aware that they have access to benefits." He stated that the Company's marketing efforts "helped drive and accelerate all of our customer types, cash pay as well as insurance as well as repeat." Defendant Laponis confirmed these points, noting the "natural tailwind" Eargo experienced from its ability to convert benefits for insurance customers.

348.    A Wells Fargo report dated January 12, 2021, increased the Company's 2021 revenue projections, noting that Eargo's new hearing aid "is expected to drive repeat customer volume higher as users upgrade" and that Eargo "is focused on bringing more users from the sideline to use hearing aids given the significantly underpenetrated nature of the industry." Referencing Eargo's "robust insurance volumes," Wells Fargo stated that it "expect[ed] insurance to continue meaningfully to EAR's overall growth[.]" Likewise, a William Blair report dated January 12, 2021, rated Eargo as "outperform," finding that "[i]nsurance continues to outperform and likely again was the biggest driver of the beat this quarter." The report stated that "[w]ith approximately 9 million FEHB patients and roughly 5,000 insurance units being shipped per quarter, we continue to see significant opportunity in the FEHB channel today and Medicare

Advantage or other payer partnerships over time."

4.      **Unknown To Investors In The IPO, Eargo Was Submitting Unsupported And Invalid Claims For Reimbursement And Improperly Recognizing Revenue**

349.    Unknown to investors in the IPO, Eargo's FEHBP customers were ineligible for a hearing aid benefit as the result of Eargo's sales practices. To attempt to obtain reimbursement for these ineligible customers, between January 2017 and continuing through the date of the Offering, Eargo systematically submitted false payment claims to FEHBP insurers based upon unsupported diagnosis codes.

350.    FEHBP carriers that offer a hearing aid benefit require that claims for hearing aid devices include a hearing loss-related diagnosis code, which is set by the International Statistical Classification of Diseases, 10th Edition, Clinical Modification/Procedure Coding System (ICD-10-CM/PCS). ICD-10 is a diagnosis coding system of diseases and signs, symptoms, abnormal findings, complaints, social circumstances and external causes of injury or diseases. ICD-10 codes, which are used in virtually all health care settings, provide a standardized approach to categorize disease and patient conditions.

351.    Two relevant ICD-10 codes used by audiologists to diagnose patients following an evaluation of hearing loss are ICD-10 diagnosis codes H90.5 and H91.93, which relate to the following:

- H90.5 refers to "Sensorineural hearing loss, unspecified," which is a diagnosis of hearing loss following damage to the inner ear. Sensorineural hearing loss is the most common type of permanent hearing loss. A patient suffering from such condition may be unable to hear soft sounds and may experience louder sounds as unclear or muffled.

- H91.93 refers to "Unspecified hearing loss, bilateral," which is a diagnosis of hearing loss in both ears that cannot be attributed to a particular type of hearing loss (e.g., Sensorineural, conductive (outer or middle ear), or mixed (outer and/or middle ear and inner ear).

352.    Insurers that participate in the FEHBP also include language in their Policy Manuals that condition the reimbursement of claims on a determination of "medical necessity."

For example, the BCBS FEP has had a longstanding requirement that all benefits are subject to a determination of "medical necessity." Both the 2020 and 2021 Standard and Basic Option BCBS FEP Manuals, which were published prior to the Offering, provided:

> All benefits are subject to the definitions, limitations, and exclusions in this brochure and are payable only when we determine that the criteria for medical necessity are met. Medical necessity shall mean healthcare services that a physician, hospital, or other covered professional or facility provider, exercising prudent clinical judgment, would provide to a patient for the purpose of preventing, evaluating, diagnosing, or treating an illness, injury, disease, or its symptoms, and that are:
>
> 1. In accordance with generally accepted standards of medical practice in the United States; and
>
> 2. Clinically appropriate . . .
>
> 3. Not primarily for the convenience of the patient . . .
>
> **The fact that one of our covered physicians, hospitals, or other professional or facility providers has prescribed, recommended, or approved a service or supply does not, in itself, make it medically necessary or covered under this Plan**.

(emphasis in original).

353.    Similar to the medical necessity requirement, BCBS FEP's 2021 Plan required a prescription for reimbursement of hearing aids. The BCBS FEP Utilization Management Guideline and the BCBS FEP Policy Manual—both issued in October 2020 prior to the Offering—stated that "over-the-counter" hearing aids were "Not covered" by the Plan.

354.    Notwithstanding the requirement that a medical professional make a bona fide determination of medical necessity, Eargo did not do what was required to support the ICD-10 code for reimbursement. Rather, Eargo routinely created and submitted reimbursement requests with unsupported diagnosis codes that incorrectly asserted that a bona fide determination of medical necessity had in fact been made by a medical professional, when it had not. Investors, who were not privy to Eargo's claims submissions practices, and in particular, the manner in which Eargo purported to support its diagnosis codes, and who were assuaged by Defendants' statements

that Eargo verified insurance eligibility and reimbursement amounts, were left in the dark as to Eargo's systematic submission of false claims.

355.    These undisclosed practices led to Eargo's entry into a Settlement Agreement with the Department of Justice ("DOJ") on April 29, 2022 "to pay $34.37 Million to settle common law and False Claims Act Allegations for unsupported diagnosis codes." As the DOJ concluded, as early as 2017, "Eargo included unsupported hearing loss-related diagnosis codes on claims for hearing aid devices that Eargo submitted to the FEHBP and on invoices—called superbills—that Eargo provided to FEHBP beneficiaries to obtain reimbursement for such devices from the FEHBP."

356.    Former Employees ("FE") of Eargo corroborate the DOJ's conclusions.[3] FE1, a former Director in Eargo's Audiology Group who worked at Eargo prior to the Class Period, explained that Eargo stopped requiring prescriptions or even audiograms by 2017. FE1 explained that the processes Eargo put in place, like getting a valid hearing test, became too cumbersome to follow and eventually got dropped from the sales process. Specifically, FE1 described that when he began working for the Company, the process for prescribing Eargo's hearing aids was specific to each state and what they each consider to be a valid hearing evaluation or test, whether this was an audiogram or otherwise, and what made it legal in each state.  But, he explained, this process turned into a "big bottleneck," and the Company ran the risk of telling customers to go get tested, without the guarantee that they would come back to Eargo. The Company realized that this was not efficient and dropped the requirement.  FE1 understood why the Company did this—it was because the amount of time it took to get a valid audiogram was too long. What he did not understand was how the Company was able to do this.

357.    FE1 explained that he voiced concerns regarding Eargo's dropping the whole

---

[3] The terms "Former Employees" and "FE" refer to the former employees of Eargo whose reports are discussed in this Complaint. In order to preserve the Former Employees' anonymity, while maintaining readability, the Complaint uses the pronouns "he," "his," and "him" to refer to all of the Former Employees, regardless of their gender.

audiogram requirement process, which, he noted, was not the right process. FE1 explained further that Eargo's product was being sold by non-licensed, non-expert "hearing professionals," and his issue with this was a matter of how these people know they are selling the appropriate device to a person without the experience to make such a decision. The requirement for selling a class one hearing aid is that a licensed professional needs to prescribe this medical device. FE1 reiterated that the Company stopped requiring an audiogram "early on"—specifically, there was an internal retooling of the product around 2016, followed by a relaunch, and at the time of the relaunch, the Company decided to stop taking audiograms.

