1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

United States District Court
Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

IN RE EARGO, INC. SECURITIES
LITIGATION

This document relates to all consolidated
cases.

Case No.  21-cv-08597-CRB

**ORDER GRANTING MOTIONS TO
DISMISS**

This consolidated putative securities class action alleges violations of the Securities Act of 1933 ("Securities Act") and the Securities Exchange Act of 1934 ("Exchange Act"). Lead Plaintiffs IBEW Local 353 Pension Plan and Xiaobin Cai, purchasers of Eargo, Inc.'s publicly traded stock, allege that the company and its executives, directors and IPO underwriters falsely or misleadingly inflated Eargo's revenue and growth opportunities because the company's business model was incompatible with the requirements for federal insurance reimbursement.  Plaintiffs also claim that Eargo falsely or misleadingly downplayed an insurance audit, which eventually became the subject of a Department of Justice investigation for insurance fraud.

Pending before the Court are the Eargo Defendants and the IPO Underwriters' motions to dismiss the amended consolidated class action complaint for failure to state a claim under Federal Rules of Civil Procedure 12(b)(6) and 9(b).  As explained below, the Court grants the motions and dismisses the Complaint in its entirety.

# I.     BACKGROUND

## A.     Factual Background[1]

### 1.     The Parties

Defendant Eargo, Inc. was founded in San Jose, California in 2010.  Compl. ¶ 2 (dkt. 59).  It went public in October 2020.  Id. ¶ 3.  Eargo makes and directly sells air conduction hearing aids to people with mild-to-moderate hearing loss.  Id. ¶ 31.  Eargo's president and chief executive officer is Christian Gormsen, and its chief financial officer is Adam Laponis.  Id. ¶¶ 27–28.  Both corporate officers are named as defendants in this suit, along with members of Eargo's board of directors, id. ¶ 315, and its IPO underwriters— J.P. Morgan Securities LLC, BofA Securities, Inc., Wells Fargo Securities, LLC, and William Blair & Company, L.L.C., id. ¶ 320.

Lead Plaintiffs are IBEW Local 353 Pension Plan, a multi-employer defined benefit pension plan, and Xiaobin Cai, an individual.  Id. ¶¶ 24–25.  Lead Plaintiffs purchased shares of Eargo common stock and now allege that they purchased the shares at artificially inflated prices and suffered damages because of Defendants' alleged violations of federal securities laws.  Id.  They purport to represent investors who purchased or otherwise acquired the common stock of Eargo between November 20, 2020 and March 2, 2022 ("Class Period").

### 2.     Eargo's Business Model

Eargo began selling its hearing aids in 2015.  Id. ¶ 31.  Eargo considers itself as a "disruptor" in the hearing aid industry.  Id. ¶ 32.  The traditional hearing aid sales model usually requires customers to make in-person visits to hearing aid professionals who examine the customer, perform an audiogram, and prescribe certain hearing aids.  Id.  The hearing aids are then tested on and fitted to the customer.  Id.  Eargo found this sales model

---

[1] These facts are drawn primarily from the Consolidated Complaint.  See Dkt. 59. Defendants request that the Court take judicial notice of Eargo's SEC filings and transcripts from earning calls and investor conferences.  Dkt. 77.  Judicial notice of these documents, which are heavily referenced in the Complaint, is proper under the incorporate-by-reference doctrine.  Khoja v. Orexigen Therapeutics, Inc., 899 F.3d 988, 999 (9th Cir. 2018).  SEC filings "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."  See Fed. R. Evid. 201(b).

both archaic and inconvenient for customers because it unnecessarily separates the hearing aid manufacturer from its customers and adds an incremental layer of cost.  Id. ¶¶ 32, 34. So Eargo developed a telecare business model that cuts out the middleman.

Under its telecare business model, Eargo has an in-house team of hearing aid dispensers who are licensed in one or more states to advise customers on their hearing aid needs.  Id. ¶¶ 34, 37.  Eargo believes that because it "sells its products online, rather than in physical stores, a dispenser that's licensed in one state can sell to customers in all of them."  Id.  According to Eargo, "potential customers are not required to have a hearing test to order the Eargo hearing solution."  Id. ¶ 36.  Eargo tells customers that there is "no need to call an audiologist before calling or buying Eargo.  Our team of pros here will work closely with you to understand your hearing situation and determine if Eargo is right for you."  Id.  Eargo also provides customers with a "do-it-yourself" hearing test.  Id. Under its business model, Eargo touts that a customer could receive its hearing aid "as little as 3 days," compared to "weeks to months" under the traditional way.  Id. ¶ 37.

### 3.      Eargo Accepts Insurance by Federal Carriers.

Before 2017, Eargo had marketed and sold its products primarily to customers who pay out-of-pocket.  Id. ¶¶ 38, 65.  Eargo then embarked on a new strategy to target customers with a Federal Employees Health Benefits Program ("FEHBP") insurance benefit.  Id. ¶ 17.

FEHBP is the largest employer-sponsored health insurance program in the world. Id. ¶ 4.  It provides health benefits through various insurance carriers, such as the Blue Cross Blue Shield Federal Employee Plan ("BCBS FEP").  Id.  FEHBP covers over eight million former and current federal employees and their family.  Id. Unlike most other medical insurance plans, FEHBP offers hearing aid benefits.  Id.  BCBS FEP, for example, offers a $2,500 benefit for hearing aids.  Id.  Eargo priced its hearing aids to commensurate with FEHBP benefits: Eargo's top-end model costs around $2,500.  Id. ¶ 350.

To submit a claim for hearing aid reimbursement, FEHBP carriers require that the claims include a hearing loss-related diagnosis code.  Id. ¶ 350.  These diagnosis codes

must be supported by a hearing loss diagnosis, which typically is based on a hearing test performed by a health care provider.  See id. ¶¶ 350–51.  FEHBP insurance carriers often condition claim reimbursements on a determination of "medical necessity."  Id. ¶ 352. "Over-the-counter" hearing aids generally are "not covered."  See id. ¶ 353.

Eargo's strategy of targeting the FEHBP insurance market initially was a success. It allowed Eargo to expand its customer base beyond cash-pay customers.  Id. ¶ 5.  Eargo also realized that customers with FEHBP benefits were less likely than cash-pay customers to return the hearing aids because the insurer paid most or all the cost.  Id.  With these insurance payments, in 2019, Eargo's net revenue more than doubled: from $32.7 million at year-end 2019 to $69.2 million in 2020.  Id.  And by the end of 2020, insurance customers comprised approximately 45-percent of Eargo's total customer base.  Id.