358.   The prescription was only the "beginning part" of FE1's concerns because then there is the issue of how Eargo supports the product and the customer. The support would vary because it was all done over the phone, and Eargo didn't consider if this was appropriate for the individual or not—the lack of physical observation made Eargo's dealings with customers "generic." FE1 noted that Eargo's attitude was "how do we keep people from returning the device' not "how can we support people to get the best hearing result from it." Everything begins "on the wrong foot" without knowing the anatomy of an individual's ear, which is so important in making a good fitting. Further, FE1 explained that Eargo was not doing any type of self-assessment, just asking customers, "Do you have hearing loss?" and giving customers a questionnaire over the phone where they were asked to rate their hearing in different settings and situations on a scale of 1 to 5. If they scored too poorly, they had to speak to an audiologist before continuing. But this process never actually materialized, and the salespeople who were being trained on how to conduct this process ended up selling the hearing aids no matter what. Eargo's attitude was, "we only have one size, and we hope like hell it fits you," which was how sales began, but, according to FE1, this is not true for hearing aid users.

359.   Critically, FE1 explained that in its transactions with the federal employees, Eargo would have had to have customers' insurance verified and have medical codes, which state how they received devices or what type of hearing loss the product was provided for. For insurance to be satisfied, the insurance company needs to see the customer needed hearing aids. In normal

practice, FE1 would need to provide an audiogram that shows the severity of hearing loss and justifies the need for a hearing aid with his state license on all documentation. Eargo couldn't have provided this for each customer, but likely still stated "bi-neural hearing loss" without providing an audiogram. FE1 clarified that this was not limited to "bi-neural" hearing loss, as the Company was using other codes too. He explained that hearing loss is one part of it, but understanding if hearing loss is sensory, neural, or conductive is a big part of medical coding. You can't just say someone has bi-neural hearing loss without specifying; they go hand in hand. If hearing loss is conductive, it can be medically corrected if it's within a certain range, and FE1 would be required to send the patient to an Ear, Nose and Throat doctor for clearance for a hearing aid. FE1 noted, "When I'm looking in someone's ear and see a disorder, it's the biggest thing they (Eargo) are not doing."

360.     Specifically, FE1 explained, Eargo used "super bills" which showed a statement of what was received from Eargo along with medical codes. A super bill is a document that is generated so that a customer can submit for reimbursement to its own insurance provider. But if a customer had on their super bill a medical code for having been fitted with bi-neural aids with hearing loss and sensory neurology, this was false, because such a medical code indicates that the customer was tested and/or received results to determine this. The problem, according to FE1, was that Eargo was using medical codes that insurers would pay off, and the codes would indicate that there was bi-neural hearing loss and that a physical exam of the ear was performed along with fitting and training the patient on how to use the product. The reality is that Eargo doesn't do this, doesn't require an audiogram or testing, or merely provided training for the customer over the phone and emailed the customer videos on device cleaning. FE1 explained that for some customers, this was inadequate: how would you know over the phone if someone knows how to properly clean or put in a hearing aid just because they are answering "yes" to questions on a phone?

361.     Finally, FE1 explained, Eargo was representing and delivering its service as a legitimate process, while providing no visual inspection and no physical meeting with a licensed

person.

362.    FE2, who worked as an audiologist at Eargo from January 2017 to December 2019 similarly described that the salespeople who were encouraging customers to buy Eargo's hearing aids without an audiogram were not qualified to do so. FE2 explained further that some customers were told not to get a hearing test done for fear that the salesperson might lose out on the commission from possible sales.

### 5.    Eargo's Stock Price Declines Due To The Conduct Described Herein

363.    Eargo's stock price declined sharply as a consequence of the untrue statements and omissions in the Offering Documents. The declines included, but were not necessarily limited to, the events described below.

364.    BCBS FEP was Eargo's largest and most significant third-party payor. As a result of Eargo's submission of thousands of false and unsupported claims to BCBS FEP, the insurer became suspicious and began an audit of Eargo no later than March 1, 2021. Typically, during an audit, the insurer continues to pay claims. Notably, BCBS refused to pay any claims as of March 1, 2021—a step that is unusual and signified the severity of the audit and issues involved.

365.    On August 12, 2021, Eargo issued a Form 8-K, signed by Defendant Laponis, as well as a press release, which disclosed an increase in the Company's accounts receivable "primarily due to a claims audit by an insurance company that is our largest third-party payor, who accounted for approximately 80% of our gross accounts receivable as of June 30, 2021." The Company also disclosed, "During the audit, claims since March 1, 2021 have not been paid. The Company is in active discussions with the payor and continues to work toward conclusion of the audit." The Company's Form 10-Q the same day disclosed the same information, as well as the fact that "another insurance company" was also auditing reimbursement claims submitted by Eargo. The Form 10-Q stated, "we have received some denials to date," and that it was "possible that they may seek recoupments of previous claims paid and deny any future claims."

366.    J.P. Morgan's analyst described the audit as a "disappointment." Wells Fargo described it as a "big risk," and William Blair's analyst noted that the audit "overshadow[ed]"

Eargo's other positive results.

367.    In response to this news, the price of Eargo's common stock declined over 24%, from a close of $32.70 on August 12, 2021 to a close of $24.70 the following day.

368.    Defendants assured investors that the audit was no cause for concern, and the market accepted Defendants' comforting statements. For example, Defendant Laponis described "these kind of audits" as "pretty common," Gormsen described the audit as an "education on our business model" for the payor. He also described the audit as merely concerning "documentation." In addition, the Company soothed the market by raising its 2021 full year revenue guidance.

369.    On September 22, 2021, the Company filed a Form 8-K with the SEC, signed by Defendant Laponis, in which Defendants disclosed, "On September 21, 2021, Eargo, Inc. (the "Company") was informed that it is the target of a criminal investigation by the U.S. Department of Justice (the "DOJ") related to insurance reimbursement claims the Company has submitted on behalf of its customers covered by federal employee health plans." Defendants additionally disclosed that the Company was withdrawing its guidance for the fiscal year ending December 31, 2021.

370.    Analysts reacted negatively to Eargo's September 22, 2021 disclosures. For example, Wells Fargo's analyst noted in a September 23, 2021 report that "we see risk that the company can no longer sell into the insurance channel due to the DOJ investigation," and that the Company was "working through if there will be immediate changes in business operations or revenue recognition."

371.    In response to this news, Eargo's stock plummeted from a closing price of $21.67 on September 22, 2021 to a closing price of $6.86 on September 23, 2021—a 68% drop.