### 4.    BCBS Audits Eargo.

BCBS was Eargo's largest third-party insurance payor.  Id. ¶ 364.  On March 15, 2021, BCBS mailed a letter to Eargo informing it that BCBS "is required by federal mandates and state statutes to conduct audits and reviews of claims to ensure appropriateness of claims and adequate documentation of clinical services provided to our members. . . .  Accordingly, [BCBS is] requesting [Eargo to] provide office/medical records for [28 listed BCBS FEP members] showing all supporting documentation."  Pls.' Opp., Ex. A at 2 (dkt. 84-2).  The letter noted that "[f]ailure to submit the requested information could result in a negative decision being rendered against you regarding these claim payment(s)."  Id.

A week later, on March 22, Eargo received a faxed letter from BCBS.  Id., Ex. B at 2 (dkt. 84-3).  The March 22 letter included Eargo's mailing address but appears to be directed at another company.  Id.  The letter stated: "Dear [unrelated company]: . . . In a review of claims that you submitted, Blue Shield has identified irregularities in your billing: **Your office is submitting Claims for a non-covered service.**"  Id. (emphasis original).

Then, on April 7, 2021, BCBS mailed another letter to Eargo.  Id., Ex. C at 2 (dkt.

United States District Court
Northern District of California

84-4).  This time, the letter was both addressed to and directed at Eargo.  The letter stated: "In a review of claims that you submitted, Blue Shield has identified irregularities in your billing: **Your office is submitting Claims for services that require additional review.**"). The letter also stated that "**effective March 01, 2021, you will be required to supply supporting documentation with all claims submitted.**"  Id. (emphasis original).

On May 12, 2021, in its Q1 2021 SEC Form 10-Q filing, Eargo stated that it was "currently subject to a routine audit with our largest third-party payor, who accounted for approximately 57% of the Company's gross accounts receivable as of March 21, 2021." Eargo MTD, Ex. C at 25 (dkt. 76-3).

Eargo updated investors on August 12, 2021 in its Q2 2021 filing, disclosing that in addition to being subject to the audit, "claims submitted since March 1, 2021 have not been paid."  Id., Ex. D at 29 (dkt. 76-4).  Eargo also stated: "Reimbursement claims submitted to another insurance company are also currently undergoing an audit, and to date claims from this insurance company have been processed and approved consistent with normal business practices during the audit.  In addition to the risk that the insurance companies may deny the claims subject to the current audits, and we have received some denials to date, it is possible that they may seek recoupments of previous claims paid and deny any future claims."  Id.  Eargo continued: "While we believe the claims submitted are valid and reimbursement with these insurance companies, and there exist processes for appeal . . . an unfavorable outcome of the ongoing audits could have a material adverse effect on our future financial results[.]"  Id.

On the August 12 earnings call, C.F.O. Laponis stated: "These kind of audits are— on claims are pretty common, particularly given the growth in our business.  We believe all the claims we submitted are valid, reimbursable and have had a very productive call even this week with the payor and we're confident we're able to provide them all the requested documentation."  Id. ¶ 157.  Laponis continued: "[T]his is more as I see it an education of our business model and how our business model works differently from the classic way of distributing hearing aids."  Id.

United States District Court
Northern District of California

1    After the August 12 filing, Eargo's stock price dropped over 24-percent, from a
2    close of $32.70 on August 12, 2021 to a close of $24.70 the following day.  Id. ¶ 260.

3    A few days later, in an August 16 meeting with analysts, Gormsen and Laponis said
4    the audit "was not 'an issue with the benefit amount, the device delivered, or a dispute
5    denial." Id. ¶ 158.  Later, on September 9, 2021, at the Wells Fargo Healthcare
6    Conference, Gormsen said: "[A]udits in the hearing aid industry happen all the time, right.
7    You're audited by large customers. . . . [BCBS is] not questioning claims, so we are not
8    denying claims, they are not questioning product. . . . They're not questioning our delivery
9    of audiology there either.  So it's really about—it's more, how do we define a process that
10   allows for them to approve our claims in a more streamlined manner, right." Id.; Eargo
11   MTD, Ex. I at 2.

### 5.    The DOJ Investigates Eargo's Insurance Claims.

13   On September 22, 2021, Eargo filed a SEC Form 8-K notifying shareholders that
14   the Department of Justice had begun conducting a criminal investigation into Eargo's
15   insurance reimbursement claims made to federal employee health plans.  Compl. ¶ 99.
16   The 8-K filing also stated that "the DOJ is now the principal contact related to the subject
17   matter of the [BCBS] audit." See id. ¶ 100.  After this announcement, Eargo's stock price
18   dropped approximately 68-percent, from $21.86 on September 22 to a close price of $6.86
19   on September 23.  Id. ¶ 102.

20   Months later, in January 2022, Eargo disclosed that the DOJ has referred the matter
21   to the Civil Division and that the criminal investigation was no longer active.  Id. ¶ 112.
22   As the DOJ investigation was pending, in March 2022, Eargo further disclosed that it had
23   offered affected customers—those who used insurance benefits for the purchase—the
24   option to return their hearing aids or purchase their hearing aids without using insurance
25   benefits.  Id. ¶ 114.

26   On April 29, 2022, the DOJ issued a press release announcing a $34.37 million
27   settlement with Eargo "to settle common law and False Claims Act allegations of
28   unsupported diagnosis code." Id. ¶ 115.  In the Settlement Agreement and the press

release, DOJ stated its allegations as follows:

> The United States alleged that, from Jan. 1, 2017, through Jan. 31, 2021, Eargo included unsupported hearing loss-related diagnosis codes on claims for hearing aid devices that Eargo submitted to the FEHBP and on invoices—called superbills—that Eargo provided to FEHBP beneficiaries to obtain reimbursement for such devices from the FEHBP.  The United States further alleged that between Feb. 1, 2021, and Sept. 22, 2021, Eargo continued to include these unsupported hearing loss-related diagnosis codes on claims and superbills—even after completing an internal review of its billing and coding practices in January 2021—resulting in Eargo knowingly submitting or causing the submission of false claims for payment to the FEHBP.

See id. ¶ 116; Eargo MTD, Ex. F.

In the press release, the DOJ noted that "[t]he claims settled by this agreement are allegations only and there has been no determination of liability."  Eargo MTD, Ex. G (dkt. 76-7).  Eargo denied any wrongdoing.  Id.

### B.    Procedural History

While the DOJ investigation was ongoing, several investors filed separate suits alleging violations of federal securities law.  See Dkt. 44.  This Court consolidated the cases and appointed IBEW Local 353 Pension Plan and Xiaobin Cai as Lead Plaintiffs.  Id. at 2.