372.    Following the close of trading on November 16, 2021, the Company filed with the SEC a Form 12b-25 Notification of Late Filing, signed by Defendant Laponis, in which the Company disclosed, "Eargo, Inc. (the "Company") has determined that it is unable to file its Quarterly Report on Form 10-Q for the quarterly period ended September 30, 2021 (the "Form 10-Q") within the prescribed time period without unreasonable effort and expense due to the

circumstances described below." Specifically, the Form 12b-25 explained that the circumstances and investigation at issue "related to insurance reimbursement claims the Company submitted on behalf of its customers covered by various federal employee health plans under the Federal Employee Health Benefits ("FEHBP") program." The Company added, "The investigation also pertains to the Company's role in customer reimbursement claim submissions to federal employee health plans."

373.    Finally, Defendants announced that the inquiry had expanded to include more of Eargo's payors than previously disclosed: "Two additional third-party payor audits related to claims submitted for customers with FEHB plans are also in process." Defendants also disclosed, "Total payments the Company has received to date from the government in relation to claims submitted under the FEHB program, net of any product returns and associated refunds, are approximately $44 million," and "During the three months ended September 30, 2021, the Company shipped 13,117 gross hearing aid systems, approximately 48% of which were to customers with potential insurance coverage." Finally, Defendants disclosed, "The Company has not yet completed its assessment of the accounting impact of the DOJ investigation and the ongoing claims audits on its financial statements for the three months ended September 30, 2021 and prior periods, and is therefore unable to file the Form 10-Q on a timely basis."

374.    Analysts reacted negatively to Eargo's November 16, 2021 disclosures. J.P. Morgan's analyst noted, "[W]e're increasingly concerned about . . . the company's ability to serve the insurance market moving forward."

375.    In response to this news, the price of Eargo shares dropped from a closing price of $7.18 on November 16, 2021 to close at $6.79 the following day, a decline of 5.44%.

376.    On November 22, 2021, the Company filed a Form 8-K and accompanying press release with the SEC, signed by Defendant Laponis, which disclosed that "the Company received a letter from The Nasdaq Stock Market LLC ("Nasdaq") indicating that, since the Company has not yet filed its Quarterly Report on Form 10-Q for the period ended September 30, 2021 (the "Form 10-Q"), the Company no longer complies with Nasdaq Listing Rule 5250(c)(1) for

continued listing." Defendants disclosed further, "Under the Nasdaq Listing Rules, the Company has 60 calendar days to submit a plan to regain compliance (the "Plan") and, if Nasdaq accepts the Plan, Nasdaq may grant an exception of up to 180 calendar days from the Form 10-Q original filing due date, or until May 16, 2022, to regain compliance. The Company intends to submit the Plan within the 60-calendar day period."

377.    In response to this news, Eargo's share price declined from a closing price of $5.88 on November 22, 2021 to a closing price of $5.56 the following day, a decline of 5%.

378.    On March 2, 2022, Eargo filed a Form 12b-25 Notification of Late Filing with the SEC, in which the Company disclosed that it was unable to file its Annual Report for 2021 on Form 10-K based on a DOJ investigation "related to insurance reimbursement claims the Company submitted on behalf of its customers covered by various federal employee health plans under the Federal Employee Health Benefits ("FEHB") program," as well as "the Company's role in customer reimbursement claim submissions to federal employee health plans." The Company further disclosed that "the Company is currently subject to a number of other ongoing audits of insurance reimbursement claims submitted to additional third-party payors. One of these claims audits does not relate to claims submitted under the FEHB program."

379.    Eargo further stated that it had "reached an understanding in principle with the DOJ with respect to certain material terms of a potential settlement and resolution of the investigation and can now reasonably estimate a probable loss of approximately $34.4 million in connection with the investigation." The Company noted that "discussions are continuing," and that "there can be no assurance as to the terms or timing of a final resolution with respect to the investigation. Further, any such settlement of the investigation may not resolve the ongoing audits of insurance reimbursement claims by additional third-party payors, nor has the Company begun working with the government and third-party payors to potentially validate processes to support any future claims that it may submit for reimbursement, and there are no guarantees that the Company will be able to arrive at any such acceptable processes or submit any future claims."

380.    Eargo further disclosed, "Beginning on December 8, 2021, the Company made the

decision to stop accepting insurance benefits as a method of direct payment and it is uncertain when, if ever, the Company will resume accepting insurance benefits as a method of direct payment." Eargo also stated that "[w]hile the Company intends to work with the government and third-party payors at the appropriate time with the objective of validating processes to support any future claims that it may submit for reimbursement, the Company may not be able to arrive at acceptable processes or submit any future claims." In other words, due to the submission of false and unsupported reimbursement claims, Eargo was forced to abandon what it highlighted as a significant growth driver in the Offering Documents.

381.    Finally, Eargo disclosed that it had "offered affected customers (i.e., customers using insurance benefits as a method of direct payment for transactions prior to December 8, 2021) the option to return their hearing aids or purchase their hearing aids without the use of their insurance benefits in case their claim is denied or ultimately not submitted by the Company to their insurance plan for payment."

382.    In response to this news, Eargo's share price declined from a close of $4.77 that day to a close of $4.02 the following day—a 15% decline.

383.    On April 29, 2022, Eargo and the DOJ entered into the Settlement Agreement referenced in § II.C.4. In response to this news, Eargo's share price declined from a close of $3.78 that day to a close of $3.64 the following day—a 3.7% decline.

384.    On May 2, 2022, Eargo filed two press releases titled "Eargo Finalizes Agreement with the United States to Resolve Investigation With No Admission of Liability," and "Reached settlement agreement to resolve DOJ investigation," as well as a Form 8-K with the SEC in which it disclosed the terms of its settlement with the DOJ and provided a "Business Update."

385.    In the Company's "Business Update" on May 2, 2022, Defendant Gormsen stated, "One of our top management priorities is to regain insurance coverage of Eargo for government employees under the FEHB program, and we are very pleased that . . . the OPM[] has agreed to not take administrative action seeking the exclusion of Eargo from the FEHB program and has indicated there will be an opportunity for further dialogue with us. Our goal is to align with the

1   OPM on and establish processes to support the submission of claims through the FEHB program."

2   Eargo also held a business update call with investors that same day.

3       386.    Eargo told investors on May 2, 2022 that "[w]e anticipate that we will need to raise

4   capital over the course of 2022."

5       387.    In response to this news, Eargo's share price continued to decline from a closing

6   price of $3.78 on April 29, 2022 to close at $3.64 on May 2—a decline of 3.7%.

7       388.    On May 11, 2022, Eargo filed a Form 12b-25 Notification of Late Filing of Form

8   10-Q with the SEC. In this Form 12b-25, Eargo disclosed that it would not be able to timely file

9   its Form 10-Q for the first quarter of 2022. Eargo further disclosed that the Company may not be

10  able to file its Form 10-Q for the third quarter of 2021 or its Form 10-K for the year of 2021 by

11  Nasdaq's May 16, 2022 deadline.

12      389.    In response to this news, Eargo's share price declined further. The stock closed at

13  $1.76 on May 10, 2022 and closed at $1.70—a 3.4% decline—on May 11. The stock continued to

14  tumble in the aftermarket, falling to $1.30—a 23% drop—after the close of regular trading. As of

15  the close of trading on May 20, 2022, the date of this filing, Eargo's stock was trading at $1.25.