On May 20, 2022, Lead Plaintiffs filed a 128-page amended consolidated class action complaint, alleging (1) violations of the Securities Act against Defendants Eargo, Inc. and its executives, board of directors and IPO underwriters; and (2) violations of the Exchange Act against Eargo, Gormsen and Laponis.  See generally Compl.  Plaintiffs generally allege that Defendants made numerous false or misleading statements in Eargo's Offering Documents and in later SEC disclosures and acted with scienter.  The Complaint alleges that prior to the IPO, Eargo and its executives knew, or it was reckless that they did not know, that Eargo's telecare business model for selling hearing aids was incompatible with FEHBP insurance policies, which require a diagnosis of "medical necessity."  Plaintiffs allege that Eargo submitted "false" insurance claims that purport to meet FEHBP

United States District Court
Northern District of California

insurance requirements even though they did not.  According to Plaintiffs, Eargo overstated its revenue and guidance in public filings by accounting for insurance reimbursements, and Eargo and its executives falsely or misleadingly touted significant business growth opportunity through the federal insurance market even though that market was out-of-reach for Eargo because the company does not require its customers to undergo in-person diagnosis or audiograms.  Plaintiffs allege that it was negligent for Eargo's board of directors and IPO underwriters to not investigate and disclose that Eargo's business model did not comport with insurance billing standards.  Plaintiffs also allege that the Eargo Defendants significantly downplayed the BCBS audit and failed to promptly disclose that BCBS was not making payments for claims submitted since March 1, 2021.

Pending now are separate motions to dismiss filed by the Eargo Defendants and the Underwriter Defendants.  See Eargo MTD (dkt. 75); Underwriters MTD (dkt. 78).  The Court heard oral argument on these motions on January 27, 2023.

## II.   LEGAL STANDARD

To survive a motion to dismiss, a complaint must contain sufficient factual matter to state a claim that is facially plausible.  Fed. R. Civ. P. 12(b)(6); Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).  A claim is facially plausible when "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Ashcroft, 556 U.S. at 678.  The court "must take all of the factual allegations in the complaint as true," but it is "not bound to accept as true a legal conclusion couched as a factual allegation."  Id.  The plausibility standard does not impose a "probability requirement, but it asks for more than a sheer possibility that a defendant acted unlawfully."  Id.

A complaint alleging fraud must also "state with particularity the circumstances constituting fraud."  Fed. R. Civ. P. 9(b); Kearns v. Ford Motor Co., 567 F.3d 1120, 1125 (9th Cir. 2009).  Rule 9(b) requires a plaintiff to set forth the "who, what, when, where, and how" of the alleged fraud.  Vess v. Ciba Geigy Corp. USA, 317 F.3d 1097, 1106 (9th Cir. 2003).  The purpose of Rule 9(b)'s heightened pleading requirement is to provide

1   notice to defendants of the specific fraudulent conduct against which they must defend.

2   Bly-Magee v. California, 236 F.3d 1014, 1018 (9th Cir. 2001); Semegen v. Weidner, 780

3   F.2d 727, 732 (9th Cir. 1985) (the complaint "must be specific enough to give defendants

4   notice of the particular misconduct which is alleged to constitute fraud").

5   **III.   DISCUSSION**

6        Plaintiffs assert claims under (A) Sections 11, 12(a)(2) and 15 of the Securities Act

7   against Eargo, Gormsen, and Laponis, plus members of Eargo's Board of Directors who

8   signed the Offering Materials, and the underwriters for Eargo's IPO.  Plaintiffs also bring

9   claims under (B) Section 10(b) and 20(a) of the Exchange Act against Eargo, Gormsen,

10  and Laponis.  Each set of claims are discussed in turn.

11       **A.     Securities Act**

12       Under Section 11(a) of the Securities Act, a stock purchaser may sue based on

13  material omissions or misrepresentations in the stock's IPO registration statement.

14  15 U.S.C. § 77k(a).  Board directors of the issuer company, professionals who participated

15  in the preparation of the registration statement, and underwriters of the security may be

16  held liable under Section 11(a).  Id.; see In re Software Toolworks Inc., 50 F.3d 615, 621

17  (9th Cir. 1994).

18       **1.     Securities Act claims sounding in fraud must be pleaded with
             particularity.**

19

20       As a preliminary matter, the parties dispute whether Rule 8(a) or the heightened

21  pleading standard of Rule 9(b) governs the Section 11 claims.  Plaintiffs argue that the

22  Rule 8(a) pleading standard should apply because the Complaint separates allegations for

23  the negligence-based claims under the Securities Act and the fraud-based claims under

24  Exchange Act.  Opp. at 31–32.  Eargo and the Underwriters disagree because both set of

25  Plaintiffs' claims are premised on fraud allegations.  Eargo MTD at 6–8 & n.3;

26  Underwriters Reply at 2–3.

27       Defendants have the better argument.  It is well established that Securities Act

28  claims may be subject to Rule 9(b) if the complaint is "grounded in fraud" or "sounds in

fraud." In re Rigel Pharm., Inc. Sec. Litig., 697 F.3d 869, 885–86 (9th Cir. 2012); Rubke v. Capitol Bancorp Ltd., 551 F.3d 1156, 1161 (9th Cir. 2009).  To decide whether a complaint sounds in fraud, a court must "determine, after a close examination of the language and structure of the complaint, whether the complaint alleges a unified course of fraudulent conduct and relies entirely on that course of conduct as the basis of a claim." Rubke, 551 F.3d at 1161

In this case, Plaintiffs cannot circumvent the heightened pleading standard because their Securities Act allegations generally mirror their fraud-based allegations under the Exchange Act.  That is, both the Securities Act and Exchange Act claims are based on Eargo's alleged fraudulent act of submitting false or improper insurance claims.  Tellingly, in pleading the Securities Act violations, Plaintiffs expressly incorporate and reallege the fraud-based allegations from the Exchange Act section of the Complaint.  See Compl. ¶¶ 450, 461, 470.  As both set of claims are premised on fraud, the heightened pleading requirements of Rule 9(b) apply to assess the sufficiency of Plaintiffs' Securities Act claims.  See In re Daou Sys., Inc., 411 F.3d 1006, 1028 (9th Cir. 2005).

### 2. Plaintiffs do not adequately plead falsity from statements made in Eargo's Offering Documents.

To survive dismissal of a Section 11 claim sounding in fraud, a plaintiff must plead with particularity (i) that the registration statement contained a misrepresentation or omission; and (ii) that the misrepresentation or omission was material.  Id. at 1027.  A misrepresentation or omission is material where it "would have misled a reasonable investor about the nature of his or her investment."  Id.  Unlike the requirements under the Exchange Act, see infra III.B, Section 11 liability does not require a showing of scienter, and defendants will be held liable for innocent or negligent material misrepresentations or omissions.  In re Stac Electronics Sec. Litig., 89 F.3d 1399, 1404 (9th Cir. 1996).