16          **6.    Eargo Violated GAAP And Overstated Revenue In The Offering
               Documents By Improperly Recognizing Revenue Of Sales To FEHBP
17             Customers**

18      390.    The Offering Documents described how Eargo recognized revenue for the sale of

19  its hearing aids, including sales to insurance customers.

20      391.    Financial statements (including footnote disclosures) are a central feature of

21  financial reporting and are a principal means of communicating financial information to external

22  parties, such as investors. For companies such as Eargo, the accounting profession (and the SEC)

23  recognize Generally Accepted Accounting Principles ("GAAP") as the uniform rules, conventions,

24  and procedures necessary to define and reflect accepted accounting practices at a particular time.

25  SEC Regulation S-X states that financial statements filed with the SEC that are not prepared and

26  presented in accordance with GAAP "will be presumed to be misleading or inaccurate, despite

27  footnotes or other disclosures." 17 C.F.R. § 210.4-01(a)(1). GAAP violations, therefore, bear on

28

whether SEC regulations for publicly-traded companies, such as Eargo, have been properly followed and satisfied.

392.    GAAP are primarily promulgated by the Financial Accounting Standards Board ("FASB") and are codified into a system that has been accepted by the SEC as the framework by which public companies must report their financial position and the results of their operations (among other things)—i.e., SEC regulations require that public company financial statements be prepared in conformity with GAAP. Beginning with the year 2009, the FASB codified its accounting standards into a system whereby pertinent sections are organized by topic and referenced by the acronym ASC ("Accounting Standards Codification"). These ASCs represent the source of authoritative GAAP for nongovernmental entities, including Eargo. (ASC 105, Generally Accepted Accounting Principles, section 10-05-1).

393.    The framework for the accounting standards that make up the ASCs within GAAP is set out in, among other places, Statements of Financial Accounting Concepts ("FASCON"). To that end, FASCON 8, Conceptual Framework for Financial Reporting ("FASCON 8"), states:

> Financial reports represent economic phenomena in words and numbers. To be useful, financial information not only must represent relevant phenomena, but it also must faithfully represent the phenomena it purports to represent. To be a perfectly faithful representation, a depiction would have three characteristics. It would be complete, neutral, and free from error.

FASCON 8, ¶QC12.

394.    Eargo incorporated GAAP Provision ASC 606 into its Offering Documents, defined the specific requirements of ASC 606, and described how Eargo complied with ASC 606.

395.    As Eargo itself has disclosed, GAAP provision ASC 606, "Revenue from Contracts with Customers," governs Eargo's recognition of revenue from its sales of hearing aids.

396.    Specifically, under ASC 606, revenue is recognized when promised goods or services are transferred to customers in an amount that reflects the consideration to which the entity expects to be entitled in exchange for those goods or services by following a five-step process:

397.    First, the business must identify the contract with its customer.

398.   Second, the business must identify the performance obligations in the contract.

399.   Third, the business must determine the transaction price and allocation to performance obligations.

400.   Fourth, the business must allocate the transaction price to the performance obligations in the contract.

401.   Fifth, the business must recognize the revenue when or as it satisfies its performance obligations.

402.   Further, ASC 606 states:

An entity shall account for a contract with a customer that is within the scope of this Topic only when all of the following criteria are met:

a.  The parties to the contract have approved the contract (in writing, orally, or in accordance with other customary business practices) and are committed to perform their respective obligations.

b.  The entity can identify each party's rights regarding the goods or services to be transferred.

c.  The entity can identify the payment terms for the goods or services to be transferred.

d.  The contract has commercial substance (that is, the risk, timing, or amount of the entity's future cash flows is expected to change as a result of the contract).

e.  ***It is probable that the entity will collect substantially all of the consideration to which it will be entitled in exchange for the goods or services that will be transferred to the customer***.

In evaluating whether collectability of an amount of consideration is probable, an entity shall consider only the customer's ability and intention to pay that amount of consideration when it is due. The amount of consideration to which the entity will be entitled may be less than the price stated in the contract if the consideration is variable because the entity may offer the customer a price concession.

403.   This final requirement in the aforementioned list of criteria is obviously not met given that in this case, the claims submitted by Eargo were not reimbursable without the proper submission of medical necessity described above.

404.   According to the Offering Documents, the Company recognized revenue consistent

with GAAP when "promised goods or services are transferred to customers in an amount that reflects the consideration to which the entity expects to be entitled in exchange for those goods or services…." Eargo stated that it "generally considers completion of an Eargo sales order (which requires customer acceptance of the Company's click-through terms and conditions for website sales and the authorization of payment through credit card or another form of payment for sales made over the phone) as a customer contract provided that collection is considered probable." The Company further claimed that it "assesses insurance eligibility" for payments that are not made upfront by credit card *prior to* booking those sales as revenue.

405.    Beginning in January 2017, however, Eargo, submitted or caused to submit false claims to FEHBP insurers based upon unsupported diagnosis codes. Such diagnosis codes were required to be supported by a hearing loss diagnosis, which is typically based on a hearing test performed by a health care provider—which Eargo did not do. The claims that the Company was submitting to FEHBP insurers for reimbursement—which comprised approximately 45% of all net revenue at or around the time of the Offering—were, in fact, not reimbursable.

406.    Due to this improper recognition of revenue, in the Offering Documents, Eargo reported materially overstated unaudited revenue for at least the first and second quarters of 2020, as set forth in the table below:

| Period | Reported Revenue (Unaudited) | Insurance Mix | Revenue Inflation |
|---|---|---|---|
| 1Q2020 | $12.6 million | ≈45% | ≈$5.6 million |
| 2Q2021 | $15.9 million | ≈45% | ≈$7.1 million |
| **Total 1Q20-2Q20** | | | **≈12.7 million** |

407.    The Offering Documents also include materially false and misleading statements regarding the "continued trend" portrayed by Eargo's unaudited revenue results "for the three

months ended September 30, 2020," which had concluded prior to the Offering. In the Offering Documents, Defendants stated "we expect preliminary unaudited revenue, net for the three months ended September 30, 2020 to be approximately $18.0 million to $18.3 million…." Defendants further stated: "We believe that these preliminary, unaudited financial results and operating metrics for the three months ended September 30, 2020 indicate that our improved operating results for the three months ended June 30, 2020 were not solely attributable to the initial impact that COVID-19 had on the process of obtaining a hearing aid through traditional channels and represent a continued trend through the three months ended September 30, 2020."