The same standard applies for pleading a violation of Section 12(a)(2), which creates a private cause of action against a person who offers or sells a security by means of a prospectus or oral communication that includes a false or misleading statement.  See

United States District Court
Northern District of California

15 U.S.C. § 77l; see also In re Morgan Stanley Info. Fund Sec. Litig., 592 F.3d 347, 359 (2d Cir. 2010) (noting Sections 11 and 12(a)(2) are "Securities Act siblings" with similar elements).

The truthfulness of the challenged statements is assessed from the standpoint at which time the statement was made.  Stac, 89 F.3d at 1404 ("[S]tatement or omission must be shown to have been false or misleading when made.").  So, for purpose of evaluating the truthfulness of the statements made in Eargo's Offering Documents, the Court need not consider post-IPO events.

The hundreds of challenged statements, as pleaded in the Complaint, generally fall into three categories: (a) unaudited financial results; (b) statements concerning available insurance coverage; and (c) risk factors concerning uncertainty surrounding available insurance and Eargo's compliance with law.

### a.   Unaudited financial results

Plaintiffs argue that Eargo's revenue figures in the Offering Documents were false or misleading because the amounts were improperly inflated by revenue derived from fraudulent insurance claims.  Opp. at 36.  Plaintiffs aver that the insurance "claims submitted by Eargo were not reimbursable without the proper submission of medical necessity."  Compl. ¶¶ 402–03.  From this, Plaintiffs conclude that Eargo's unaudited financial results were inaccurate, misleading, or false because it was not probable that Eargo could collect insurance reimbursements as revenue.  And under the accounting standards of ASC 606, companies should recognize revenue only to the extent that the company expects to receive the recognized amount.  See id. ¶ 141.  Plaintiffs estimate that the unaudited, reported revenue were improperly inflated by approximately 45-percent, i.e., the share of Eargo's revenue attributed to insurance reimbursements.  See id. ¶ 145.  In response, Eargo and the Underwriters argue that the reported revenues, which have not been restated, are inactionable statements of opinion.  Eargo MTD at 17–18; Underwriters MTD at 6–7.

The Supreme Court has recognized that "[g]enerally accepted accounting

United States District Court
Northern District of California

principles," such as ASC 606, "tolerate a range of reasonable treatments, leaving the choice among alternatives to management."  Thor Power Tool Co. v. C.I.R., 439 U.S. 522, 544 (1979).  It is well established in this circuit that accounting judgments may constitute statements of opinion.  City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc., 856 F.3d 605, 621 (9th Cir. 2017); accord, e.g., Hunt v. Bloom Energy Corp., No. 19-cv-02935-HSG, 2021 WL 4461171, at *5 (N.D. Cal. Sept. 29, 2021) ("The Ninth Circuit has [ ] recognized that the application of GAAP—at least at times—requires a company to exercise its judgment, such that a company's financial statements may constitute opinions.").

For accounting statements of opinion to be actionable, the opinion must (1) "itself constitute[] a factual misstatement" or (2) is "rendered misleading by the omission of discrete factual representations."  Omnicare, Inc. v. Laborers Dist. Council Const. Industry Pension Fund 575 U.S. 175, 182–84 (2015).  Put another way, an opinion itself may be a misrepresentation of fact if a speaker says something is true but does not actually believe it is true.  Id. at 183–86.  And for omissions, the "investor must identify particular (and material) facts going to the basis for the issuer's opinion—facts about the inquiry [underlying the opinion] the issuer did or did not conduct or the knowledge it did or did not have—whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context."  Id. at 194.  Satisfying the Omnicare framework is, as the Supreme Court recognized, "no small task."  Id.

Here, Plaintiffs have fallen short of meeting the Omnicare requirements.  The Complaint contains no allegations of subjective falsity—that is, Plaintiffs do not allege, with particularity, facts showing that Defendants believed that FEHBP insurance companies would not reimburse the claims.  Plaintiffs merely speculate that Defendants must know, or it was reckless that they did not know, from BCBS's policy manual that Eargo's claims would be rejected for falsehood.  But their speculation is undercut by the fact that federal insurance carriers, including BCBS, have reimbursed Eargo's claims for nearly three years prior and without issue.  Plaintiffs do not plead facts to the contrary.

1    Therefore, nothing in the Complaint suggests that Defendants "must have known" that

2    their accounting statements were misleading.  See Dearborn Heights, 856 F.3d at 618.

3           A statement of opinion, moreover, "is not necessarily misleading when an issuer

4    knows, but fails to disclose, some fact cutting the other way," because opinions generally

5    "rest on a weighing of competing facts."  Omnicare, 575 U.S. at 189.  Though BCBS's

6    policy manual states that it does not cover "[o]ver the counter hearing aids," see Eargo

7    MTD, Supp. Decl., Ex. W at 57 (dkt. 93-1), the Complaint does not plead with

8    particularity facts showing that the Defendants considered Eargo's hearing aids to be

9    "over-the-counter" products.[2]  Of course, different people may have different

10   interpretations of what an insurance policy covers.  And insurance companies may have

11   different interpretations from providers and patients.  Here, Plaintiffs at best may have

12   established a legitimate difference in opinion as to what BCBS's policy required, but that

13   is hardly sufficient to state a securities fraud claim.

14          Plaintiffs also argue that the Defendants violated Item 303 of Regulation S-K.  See

15   Opp. at 50.  Under Item 303, issuers must "[d]escribe any known trends or uncertainties

16   that have had or that the registrant reasonably expects will have a material favorable or

17   unfavorable impact on net sales or revenues or income from continuing operations."  17

18   C.F.R. § 229.303(a)(3)(ii).  An Item 303 violation has three elements: (1) a defendant

19   knew of an adverse trend, (2) the trend would have a material impact, and (3) the material

20   impact is reasonably likely to occur.  Steckman v. Hart Brewing, Inc., 143 F.3d 1293,

21   1296–97 (9th Cir. 1998).  Plaintiffs' allegations here are inadequate because the Complaint

22   does not mention that any FEHBP carrier denied Eargo's claims prior to the IPO.  Put

23   differently, Plaintiffs make no allegations that establish a trend that Eargo knew its

24   insurance claims were false or improper and that consequently its submissions would be

25   denied.

26   _____

27   [2] In post-IPO statements, Eargo has expressly disclaimed that its hearing aids are "over-the-counter" products under then-existing FDA regulations.  See Ex. A at 20–21; see also,

28   e.g., Ex. E at 5 (on the August 12, 2021 Q2 Earnings Call: "As another reminder, Eargo is not an OTC [over-the-counter] hearing aid as this regulatory category does not yet exist.").