408.    These statements were materially false and misleading. It was misleading for Eargo to refer to its "improved operating results for the three months ended June 30, 2020," and to portray its third quarter 2020 "financial results and operating metrics" as "represent[ing] a continued trend through the three months ended September 30, 2020," because Eargo's revenue performance was materially false and misleading. As described above, approximately 45% of Eargo's sales related to FEHBP customers, and Eargo routinely created, submitted, and caused the submission of false reimbursement requests to FEHBP insurers based on a hearing loss diagnosis that Eargo did not undertake. Further, given that Eargo's FEHBP customers were ineligible for reimbursement (and thus could not be included, at all, in describing Eargo's revenue), Defendants' third quarter 2020 preliminary revenue statement was baseless and impossible for Eargo to achieve.

### D.    The Securities Act Defendants' Untrue Statements And Omissions

#### 1.    Untrue Statements And Omissions

409.    The Offering Documents were negligently prepared and, as a result, contained untrue statements of material fact, omitted material facts necessary to make the statements contained in them not misleading, and failed to make adequate disclosures required under the statute, rules, and regulations governing the preparation of public offering documents for securities.

410.    As noted above, Eargo materially misstated its revenue in the Offering Documents. Eargo also made a number of other untrue statements and omissions in the Offering Documents.

411.   For example, Eargo stated that "the increase in customers with insurance coverage has been a significant driver of our growth in 2020, and we intend to pursue additional coverage in the future."

412.   It was materially misleading to state that "the increase in customers with insurance coverage has been a significant driver of our growth in 2020," without disclosing that: (i) FEHBP customers (including BCBS FEP customers) were not eligible for reimbursement for the purchase of Eargo hearing aids; and (ii) Eargo had been submitting unsupported, false claims to FEHBP insurers (including BCBS FEP) to obtain reimbursement.

413.   It was also materially misleading to state that "we intend to pursue additional coverage in the future" as a growth strategy without disclosing that the manner of pursuing such coverage involved submitting false claims to FEHBP insurers (including BCBS FEP) to obtain reimbursement.

414.   In describing its pool of potential insurance customers, Eargo stated that "there are approximately 12 million adults in the United States over 50 years of age with both hearing loss and access to an existing hearing aid benefit under these plans."

415.   The statements regarding Eargo's addressable insurance market were untrue and misleading when made. The total insured consumers accessible to Eargo was not approximately 12 million consumers given that this figure included FEHBP customers, and that Eargo's FEHBP customers were ineligible for insurance reimbursement.

416.   Eargo's Registration Statement also contained a discussion of the Company's "growth strategies," in which Eargo told investors that it planned to "[o]ptimize [its] customer mix" and touted its success in targeting customers with insurance. Specifically, the Registration Statement stated: "Beginning in the fourth quarter of 2019, we began targeting a more diverse mix of customers, including those with hearing aid health insurance benefits and repeat customers. We believe consumers with hearing aid insurance benefits typically convert at higher rates and return their devices at lower rates, due in part to having reduced or, in some cases, no out of pocket cost for an Eargo hearing aid. This more optimized customer mix has resulted in a lower overall

customer acquisition cost. We believe this strategy will continue to further improve the efficiency of our sales and marketing sped as we scale our business."

417.    These statements about Eargo's customer base and growth strategies were untrue and misleading, omitted material facts, and lacked a reasonable basis when made because: (i) Eargo's FEHBP customers (including BCBS FEP customers) were ineligible for insurance reimbursement, and (ii) Eargo had been systematically submitting unsupported, false reimbursement requests to obtain reimbursement.

418.    The Offering Documents also stated, "Changes in third-party coverage and reimbursement may impact our ability to grow and sell our products" and that "A payor's decision to provide coverage for a product does not imply that an adequate reimbursement rate will be approved… Third-party coverage and reimbursement may never become available to us at sufficient levels."

419.    It was misleading for Defendants to describe generic, abstract risks regarding potential "changes in third-party coverage" while concealing that the risks that had already occurred, i.e., that FEHBP customers (including BCBS FEP customers) were not eligible for reimbursement for the purchase of Eargo hearing aids, and that Eargo had submitted numerous unsupported claims to BCBS and other insurers that were not eligible for payment at all.

420.    Further, the Offering Documents included a section on Eargo's compliance with "U.S. or foreign federal and state healthcare regulatory laws," stating that "if" Eargo failed to comply with such laws "we could be subject to penalties, including, but not limited to, administrative, civil and criminal penalties, damages, fines, disgorgement, exclusion from participation in governmental healthcare programs and the curtailment of our operations, any of which could adversely impact our reputation." That section listed as an example of such laws "the U.S. federal false claims laws, including the False Claims Act, which can be enforced through whistleblower actions, and civil monetary penalties laws, which, among other things, impose criminal and civil penalties against individuals or entities for knowingly presenting, or causing to be presented, to the U.S. federal government, claims for payment or approval that are false or

fraudulent, knowingly making, using or causing to be made or used, a false record or statement material to a false or fraudulent claim, or from knowingly making a false statement to avoid, decrease or conceal an obligation to pay money to the U.S. federal government."

421.    It was misleading to describe generic and abstract risks that "could" render Eargo subject to penalties and fines, without disclosing that, in fact, those risks had already occurred because Eargo's FEHBP customers (including BCBS FEP customers) were not eligible for reimbursement for the purchase of Eargo hearing aids, and Eargo had submitted numerous unsupported, false claims to BCBS and other insurers that were not eligible for payment at all.

## 2.    Failure To Disclose Information Required By Regulation S-K

422.    The Offering Documents also failed to disclose material information required to be disclosed by Regulation S-K, 17 C.F.R. §§ 229 et seq.

423.    The Offering Documents failed to disclose material information required by Item 303, 17 C.F.R. § 229.303, which requires disclosure of "material events and uncertainties known to management that are reasonably likely to cause reported financial information not to be necessarily indicative of future operating results or of future financial condition." Specifically, Item 303 requires a description of "any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." In addition, Item 303 requires disclosure of: "any known … events or uncertainties that will result in or that are reasonably likely to result in the registrant's liquidity increasing or decreasing in any material way" and "any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."

424.    Here, the Offering Documents did not disclose the actual "continued trend" regarding Eargo sales and revenue or the uncertainty that Eargo customers were eligible for reimbursement by FEHBP insurers. The Offering Documents further failed to describe the manner in which the FEHBP's exclusion of Eargo hearing aids from coverage and/or denial of claims was reasonably likely to have a material unfavorable impact on Eargo's net sales or revenue. Prior to

the Offering, FEHBP customers comprised approximately 45% of Eargo's customer base, making this trend and uncertainty unquestionably material. Indeed, as of June 30, 2020, BCBS FEP by itself already comprised approximately 36% of Eargo's gross accounts receivable, a figure that rose through year-end to approximately 45%.

425.   The uncertainty of the ineligibility of FEHBP customers (including BCBS FEP customers)—approximately 45% of Eargo's total customer base—to receive a hearing aid reimbursement benefit existed and was known prior to the Offering. As such, the Company was required to disclose the manner in which that known uncertainty was reasonably expected to materially affect Eargo's future performance and have a material unfavorable impact on its sales and net revenue, as it ultimately did.