United States District Court
Northern District of California

### b.    Statements on insurance opportunities

Plaintiffs allege that the Offering Documents contained false or misleading statements about Eargo's ability to obtain insurance coverage and its growth opportunities through the insurance market.  See, e.g., Compl. ¶ 411 ("Eargo stated that 'the increase in customers with insurance coverage has been a significant driver of our growth in 2020, and we intend to pursue additional coverage in the future.'"); id. ¶¶ 412–13 ("'we intend to pursue additional coverage in the future' as a growth strategy"); id. ¶ 414 ("In describing its pool of potential insurance customers, Eargo stated that 'there are approximately 12 million adults in the United States over 50 years of age with both hearing loss and access to an existing hearing aid benefit under these plans.'").  Plaintiffs allege that statements about the size or importance of the FEHBP insurance market were misleading because "Eargo's FEHBP customers (including BCBS FEP customers) were ineligible for insurance reimbursement," and "Eargo had been systematically submitting unsupported, false reimbursement requests to obtain reimbursement."  Id. ¶¶ 412, 417.  In response, Defendants argue that these statements are (i) inactionable expressions of corporate optimism, (ii) forward-looking statements protected by the PSLRA's safe harbor provision; or (iii) puffery.

### i.    Corporate optimism

It is well established that statements expressing corporate optimism generally are not actionable.  See In re Cutera Sec. Litig., 610 F.3d 1103, 1111 (9th Cir. 2010).  An exception to that general rule is if the challenged statements "address specific aspects of a company's operation that the speaker knows" is false.  In re Quality Sys., Inc. Sec. Litig., 865 F.3d 1130, 1143 (9th Cir. 2017); see, e.g., Warshaw v. Xoma Corp., 74 F.3d 955, 959 (9th Cir. 1996) (telling investors FDA approval was "going fine" when the company knew approval would never come was materially misleading); Fecht v. Price Co., 70 F.3d 1078, 1081 (9th Cir. 1995) (saying the company "anticipates a continuation of its accelerated expansion schedule" when the expansion already failed was misleading).

In this case, the statements made in the Offering Documents—e.g., that Eargo

1    "intends to pursue additional coverage in the future" and "there are approximately 12

2    million adults in the United States over 50 years of age with both hearing loss and access

3    to an existing hearing aid benefit under these plans," Compl. ¶¶ 411–14—simply conveyed

4    corporate optimism.  Plaintiffs have not pleaded in the Complaint that Defendants believed

5    that the mechanism for revenue growth through insurance coverage was unattainable.

6            Plaintiffs' reliance on <u>SEC v. Richman</u>, No. 21-CV-01911-CRB, 2021 WL 5113168

7    (N.D. Cal. Nov. 3, 2021), is misplaced.  In <u>Richman</u>, this Court found that the SEC

8    adequately pleaded falsity based on allegations that the company knew its insurance

9    practices were risky or dubious.  <u>Id.</u> at *7.  Specifically, almost a year before the

10   company's Series C funding, "the company's general counsel emailed defendants that 'any

11   tests prescribed based solely on consumers' questionnaires, versus a live consultation

12   between consumer and doctor, would be a reimbursement risk.'"  <u>Id.</u> at *2.  Afterward, not

13   only did the executive defendants continue to use the wrongful practice, "they also

14   allegedly 'concealed' [its] the use 'from the general counsel and the [company's] board."

15   <u>Id.</u>  And at the start of the Series C funding rounding, the company falsified

16   "documentation in response to insurer inquiries" and the "insurers challenged the

17   company's practices, including allegations of 'fraud and abuse.'"  <u>Id.</u> at *7.

18           The allegations from Plaintiffs' Complaint are poles apart from the SEC's

19   allegations in <u>Richman</u>.  In its Offering Documents, Eargo made clear that its telecare

20   business model was nontraditional in that customers could "complete their purchase over

21   the phone with [Eargo's] sales consultant or directly on [its] website, without the need to

22   navigate multiple visits to the hearing clinic for tests and fittings,'" Compl. ¶ 329, and

23   through "'do-it-yourself'" assessments, <u>id.</u> ¶ 331.  Plaintiffs do not plead with particularity

24   any facts showing that Eargo knew or should have known its telecare business model was

25   seriously incompatible with FEHBP insurance policies.  And unlike in <u>Richman</u> where the

26   company's general counsel raised concerns with its founders and executives, Plaintiffs

27   here do not plead facts showing that the two former Eargo employees who spoke with the

28   DOJ during the investigation—and who allegedly expressed concerns about Eargo's

business model—even interacted with the Eargo's executives.  Plaintiffs do not offer any contemporaneous witness accounts that the Defendants knew that their conduct of submitting claims to federal insurance carriers was wrong.  Without more, the excerpts from the former employees' statements "cannot substitute for reports during the Class Period required to establish each statement was false when made."  City of Sunrise Firefighters' Pension Fund v. Oracle Corp., No. 18-cv-4844-BLF, 2019 WL 6877195, at *14 (N.D. Cal. Dec. 17, 2019); In re Rackable Sys., Inc. Sec. Litig., No. 09-cv-222-CW, 2010 WL 3447857, at *9 (N.D. Cal. Aug. 27, 2010) (rejecting former employee allegations when they had no "interaction or communication with any of the defendants").

### ii.    Safe harbor

The PSLRA carves out a safe harbor from liability for statements that are identified as "forward-looking" and are "accompanied by meaningful cautionary statements."  15 U.S.C. § 78u-5(c)(1)(A)(i).  A forward-looking statement is "any statement regarding (1) financial projections, (2) plans and objectives of management for future operations, (3) future economic performance, or (4) the assumptions 'underlying or related to' any of these issues."  No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. W. Holding Corp., 320 F.3d 920, 936 (9th Cir. 2003).  A projection may contain an implied factual misstatement where (1) the speaker does not actually believe the statement, (2) there is no reasonable basis to believe the statement is true, or (3) the speaker is aware of undisclosed facts that seriously undermine the statement's accuracy.  Provenz v. Miller, 102 F.3d 1478, 1487 (9th Cir. 1996).  Under the PSLRA, forward-looking statements are not actionable (i) if they are identified as forward looking and accompanied by meaningful cautionary language; or (ii) if Plaintiffs fail to prove Defendants made the statements with actual knowledge that they were materially false or misleading.  Park v. GoPro, Inc., No. 18-cv-193-EMC, 2019 WL 1231175, at *15 (N.D. Cal. Mar. 15, 2019).  When meaningful cautionary language accompanies a forward-looking statement, the speaker's state of mind "is irrelevant."  Cutera, 610 F.3d at 1112.