426.   Similarly, the Offering Documents failed to disclose material information required to be disclosed by Item 105 of SEC Regulation S-K (17 C.F.R. § 229.105), which requires disclosure of "the most significant factors that make the offering speculative or risky." Here, as set forth in § II.C, the Offering Documents did not disclose any information regarding the acute risk posed by the exclusion of FEHBP customers (including BCBS FEP customers) from receiving a hearing aid insurance benefit, and the submission of unsupported claims for such customers, which threatened to wipe out close to half of the Company's reported and expected revenue.

### E.   The Securities Act Defendants' Failure To Exercise Reasonable Care Or To Conduct A Reasonable Investigation In Connection With The Offering

427.   None of the Securities Act Defendants made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Offering Documents were accurate and complete and not misstated in all material respects.

428.   Due diligence is a critical component of the issuing and underwriting process. Directors, officers, accountants, and underwriters are able to perform due diligence because of their expertise and access to the Company's non-public information. Underwriters must not rely on management statements; instead, they should play a devil's advocate role and conduct a thorough verification process. At a minimum, due diligence for every public offering should

involve: (1) interviews of upper and mid-level management; (2) a review of the company's sales practices, revenue recognition practices, and other business practices that are important to its sales, revenues, and income; (3) a review of the auditor's management letters; (4) a review of items identified therein; (5) a review of the company's SEC filings (particularly those incorporated by reference); (6) a critical review of the company's financial statements, including an understanding of the company's accounting and conversations with the company's auditors without management present; (7) a review of the company's internal controls; (8) a review of negative facts and concerns within each underwriter's organization and within the underwriter syndicate; and (9) a review of critical non-public documents and records forming the basis for the company's assets, liabilities, earnings, contingent liabilities, and the Company's potential negative trends (or lack thereof) as required to be disclosed under the securities laws.

429.    Red flags uncovered through this process must then be investigated. Officers and auditors must participate in the underwriters' due diligence, and non-officer directors are responsible for the integrity of the due diligence process in their capacity as the ultimate governing body of the issuer.

430.    *First*, a review of Company practices, including FEHBP insurance requirements and the reimbursement documentation the Company submitted and caused to be submitted on behalf of its FEHBP customers, would have revealed that Eargo's FEHBP customers were ineligible for a hearing aid benefit because the Company utilized diagnosis codes predicated on a finding of hearing loss on hearing tests that the Company did not perform. In fact, shortly after the Offering in January 2021, Eargo completed an internal review that found the Company had systematically submitted false and unsupported insurance claims to the FEHBP. And soon thereafter, no later than March 1, 2021, BCBS initiated a significant audit and stopped paying claims precisely because Eargo's submissions were so suspicious.

431.    Further, the Securities Act Defendants had reason to inquire further into whether FEHBP insurance payors would actually cover Eargo's products, particularly given that FEHBP customers comprised 45% of Eargo's customers base.

432.    In addition, one of those FEHBP insurers, BCBS FEP, had a longstanding requirement that all benefits are subject to a determination of "medical necessity." Both the 2020 and 2021 Standard and Basic Option BCBS FEP Manuals provide, in relevant part, "***All benefits are subject to the definitions, limitations, and exclusions in this brochure and are payable only when we determine that the criteria for medical necessity are met***." The BCBS FEP Policy Manual, released in October 2020 prior to Eargo's IPO, also stated that "[o]ver the counter hearing aids, enhancement devices, accessories or supplies (including remote controls and warranty package)" were "Not covered" by its Plan, and that Plan Members had to pay "All charges" for such items. Similarly, an October 2020 BCBS FEP UM Guideline, also issued prior to Eargo's IPO, stated that "[o]ver-the-counter hearing aids/hearing assistive devices/personal sound amplification products (PSAPs) available without a prescription" were "Not covered" by the Plan. This information should have triggered investigation into Eargo's practices with respect to reimbursement requests (including as to additional FEHBP insurers), and in particular how it supported its diagnosis codes.

433.    Given the stated importance of sales to customers with an FEHBP insurance benefit, who comprised approximately 45% of Eargo customers at the time of the Offering, it was incumbent upon the Securities Act Defendants to ensure that such FEHBP customers were actually eligible for reimbursement given the manner in which Eargo sold its products and submitted (and caused the submission) of insurance reimbursement claims. Yet none of the Securities Act Defendants made a reasonable investigation regarding Eargo's claims process or the eligibility of Eargo insurance customers for reimbursement (including Eargo's purported "verification" of customers with insurance benefits), particularly to the Company's largest-yet-undisclosed third-party payor. By failing to investigate and ensure that Eargo's insurance customers were actually eligible for reimbursement, and that Eargo's claims filings were accurate and supported, the Securities Act Defendants did not possess reasonable grounds for the belief that the Company's statements regarding Eargo's revenues, compliance with GAAP, loss contingency, accounts receivable, penetration into the insurance pool, growth strategy, and the overall insurance pool

were accurate and complete and not misstated in material respects.

434. ***Second***, at the time of Eargo's IPO, and as the Company disclosed in the Offering Documents, Eargo had identified a material weakness in its internal controls over financial reporting. Specifically, the Prospectus disclosed, "In connection with the preparation of our financial statements, we identified a material weakness in our internal control over financial reporting . . . . The material weakness related to a lack of qualified supervisory accounting resources, including those necessary to account for and disclose certain complex transactions and for which we lacked the technical expertise to identify, analyze and appropriately record those transactions." The Prospectus warned that the Company "cannot assure" investors that "the measures we have taken to date, and are continuing to implement, will be sufficient to remediate the material weakness we have identified or avoid potential future material weaknesses."

435. Weaknesses in internal controls over financial reporting increase the risk of fraud by providing an opportunity for fraud to occur. For example, AS 2401 (Consideration of Fraud in a Financial Statement Audit) states that "the absence of controls, ineffective controls, or the ability of management to override controls . . . provide an opportunity for a fraud to be perpetrated." AS 2401.07. The Public Companies Accounting Oversight Board ("PCAOB") highlights the "employment of ineffective accounting [or] internal audit" and "[i]neffective accounting" as risk factors relating to misstatements arising from fraudulent financial reporting—the very internal control deficiencies Eargo acknowledged existed at the time of the IPO. AS 2401.A2, Opportunities at d. The existence of these material weaknesses, the lack of any external audit of Eargo's internal controls, and the lack of audited financial results for the reported periods in 2020, should have prompted the Underwriter Defendants to scrutinize Eargo's internal controls over financial reporting to ensure that Eargo's statements about its business and finances were accurate.