Here, statements in the Offering Documents that Eargo intended to target customers

with eligible insurance coverage are forward-looking statements regarding plans and objectives for future operations.  Furthermore, the Offering Documents disclosed that Eargo's "products were primarily purchased on a cash-pay basis" and expressly warned that continued insurance coverage was uncertain due to insurance or regulatory changes.  See, e.g., Eargo MTD, Ex. A (Registration Statement) at 27 ("Third party coverage and reimbursement … could decrease for our products, which could reduce our market share.").

### iii.    Puffery

Statements that are mere "puffery" are non-actionable as securities fraud.  Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc., 759 F.3d 1051, 1060 (9th Cir. 2014).  Puffery comprises generalized, vague, nonquantifiable statements of corporate optimism.  See Omnicare, 575 U.S. at 183–84 (differentiating between "mere puffery" and "determinate, verifiable statement[s]" about a company's products).

Though Plaintiffs point to a handful of statements containing concrete facts that are quantifiable and verifiable—e.g., "insurance customers comprised 45–48% of Eargo's customer base," Opp. at 15—most of the challenged statements simply convey optimism for business growth.  See, e.g., Compl. ¶ 52 ("'huge opportunity long term to expand [ ]' to FEHBP customers"); id. ¶ 211 ("Regarding further penetration of the insurance market, Gormsen further touted the 'enormous head room and long-term grown.'").  More to that, the challenged numbers are "false" if only there is merit to Plaintiffs' accounting argument about excluding insurance payments as revenue—there is not.  See supra III.A.2.a.

After reviewing the Complaint and the Offering Documents, the Court finds that the challenged statements about Eargo's insurance opportunities fall into one or more of the recognized defenses.

### c.    Risk factors

Plaintiffs challenge various risk factors in Eargo's SEC filings related to the uncertainty surrounding available insurance, its compliance with law, and its business model.  Specifically, Plaintiffs allege that Eargo's risk disclosures were meaningless and

17

generic—e.g., Eargo warning that "'[c]hanges in third-party coverage and reimbursement may impact our ability to grow and sell our products'" and that "'[t]hird-party coverage and reimbursement may never become available to us at sufficient levels." Compl. ¶ 418. Plaintiffs argue that because Eargo already "had submitted numerous unsupported, false claims to BCBS and other insurers that were not eligible for payment at all," "[i]t was misleading for Defendants to describe generic, abstract risks regarding potential 'changes in third-party coverage'" or potential civil penalties or fines. Id. ¶¶ 419–21. Defendants argue that the risk factors were genuine and appropriate because at the time of the IPO, none of the described risks were realized.

The Ninth Circuit has held that "risk factors" are not actionable without further factual allegations indicating that the risks had already "come to fruition." Siracusano v. Matrixx Initiatives, Inc., 585 F.3d 1167, 1181 (9th Cir. 2009); accord, e.g., In re Pivotal Sec. Litig., No. 19-cv-3589-CRB, 2020 WL 4193384, at *6–7 (N.D. Cal. July 21, 2020). Here, the Complaint does not contain well-pleaded facts showing that, at the time of the IPO, any insurer audit or regulatory investigation had begun such that it would make Eargo's risk disclosures inaccurate. Plaintiffs therefore have not stated an actionable claim based on the risk factors.

Accordingly, the Court finds that Plaintiffs have not pleaded actionable claims under Sections 11 and 12(a)(2) of the Securities Act.

And because Plaintiffs have not pleaded underlying violations of Sections 11 or 12, their Section 15 claim against a "control person" of the company fails, too. See 15 U.S.C. § 77o; e.g., In re Rigel Pharm., Inc. Sec. Lit., 697 F.3d 869, 886 (9th Cir. 2012) ("Because Plaintiff here has failed to adequately plead a violation of the federal securities laws, it follows that Plaintiff also has failed to adequately plead violations of [ ] section 15.").

## B. Exchange Act

Plaintiffs' second set of claims is brought under Sections 10(b) and 20(a) of the Exchange Act against Eargo, Gormsen and Laponis.

To plead a violation under Rule 10b–5, which was promulgated under the Securities

Act, a plaintiff must allege: "(1) a material misrepresentation or omission of fact, (2) scienter, (3) a connection with the purchase or sale of a security, (4) transaction and loss causation, and (5) economic loss." Zucco Partners, LLC v. Digimarc Corp., 552 F.3d 981, 990 (9th Cir. 2009). Eargo challenges the sufficiency of Plaintiffs' allegations with respect to only the first two elements: (1) the falsity of Eargo's statements and (2) whether they were made with scienter. The "more exacting pleading requirements" of the PSLRA require that the complaint plead both falsity and scienter with particularity. Id.; see also 15 U.S.C. § 78u4(b)(1).

### 1.    Falsity or Misrepresentation

To begin with, Plaintiffs' claims under the Exchange Act largely hinge on the same or similar categories of challenged statements as those under their Securities Act claims—that is, statements about Eargo's revenue, insurance coverage, and risk factors. Thus, most of Plaintiffs' Exchange Act claims are not actionable for the reasons why their Securities Act claims fail. See supra III(A)(2)(a)–(c).

Nonetheless, for their Section 10(b) claims, Plaintiffs also allege that Eargo's representation that it "validates customer eligibility and reimbursement amounts prior to shipping the product," Compl. ¶¶ 135, 202, was false or misleading. Plaintiffs also allege that Eargo falsely or misleadingly characterized and downplayed the BCBS audit as "routine"; an "opportunity" to "educate" BCBS" of Eargo's business model; "pretty common"; and something that "happen[s] all the time." See id. ¶¶ 88, 156, 242, 253.

### a.    Validation of customer eligibility[3]

Plaintiffs contend that Eargo falsely or misleadingly conveyed to investors that the company precleared benefits reimbursements prior to submitting them to the insurance carriers. Plaintiffs repeatedly take a snippet from Eargo's March 16, 2021 Form 10-K that said Eargo "validates customer eligibility and reimbursement amounts prior to shipping the product." E.g., Compl. ¶¶ 41, 135, 202. Plaintiffs and Eargo disagree what "validates

---

[3] Plaintiffs concede that the language about validating customers' eligibility does not expressly appear in Eargo's Offering Documents. See Hr'g Tr. 4:10–16 (Jan. 27, 2023).

1   customer eligibility" means.  On the one hand, Plaintiffs argue that "validates customer

2   eligibility" meant that Eargo "pre-clear[ed] customer eligibility with FEHBP insurers."

3   Opp. at 14–15.  On the other hand, Eargo argues that validation in this sentence meant only

4   that Eargo "verif[ied] the customer had an insurance policy that included hearing-aid

5   benefits."  Eargo Reply at 7.  This verification, Eargo argues, did not mean that "it would

6   pre-clear customer eligibility with FEHBP insurers."  Id.