436. ***Third***, Eargo's designation as an "emerging growth company" is a red flag that the Underwriter Defendants should not have ignored. The emerging growth company designation, established under the Jumpstart Our Business Startups ("JOBS") Act of 2012, makes it easier for small and growing businesses, specifically those on track to conduct an initial public offering, to

attract investors and access capital by relaxing regulatory requirements and cutting some red tape. Eargo is such a company, having noted in its Offering Documents, "We are an 'emerging growth company' as defined under the federal securities laws and, as such, have elected to comply with certain reduced public company reporting requirements for this prospectus and may elect to do so in future filings."

437.    The PCAOB has called attention to the potential for material weaknesses at companies that designate themselves as emerging growth companies. In a "White Paper on Characteristics of Emerging Growth Companies" issued in November 2016, the PCAOB noted that, as of November 2016, among the companies that had filed with the SEC as emerging growth companies and had provided management reports on internal controls over financial reporting, 47% had identified material weaknesses in internal controls. In another white paper published in March 2017, the PCAOB found that found that of 1,951 companies reporting as EGCs in the 18 months prior to the reporting period, more than half (51 percent), received an explanatory paragraph in their most recent auditor's report expressing substantial doubt about the company's ability to continue as a going concern. Further reporting on emerging growth companies since the passage of the JOBS Act has suggested that emerging growth companies—which can take advantage of reduced reporting requirements and time and cost reductions in order to go public— have increased opportunities to commit securities fraud.

438.    ***Fourth***, Eargo disclosed that the Company recognized revenue when its products are shipped to customers, but that revenue was not, in fact, realized or realizable because Eargo's products were not, in fact, reimbursable by FEHB insurers. These customers comprised approximately 45% of Eargo's customer base, and the Company described insurance customers as an important growth driver.  Given the time gap between revenue recognition and actual payment, the Underwriter Defendants should have conducted adequate due diligence to ascertain that Eargo was, in fact, verifying its products eligibility to be reimbursed by its third-party payors and submitting appropriate reimbursement claims before recognizing the revenue from those products, particularly given that Eargo reported unaudited financial results for the periods in 2020 reported

in the Offering Documents.

439.     The foregoing red flags should have caused the Underwriter Defendants and all Securities Act Defendants to conduct additional due diligence before drafting and disseminating the Offering Documents. By overlooking these red flags, the Securities Act Defendants negligently failed to conduct reasonable due diligence into the accuracy and completeness of the representations contained in the Offering Documents, and are liable for the misstatements and omissions contained in the registration statements.

440.     Had the Securities Act Defendants exercised reasonable care, they would have known of the material misstatements and omissions alleged herein.

441.     The Underwriter Defendants could not simply rely on Eargo or on the work of Eargo's outside auditors because the investing public relies on the underwriters to obtain and verify relevant information and then make sure that essential facts are disclosed. Further, as described above, Eargo included unaudited results for reporting periods in 2020 in its Offering Documents. Thus, the Underwriter Defendants must each conduct its own, independent (and reasonable) investigation. A reasonable investigation would have disclosed to the Underwriter Defendants that the Offering Documents contained material misstatements and omissions concerning the subjects noted above, including Eargo's sales practices and net revenue results.

442.     Similarly, the Securities Act Individual Defendants who signed the Registration Statement failed to conduct a reasonable investigation of the statements contained in the Registration Statement and documents incorporated therein by reference and did not possess reasonable grounds for believing that the statements therein were true and not materially misstated. A reasonable investigation would have disclosed to the Securities Act Individual that the Offering Documents contained material misstatements and omissions concerning the subjects noted above, including Eargo's sales and net revenue.

443.     These Securities Act Defendants were sophisticated in financing and internal control issues given their collective industry experience and yet failed to reasonably inquire as to the Company's misstatements and omissions notwithstanding numerous "red flags" noted above.

1

2

**F.    CLASS ACTION ALLEGATIONS APPLICABLE TO THE SECURITIES ACT CLAIMS**

444.    Lead Plaintiffs bring this action as a class action pursuant to Fed. R. Civ. P. 23(a) and 23(b)(3) on behalf of a Class consisting of all those who purchased or otherwise acquired the common stock of Eargo in or traceable to the IPO, and who were damaged thereby (the "Securities Act Class"). Excluded from the Securities Act Class are Defendants, the officers and directors of Eargo at all relevant times, members of their immediate families and their legal representatives, heirs, agents, affiliates, successors or assigns, Defendants' liability insurance carriers and any affiliates or subsidiaries thereof, and any entity in which Defendants or their immediate families have or had a controlling interest.

445.    The members of the Securities Act Class are so numerous that joinder of all members is impracticable. Eargo shares were actively traded on the Nasdaq Stock Market. As of September 14, 2021, Eargo had over 39 million shares of common stock outstanding, owned by hundreds or thousands of investors. While the exact number of Securities Act Class members is unknown to Lead Plaintiffs at this time and can only be ascertained through appropriate discovery, Lead Plaintiffs believe that there are at least hundreds or thousands of members of the proposed Securities Act Class. Securities Act Class members who purchased Eargo common stock may be identified from records maintained by Eargo or its transfer agent(s), and may be notified of this class action using a form of notice similar to that customarily used in securities class actions.

446.    Lead Plaintiff's claims are typical of Securities Act Class members' claims, as all members of the Securities Act Class were similarly affected by Defendants' wrongful conduct in violation of federal laws as complained of herein.

447.    Lead Plaintiffs will fairly and adequately protect Securities Act Class members' interests and have retained competent counsel experienced in class actions and securities litigation.

448.    Common questions of law and fact exist as to all Securities Act Class members and predominate over any questions solely affecting individual Securities Act Class members. Among the questions of fact and law common to the Securities Act Class are:

(a)     whether the federal securities laws were violated by Defendants' acts and omissions as alleged herein;

(b)     whether the Defendants made statements to the investing public in the Offering Documents that were inaccurate or omitted material facts; and

(c)     the proper way to measure damages.

449.    A class action is superior to all other available methods for the fair and efficient adjudication of this action because joinder of all Securities Act Class members is impracticable. Additionally, the damage suffered by some individual Securities Act Class members may be relatively small so that the burden and expense of individual litigation make it impossible for such members to individually redress the wrong done to them. There will be no difficulty in the management of this action as a class action.

## COUNT III

### Against Eargo, The Securities Act Individual Defendants, And The Underwriter Defendants For Violations of Section 11 Of The Securities Act

450.    Plaintiff repeats and realleges each allegation contained above.

451.    This Count is brought by Plaintiff under Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of all persons and entities that purchased and otherwise acquired Eargo common stock in connection with, and traceable to, the Offering, and does not sound in fraud.

452.    The Offering Documents were inaccurate, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and failed adequately to disclose material facts, as alleged above.

453.    The Company is the registrant for the Offering. As issuer of the shares, Eargo is strictly liable to Plaintiff and to the members of the Class for the misstatements and omissions in the Offering Documents.

454.    As signatories of the Offering Documents, the Securities Act Individual Defendants were responsible for their contents and dissemination.

455.    The Underwriter Defendants served as the underwriters for the Offering and each

qualifies as the "underwriter" according to the definition contained in Section 2(a)(11) of the Securities Act, 15 U.S.C. § 77b(a)(11). As such, each Underwriter Defendant participated in the solicitation, offering, and sale of the securities to the investing public under the Offering Documents.