7          This statement about validation of customer eligibility is ambiguous, and both

8   readings of the phrase are plausible.  At the motion-to-dismiss stage, the Court cannot

9   undertake the necessarily factual inquiry to determine how a reasonable investor would

10   understand the phrase "validates customer eligibility."  The inquiry at this stage is whether

11   Plaintiffs have pleaded adequately and with particularity that the "representations, viewed

12   as a whole, would have misled a reasonable investor."  Rombach v. Chang, 355 F.3d 164,

13   178 n.11 (2d Cir. 2004).  In other words, the question is whether a reasonable investor

14   would have been misled by Eargo's statement about validating insurance eligibility.  See

15   S.E.C. v. Stratocomm Corp., No. 15-1538-CV, 2016 WL 3355378, at *1 (2d Cir. 2016)

16   ("[U]ntrue assertions, ambiguous statements, and half-truths can render a statement

17   misleading.").  Perhaps an investor would interpret the phrase as Plaintiffs suggest.  Or

18   perhaps it wouldn't.  At the pleadings stage, however, the Court cannot make this factual

19   determination.  Nor does the Court need to because, regardless, Plaintiffs do not plead a

20   strong inference of scienter.  See infra III.B.2.

21                      **b.    Eargo's characterization of the BCBS audit**

22          Plaintiffs also claim that Eargo did not timely reveal the BCBS audit and that they

23   mischaracterized and downplayed the audit to investors.  Opp. at 16.  Eargo disagrees and

24   asserts that it timely disclosed the insurance audit and its executives reasonably believed

25   that the audit was routine.  Eargo Reply at 8–9.

26          The Court finds that Plaintiffs have not adequately pleaded that Eargo should have

27   disclosed the BCBS audit in its Q4 2020 SEC Form 10-K.  The first BCBS letter to Eargo

28   requesting documentations was dated March 15, 2021 and sent via certified mail.

United States District Court
Northern District of California

20

1    Plaintiffs do not allege any facts suggesting that Eargo received the letter a day later after it

2    was mailed—i.e., on March 16, the day of the Q4 2020 filing.  Eargo disclosed the audit in

3    its next scheduled SEC filing on May 13, 2021.  See Compl. ¶ 230.

4         Furthermore, Plaintiffs fail to adequately plead that the Eargo executives did not

5    believe the insurance audit was routine.  BCBS's March 15 letter stated that the insurance

6    company was "required by federal mandates and state statutes to conduct audits and

7    reviews of claims. . . .  Accordingly, we are requesting your office to provide

8    office/medical records for [approximately 30] members showing all supporting

9    documentation."  Opp., Ex. A at 2.  Plaintiffs do not plead whether or how this letter

10   sounded any alarm at Eargo.

11        In making their argument, Plaintiffs put more weight on BCBS's March 22, 2021

12   letter.  This letter stated that the certain submitted claims were "for a non-covered service."

13   Id., Ex. B at 2.  But whether the March 22 letter pertained to Eargo is unclear because it

14   addressed another company.  Id., Ex. B at 2.  Eargo argues that this letter "was plainly sent

15   by mistake."  Eargo Reply at 7–8.  Plaintiffs do not plead how Eargo treated the March 22

16   letter.  Perhaps Eargo followed up with BCBS?  Or perhaps Eargo disregarded it?  It's

17   unclear.

18        Then came a third letter from BCBS on April 7, 2021.  This time, instead of saying

19   insurance claims were submitted for a non-covered service, the correctly addressed letter

20   stated that Eargo's claims "require additional review."  Opp., Ex. C at 2.  Importantly,

21   neither the March 15 letter nor the April 7 letter—letters that were unmistakably

22   addressing Eargo—said that BCBS was ceasing payment.  Rather, the April 7 letter stated:

23   "[E]ffective March 01, 2021, you will be required to supply supporting documentation

24   with all claims submitted."  Id. at 2.

25        A misleading statement is one that "affirmatively create[s] an impression of a state

26   of affairs that differs in a material way from the one that actually exists."  Brody v.

27   Transitional Hosps. Corp., 280 F.3d 997, 1006 (9th Cir. 2002).  Plaintiffs do not

28   adequately plead facts showing that Eargo's characterization of the BCBS audit was false

United States District Court
Northern District of California

1   or misleading at the time they made its SEC disclosure.  That is, Plaintiffs fail to plead

2   with particularity any facts showing that Eargo or its executives did not believe that the

3   audit was routine.  Moreover, Plaintiffs do not plead facts showing that Eargo immediately

4   knew that BCBS would freeze payments on all claims submitted since March 1, 2021.

5   BCBS's letters asked for additional documents on Eargo's submitted claims; they did not

6   expressly say that payment would cease.  And when the payment freeze became evident

7   later on, Eargo disclosed BCBS's nonpayment in August 2021 on its Q2 2021 SEC Form

8   10-Q—i.e., approximately four months after receiving the April 7 letter.

9           Though most of Eargo's statements about the BCBS audit were not false or

10  misleading, Plaintiffs do adequately plead that Gormsen downplayed the audit at the Wells

11  Fargo Investor Conference.  At the conference, Gormsen said, "[BCBS is] not questioning

12  claims, so we are not denying claims, they are not questioning product."  Eargo MTD, Ex.

13  I at 2.  Putting aside whatever Gormsen meant when he said "we are not denying

14  claims"—that is, whether he attempted to convey that BCBS was not denying claims or

15  that Eargo was not accepting insurance payments—his statement that BCBS was "not

16  questioning claims" could appear false or misleading to a reasonable investor.  The April 7

17  letter from BCBS expressly stated that "[Eargo's] billing activity shows non-compliance

18  with Blue Shield's payment policy and standards of industry billing, [so] Blue Shield will

19  be performing pre-payment reviews of your claims."  Opp., Ex. C at 2.  So contrary to

20  what Gormsen said at the conference, BCBS appears to be "questioning claims."

21          Regardless, as explained next, Plaintiffs fail to plead with particularity that the

22  Eargo Defendants acted with scienter.

23                          **2.      Scienter**

24          It takes more than identifying snippets from past misstatements to plead an

25  actionable Exchange Act claim.  A Section 10(b) claim must also "state with particularity

26  facts giving rise to a strong inference that the defendant acted" with scienter.  Tellabs, Inc.

27  v. Makor Issues & Rts., Ltd., 551 U.S. 308, 321 (2007); 15 U.S.C. § 78u–4(b)(2)(A).