456.    None of these Securities Act Defendants made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Offering Documents were true, did not omit any material facts, and were not misleading.

457.    These Securities Act Defendants issued, caused to be issued, and participated in the issuance of materially untrue written statements to the investing public that were contained in the Offering Documents, which misrepresented or failed to disclose, inter alia, the facts alleged above. By reasons of the conduct alleged, each of these Securities Act Defendants violated Section 11 of the Securities Act.

458.    Plaintiff and other members of the Class acquired Eargo common stock either in or traceable to the Offering.

459.    Plaintiff and the Class have sustained damages. The value of Eargo's common stock has declined substantially after and as a result of the alleged violations.

460.    At the times when they purchased Eargo common stock, Plaintiff and the other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged in this Complaint and could not have reasonably discovered those facts before Eargo's subsequent announcements. Less than one year has elapsed from the time when Plaintiff discovered or reasonably could have discovered the facts upon which this Complaint is based to the time when Plaintiff filed this Complaint. Less than three years have elapsed from the time when the securities upon which this Count is brought were bona fide offered to the public to the time when Plaintiff filed this Complaint.

## COUNT IV

### Against Eargo And The Underwriter Defendants For
### Violations Of Section 12(a)(2) Of The Securities Act

461.    Plaintiff repeats and realleges every allegation contained above.

462.    This Count is brought by Plaintiff under Section 12(a)(2) of the Securities Act, 15 U.S.C. § 77l(a)(2), on behalf of all purchasers of Eargo common stock in connection with, and traceable to, the Offering.

463.    Eargo and the Underwriter Defendants were sellers, offerors, and solicitors of sales of the securities offered using the Offering Documents in the Offering.

464.    The Offering Documents contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and failed to disclose material facts. The actions of solicitation by Eargo and the Underwriter Defendants included participating in the preparation and distribution of the false and misleading Offering Documents.

465.    Eargo and the Underwriter Defendants breached their duty owed to the purchasers of Eargo common stock, including Plaintiff and other Class members, to make a reasonable and diligent investigation of the statements contained in the Offering Documents and to ensure that the statements were true and that the Offering Documents did not omit to state a material fact required to be stated in order to make the statements contained in the Offering Documents not misleading.

466.    Plaintiff and other members of the Class purchased or otherwise acquired Eargo securities in or traceable to the Offering. Lead Plaintiff and other members of the Class did not know, and in the exercise of reasonable diligence could not have known, of the untruths and omissions contained in the Offering Documents.

467.    Plaintiff, individually and representatively, offers to tender to Eargo and the Underwriter Defendants those securities that Plaintiff and other Class members continue to own, on behalf of all members of the Class who continue to own the securities, in return for the consideration paid for those securities together with interest on the amount owed to Plaintiff and the Class under Section 12(a)(2).

468.     By reason of the conduct alleged in this Complaint, Eargo and the Underwriter Defendants violated Section 12(a)(2) of the Securities Act. Accordingly, Plaintiff and members of the Class who hold Eargo securities purchased in the Offering have the right to rescind and recover the consideration paid for their Eargo shares and elect to rescind and tender their Eargo securities to Eargo and the Underwriter Defendants. Class members who have sold their Eargo common stock are entitled to rescissionary damages.

469.     Less than three years have elapsed from the time when the securities upon which this Count is brought were sold to the public to the time of the filing of this action. Less than one year has elapsed from the time when Plaintiff discovered or reasonably could have discovered the facts upon which this Count is based to the time of the filing of this action.

## <u>COUNT V</u>

### Against The Securities Act Individual Defendants For Violations Of Section 15 Of The Securities Act

470.     Plaintiff repeats and realleges every allegation contained above.

471.     This Count is brought by Plaintiff under Section 15 of the Securities Act, 15 U.S.C. § 77o, on behalf of all purchasers of Eargo common stock in connection with, and traceable to, the Offering.

472.     Each of the Securities Act Individual Defendants was a control person of Eargo by virtue of his or her position as a director or senior officer of the Company. Each of the Securities Act Individual Defendants was a control person of Eargo within the meaning of Section 15 of the Securities Act by reason of his or her own involvement in the daily business of Eargo and as a senior executive or director of Eargo. The Securities Act Individual Defendants, at the time they held positions with Eargo, were able to, and did, exercise substantial control over Eargo's operations, including control of the materially untrue and misleading statements, omissions, and course of conduct complained of in this action.

473.     Each of the Securities Act Individual Defendants was a culpable participant in the violations of Sections 11 and 12(a)(2) of the Securities Act alleged in Counts I and II above, based

on having signed the Offering Documents and having otherwise participated in the process that allowed the Offering to be completed.

474.   As a result of the foregoing, Plaintiff and the other members of the Class have suffered damages.

## III.   **PRAYER FOR RELIEF**

475.   WHEREFORE, Lead Plaintiffs pray for relief and judgment as follows:

(a)   Declaring the action to be a proper class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

(b)   Awarding all damages and other remedies available under the Securities Act and the Securities Exchange Act in favor of Lead Plaintiffs and all members of the Class against Defendants in an amount to be proven at trial, including interest thereon;

(c)   Awarding Lead Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

(d)   Such other and further relief as the Court may deem just and proper.

## IV.   **JURY TRIAL DEMANDED**

Lead Plaintiffs demand a trial by jury.

Dated: May 20, 2022                    Respectfully submitted,

**BERNSTEIN LITOWITZ BERGER**
**& GROSSMANN LLP**

By: */s/ John Rizio-Hamilton*
John Rizio-Hamilton (*Pro Hac Vice*)
johnr@blbglaw.com
Robert Kravetz (*Pro Hac Vice Pending*)
robert.kravetz@blbglaw.com
Kate Aufses (*Pro Hac Vice*)
kate.aufses@blbglaw.com
1251 Avenue of the Americas, 44th Floor
New York, NY 10020
Tel: (212) 554-1400
Fax: (212) 554-1444

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**BLOCK & LEVITON LLP**
Jacob A. Walker (Bar No. 271217)
jake@blockleviton.com
Brendan Jarboe (*Pro Hac Vice Pending*)
brendan@blockleviton.com
Mark Byrne (*Pro Hac Vice Pending*)
mark@blockleviton.com
260 Franklin Street, Suite 1860
Boston, MA 02110
Tel: (617) 398-5600

*Counsel for Lead Plaintiffs IBEW Local 353 Pension Plan and Xiaobin Cai and Lead Counsel for the Class*

1

**<u>CERTIFICATE OF SERVICE</u>**

2
     I hereby certify that on May 20, 2022, the foregoing document was served on counsel for

3
Defendants in the above-captioned action.

4
     Executed on May 20, 2022, at Los Angeles, California.

5

6
                     */s/ Jonathan D. Uslaner*
                     JONATHAN D. USLANER

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28