28          Scienter is "a mental state embracing intent to deceive, manipulate, or defraud."

United States District Court
Northern District of California

22

1    Tellabs, 551 U.S. at 319.  To demonstrate scienter, a complaint must allege that the

2    defendants made "false or misleading statements either intentionally or with deliberate

3    recklessness." Zucco, 552 F.3d at 991.  Deliberate recklessness is not "mere recklessness."

4    Schueneman v. Arena Pharms., Inc., 840 F.3d 698, 705 (9th Cir. 2016).  It is more than

5    "mere recklessness or a motive to commit fraud." Id.  Deliberate recklessness is "an

6    extreme departure from the standards of ordinary care . . . which presents a danger of

7    misleading buyers or sellers that is either known to the defendant or is so obvious that the

8    actor must have been aware of it."

9        The "strong inference" standard under the PSLRA also "present[s] no small hurdle

10   for the securities fraud plaintiff." Zucco, 552 F.3d at 990.  A reviewing court must

11   "engage in a comparative evaluation [and] . . . consider, not only inferences urged by the

12   plaintiff . . . but also competing inferences rationally drawn from the facts alleged."

13   Tellabs, 551 U.S. at 314.  A securities-fraud plaintiff must meet this "high burden" to

14   survive a motion-to-dismiss challenge.  Prodanova v. H.C. Wainwright & Co., LLC, 993

15   F.3d 1097, 1106 (9th Cir. 2021).

16       For a host of reasons, Plaintiffs have not met this high burden of pleading a strong

17   inference of scienter.

18       First, Plaintiffs do not allege facts showing that any Eargo Defendants sold stocks

19   during the Class Period, and the absence of such insider trading "supports an inference of

20   no scienter." See In re Rigel Pharm., Inc. Sec. Litig., 697 F.3d 869, 884 (9th Cir. 2012)

21   ("[B]ecause none of the defendants sold stock during the period between the allegedly

22   fraudulent statements and the subsequent public disclosure. . . , the value of the stock and

23   stock options does not support an inference of scienter. . . .  In fact, it supports the opposite

24   inference."); accord, e.g., In re Solarcity Corp. Sec. Litig., 274 F. Supp. 3d 972, 1011

25   (N.D. Cal. 2017).

26       Second, Plaintiffs merely speculate that Gormsen and Laponis, as healthcare

27   industry veterans, knew—or it was reckless that they did not know—that Eargo's telecare

28   business model would not comport with the publicized insurance requirement that hearing-

aid benefits meet the criteria for "medical necessity." Opp. at 23–28. Plaintiffs' argument here is premised on their contested interpretation of BCBS's insurance policy that a hearing-aid prescription by a medical professional or audiologist is required. Plaintiffs do not adequately plead that the Eargo Defendants shared their interpretation of the BCBS policy or that Defendants even read the BCBS policy manual that was updated days before Eargo's IPO. See Hr'g Tr. 24:24–25:08.

Third, Plaintiffs make their allegations with the benefit of hindsight and after Eargo settled with the DOJ. They say that the DOJ made "findings" that Eargo submitted improper or false claims, and Eargo's "rapid and substantial" settlement with the DOJ are evidence of scienter. Opp. at 23–24. Not so. The DOJ made allegations. Allegations, of course, are not tested or adjudicated findings. A government investigation is not evidence of fraud, especially where the investigation ended with a settlement that disclaims liability. See Veal v. LendingClub Corp., 423 F. Supp. 3d 785, 811–12 (N.D. Cal. 2019) ("Plaintiffs may not allege 'facts' simply because they appear in [a government] Complaint.").

Fourth, Plaintiffs do not identify any facts suggesting that Gormsen or Laponis believed the BCBS audit was anything but routine.

Fifth, Plaintiffs do not offer any particularized allegation of what Eargo's January 2021 "internal review"—as referenced in the DOJ settlement agreement and press release—showed about Eargo's billing practices or that Gormsen or Laponis were even aware of such internal review. Plaintiffs' descriptions of this "internal review" are vague and merely borrow from the DOJ's unadjudicated allegations.

Finally, Plaintiffs attempt to invoke the "core operations doctrine." Opp. at 27–28. Under this doctrine, scienter may be inferred if the fraud is based on facts "critical to a business's core operations," such that the company's key officers would know of those facts. South Ferry LP, No. 2 v. Killinger, 542 F.3d 776, 783–84 (9th Cir. 2008). The proof required under this doctrine "is not easy": it requires "either [1] specific admissions by one or more corporate executives of detailed involvement in the minutia of a company's operations, such as data monitoring, or [2] witness accounts demonstrating that executives

had actual involvement in creating false reports." <u>Police Ret. Sys. of St. Louis v. Intuitive</u> <u>Surgical, Inc.</u>, 759 F.3d 1051, 1060 (9th Cir. 2014).  Courts applying the "core operations doctrine" have required plaintiffs to plead "details about the defendants' access to information within the company" related to the fraud.  <u>South Ferry</u>, 542 F.3d 776 at 785.

Here, Plaintiffs cannot rely on the "core operations doctrine" to save their case because the Complaint cites no particularized facts that the Eargo Defendants believed, or they were deliberately reckless in disbelieving, that its insurance submissions were false or improper.  There also are no corroborating witness statements that Gormsen and Laponis knew Eargo's telecare business model ran afoul of FEHBP insurance rules and still submitted the wrongful claims anyway.

Accordingly, after reviewing the Complaint, this Court finds that Plaintiffs have not pleaded particularized facts showing a strong inference of scienter with respect to any of the challenged statements.  Plaintiffs' Section 10(b) claim is therefore dismissed.

And because Plaintiffs have failed to state an underlying federal securities law violation, their Section 20(a) claim against a "control person" fails, too.  <u>See</u> <u>In re Rigel</u> <u>Pharms., Inc. Sec. Litig.</u>, 697 F.3d 869, 886 (9th Cir. 2012) ("Because Plaintiff here has failed to adequately plead a violation of the federal securities laws, it follows that Plaintiff also has failed to adequately plead violations of section 20(a).").

## IV.   CONCLUSION

For the foregoing reasons, the Court **GRANTS** Defendants' motions to dismiss with leave to amend.

Should Plaintiffs elect to file an amended complaint curing the deficiencies identified in this Order, Plaintiffs shall do so within 30 days of this Order.  Failure to meet the 30-day deadline to file an amended complaint or failure to cure the deficiencies identified in this Order will result in a dismissal with prejudice of Plaintiffs' claims. Plaintiffs may not add new causes of action or parties without leave of the Court or stipulation of the parties pursuant to Rule 15 of the Federal Rules of Civil Procedure.

**IT IS SO ORDERED.**

Dated: February 14, 2023



CHARLES R. BREYER
United States District Judge